William I. KOCH, et al., Plaintiffs,

v.

KOCH INDUSTRIES, INC., et al., Defendants.

No. 85–1636–SAC.

United States District Court, D. Kansas.

July 11, 1997.

**1466**

Harry Najim, Najim & Baker, Cliff Malone, Adams, Jones, Robinson & Malone, Wichita, KS, Kirkland & Ellis, Donald E. Scott, Denver, CO, Fred H. Bartlit, Jr., John T. Hickey, Jr., Alex Dimitrief, Chicago, for William I. Koch, Oxbow Energy, Spring Creek Art Foundation, Northern Trust.

Harry Najim, Najim & Baker, Cliff Malone, Adams, Jones, Robinson & Malone, Wichita, KS, Gregory Huffman, Frank L. Hill, Dallas, TX, for L B Simmons Energy, Gay A. Roane, Ann Alspaugh, Marjorie Gray, Marjorie Simmons, Paul Cox, Holly Farabee.

Harry Najim, Najim & Baker, Cliff Malone, Adams, Jones, Robinson & Malone, Wichita, KS, Russell E., Brooks, Milbank, Tweed, Hadley & McCloy, New York City, for Frederick Koch, U.S. Trust Co.

Robert L. Howard, James Armstrong, Foulston & Siefkin, Wichita, KS, Tim Mustaine, Donald L. Cordes, for Koch Industries, Charles G. Koch, David H. Koch, Donald L. Cordes, Thomas M. Carey.

## TABLE OF CONTENTS

I. BACKGROUND AND NATURE OF THE CASE ........................... 1468
II. SUMMARY JUDGMENT STANDARDS ................................ 1470
 A. Affidavits ......................................................... 1471
 B. Plaintiffs' Procedural Objections ...................................... 1472
III. STATEMENT OF GENERAL FACTS ................................... 1472
IV. LEGAL THEORIES ............................................... 1486
 A. Federal Securities Fraud ............................................ 1486
 B. Common-law Fraud ................................................ 1489
 C. Breach of Fiduciary Duty ........................................... 1490
 D. Breach of Warranty ............................................... 1491
 E. Materiality ....................................................... 1492
V. PINE BEND REFINERY ........................................... 1493
 A. Statement of Uncontroverted Facts .................................. 1493
 B. Scope of Claims .................................................. 1503
 C. Claim: Capacity as of the SPA ...................................... 1504
 1) Arguments ................................................. 1504
 2) Analysis ................................................... 1506
 D. Claim: Future Expansion Plans to 155,000 bpd ........................ 1507
 1) Arguments ................................................. 1507
 2) Analysis ................................................... 1509
 E. Claim: Future Expansion Plans to 175,000 bpd ........................ 1510
 1) Arguments ................................................. 1510
 2) Analysis ................................................... 1511
 F. Detrimental Reliance .............................................. 1511
 1) Arguments ................................................. 1511

 2) Analysis .................................................... 1512
 G. Claim: False Statements at the March 1983 Meetings and Material .. 1512
 Omissions Prior to the SPA
 1) Arguments ................................................. 1513
 2) Analysis ................................................... 1513
VI. CANADIAN AND UNITED STATES OIL AND GAS PROPERTIES ........ 1514
 A. Statement of Facts ............................................. 1514
 B. Claim: Cold Lake Reserves ...................................... 1527
 1) Undisclosed Development Activities ............................ 1528
 a. Factual Overview ......................................... 1528
 b. Arguments .............................................. 1528
 c. Analysis ............................................... 1530
 2) Reserve Changes ............................................ 1531
 a. Factual Overview ......................................... 1531
 b. Arguments .............................................. 1531
 c. Analysis ............................................... 1532
 C. Claim: Giltedge Producing Properties ............................. 1535
 D. Claim: Capa Madison Property ................................... 1538
 1) Fireflood project ........................................... 1538
 a. Factual overview ......................................... 1538
 b. Arguments .............................................. 1538
 c. Analysis ............................................... 1539
 2) Expected Value of the Capa Madison Unit ...................... 1539
 a. Factual Overview ......................................... 1539
 b. Arguments .............................................. 1540
 c. Analysis ............................................... 1541
VII. ABKO ........................................................... 1542
 A. Statement of Facts ............................................. 1542
 B. Claims ........................................................ 1551
 C. Arguments ..................................................... 1552
 D. Analysis ....................................................... 1553
 1) Reliance on $45 million valuation ............................ 1554
 2) Fair Market Value of Dealership Properties ................... 1555
 3) Defendants' Knowledge of Fair Market Value ................... 1557
 4) Plaintiffs' reliance on Report's Valuation ..................... 1557
VIII. ACCOUNTING .................................................... 1558
 A. Failure To Disclose Non–Recurring Expenses ...................... 1570
 1) Scope of Alleged Claim ...................................... 1571
 2) Arguments ................................................. 1572
 3) Analysis ................................................... 1573
 B. Capitalization Versus Expensing of Certain Refinery Expenditures ........ 1574
 1) Claim ..................................................... 1574
 2) Arguments ................................................. 1574
 3) Analysis ................................................... 1575
 C. Capitalization Versus Expensing of Interest on Construction Projects ...... 1577
 1) Claim ..................................................... 1577
 2) Arguments ................................................. 1577
 3) Analysis ................................................... 1577
 D. Accounting for the Loss on Blue Hill ............................. 1579
 1) Claim ..................................................... 1579
 2) Arguments ................................................. 1579
 3) Analysis ................................................... 1580
 E. Accounting for Refinery Turnaround Expenses ..................... 1580
 1) Claim ..................................................... 1580
 2) Arguments ................................................. 1581
 3) Analysis ................................................... 1581
IX. STATUTE OF LIMITATIONS ON CLAIMS AGAINST THE DEFEN-
 DANTS CAREY, CORDES AND DAVID KOCH ........................ 1583

*MEMORANDUM AND ORDER*

CROW, Senior District Judge.

For some time, the court has had pending before it the defendants' motion for summary judgment (Dk.580). By any standards, the briefs and exhibits filed in conjunction with this summary judgment proceeding are extraordinary. The defendants' memorandum in support of its motion (Dk.581) consists of 138 pages, the plaintiffs' memorandum in opposition (Dk.597) is 150 pages, the defendants' reply memorandum (Dk.602) is 75 pages. The plaintiffs' "Objections to Impermissible Evidentiary Arguments and Response to New Matters in Defendants' Reply Brief" (Dk.605), which is in effect a surreply brief, is 20 pages. The defendants' response (Dk.608) to the surreply is another 12 pages. The defendants' motion and reply and the plaintiffs' opposing memorandum are supported by statements of fact that total more than 400 pages. Behind each statement of facts are exhibits that total close to 10,000 pages. All together, the memoranda and exhibits take up more than twelve feet of shelf space in the court's library. Accordingly, it seems an understatement to say only that the parties inundated the court with material.

Reasons for the delay go beyond the sheer volume of material filed. The issues and arguments advanced and the factual detail presented in support of them were unusually complex. More often than revealed in this order, both parties expected the court to evaluate arguments without the benefit of a full background explanation of the relevant operating concepts and principles involved in refinery operations, oil and gas exploration, real estate ventures, and accounting matters. Other circumstances also contribute to the complexity of this motion. The plaintiffs' claims span a period of years. Each area of claims has its own group of witnesses, most of whom are unable to recall the pertinent events and details that occurred more than a decade ago. Consequently, both sides focus the dispute in many instances over the possible interpretations of notes, reports, summaries and forms and over the possible inferences to be drawn from them. For this same reason, expert witnesses take on more importance as does the court's role in assessing the reasonableness of the inferences underlying the expert opinions being offered. This also makes it critical for the court to understand the purpose and use of the different documents. The court's work in this regard was frustrated by both sides' less than exemplary work in citing all of the necessary evidence and testimony.

Finally, the court has spent an undue amount of time discerning the scope of the plaintiffs' pleaded claims. As discussed later, the plaintiffs unabashedly shift the focus on several of their claims from what they initially alleged in their amended complaints and explained in their motions to amend. The defendants on several occasions express surprise at what the plaintiffs now clarify as their claims. The plaintiffs explain some changes to be the result of learning additional facts during discovery. Other changes, however, seem more like questionable efforts to revive a dying claim.

To the reader, it may seem no issue goes without comment in this order. The court, however, deliberated on several more issues than are discussed in this tome. Had every issue been addressed here, this order would be longer by several hundred pages. The court confined itself to what are the central matters behind its ruling. Thus, the parties may infer that all issues and arguments have been considered and impliedly decided consistent with the court's ultimate ruling on the relevant claim.

## I. BACKGROUND AND NATURE OF THE CASE

William and Frederick Koch and the other plaintiffs sold back to Koch Industries, Inc. ("KII") all of their common stock which was approximately 47.8% of the total common stock outstanding. By the terms of the Stock Purchase Agreement ("SPA") executed on June 4, 1983, and closed on June 10, 1983, each plaintiff received a cash payment of $200 per share of common stock, an amount equal to par value for the preferred stock owned, dividends on the common and pre-

ferred prorated to the date of the Stock Purchase Agreement, and interest from such date to the date of closing. The total cash consideration paid by KII to or for the benefit of the plaintiffs was $1.106 billion. In addition, the plaintiffs received a distribution of their pro-rata share of some offshore oil exploration property. As a result of this transaction, William and Frederick Koch severed their financial ties to the corporation started by their father and left its management in the hands of their brothers, Charles and David Koch.

Less than six months after the deal was consummated, William began an investigation to determine whether he had been defrauded. From his investigation, William believed KII had retained an undisclosed interest in an oil and gas concession in Qatar. After an inquiry from William's counsel and assurances from KII's counsel, the plaintiffs commenced this action in June of 1985 alleging fraud in connection with Qatar and two other assets (Capa Madison Unit and the Bates & Reimann wells) and alleging a general conspiracy to defraud the selling shareholders.[1] On the defendants' motion, the court granted summary judgment in November of 1986 on the plaintiffs' claims concerning Koch Qatar and the Bates and Reimann wells, but denied summary judgment on the Capa Madison Unit. (Dk. 103).

After unsuccessfully asking the court to reconsider its ruling or, alternatively, to allow the plaintiffs to amend their complaint, the plaintiffs filed with the Tenth Circuit a writ of mandamus, which was denied. The plaintiffs then filed a new action against KII and other defendants in federal court in Kansas City, Kansas. Judge Saffels dismissed the Kansas City suit, as an improper attempt to split causes of actions arising from a single wrong which should be prosecuted in a single action. The Tenth Circuit subsequently affirmed this dismissal. The plaintiffs' efforts to find relief through other tribunals ended with William Koch's attempted counterclaim in an action brought by Charles and David against William for breach of an agreement to divide family real estate and a coin collection. Judge Kelly dismissed the William's counterclaim for the same reasons earlier stated in Judge Saffels' order.

The plaintiffs filed another motion for leave to file a second amended complaint. This time the court permitted the plaintiffs to add some allegations. (Dk. 172). The plaintiffs' second amended complaint added allegations and later amended them concerning Pine Bend Refinery, the value of certain Canadian oil and gas properties, accounting policies and practices underlying KII's financial statements. The court subsequently limited the scope of these new allegations, as the plaintiffs had filed a second amended complaint that exceeded the scope of the court's leave. (Dk. 386). The plaintiffs again sought leave to amend their second amended complaint with respect to their accounting allegations. (Dk. 419). The court granted the plaintiffs' leave to add some of these accounting allegations subject to certain conditions. (Dk. 505). Thereafter, the parties timely completed their remaining discovery and completed their briefing of the pending matters.

To the plaintiffs, this case is "a straightforward attempt to remedy" fraud and breaches of warranties and fiduciary duties. (Dk. 597 at 148). Involving more than a "billion dollars," this case is not a "family vendetta." (Dk. 597 at 3). Indeed, the "huge sum" of money at stake more than explains the plaintiffs "dogged persistence" in prosecuting their allegations. (Dk. 597 at 3–4). The plaintiffs deny that their case is about "family relationships" but admit that the case is "made more painful because of those relationship." (Dk. 597 at 4).

The defendants paint a much different picture of the same subject. From the lengthy procedural history and the uncontroverted facts, the defendants see a "lawsuit ... fueled by the one-sided vendetta of William Koch against his brothers, Charles and David, and the company they now substantially own." (Dk. 581, p. 135). They realize that the $435 million from the SPA has im-

---

**1.** The court found that the plaintiffs had not satisfied the requirements of Rule 9(b) with respect to allegations concerning the Giltedge field, Cold Lake, the Pine Bend Refinery, and other financial and/or accounting discrepancies. (Dk. 103).

munized William from the ordinary monetary restraints inherent in litigation. According to the defendants, William has "set out on a course of action to sponsor litigation which, as of this date, has occupied the time and attention of at least 25 federal and state judges in nine different proceedings." (Dk. 581, p. 137). In this case, William has proven himself financially able and willing to add and drop law firms and experts to his litigation team. Indeed, the plaintiffs' current testimonial experts have charged over $1.5 million for their opinions. After poring over KII records in search of claims, William's litigation team has pleaded some claims that it has forced to abandon and has shifted the focus of other claims to fit the most recent expert opinions. The defendants say this extraordinary effort simply reveals that the plaintiffs have no valid claims.

There is little about this case that is ordinary, plain, or straightforward. With over one billion dollars at stake and both sides being well-heeled for litigation, even what should be simple or ordinary has become complex and extraordinary. Even so, the court believes both sides have had a fair opportunity for discovery and for presenting their positions in this summary judgment proceeding. Moreover, the court believes it has taken the time and made the effort to consider carefully the arguments and issues presented for its ruling.

> Sometime ago in an order, the court said:
>
> It is no secret that the courts have become the stage for the unraveling of a family. There are indications that harbored ill feelings have created and fueled expensive and time-consuming litigation in the courts, as well as, much publicized proceedings within other branches of government.

(Dk. 172 at 16). The court summarized its observations in a later order noting that the "case is obviously driven by family spite and is undeterred by general financial considerations." (Dk. 386 at 16). While it has recognized what it believes to be the obvious, the court has done so only when the plaintiffs' motives for pursuing the action or for filing a motion were a relevant consideration. For purposes of this motion, the court does not consider the plaintiffs' motives for bringing this suit to be a factor of much relevance.

## II. SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that

party's favor.'"[2] *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

### A. Affidavits

 Both sides challenge one or more affidavits submitted by the other side. To satisfy Rule 56(e) standards, affidavits must "be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein." *Conaway v. Smith,* 853 F.2d 789, 792 (10th Cir.1988). A statement merely indicating that a purported affidavit is based upon "information and belief" is insufficient. *Price v. Rochford,* 947 F.2d 829, 832–33 (7th Cir.1991). "'[G]eneralized, unsubstantiated, non-personal affidavits are insufficient....'" *Thomas v. International Business Machines,* 48 F.3d at 485 (quoting *Stevens v. Barnard,* 512 F.2d 876, 879 (10th Cir.1975)). The object of Rule 56(e) "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Na-*

*tional Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). Affidavits offering only "'conclusory allegations without specific supporting facts have no probative value.'" *Nichols v. Hurley,* 921 F.2d 1101, 1113 (10th Cir.1990) (quoting *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985)). Conclusory statements going to ultimate issues are not adequate to avoid summary judgment. *Nichols v. Hurley,* 921 F.2d at 1114. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page,* 715 F.2d 1238, 1243 (7th Cir.1983), *cert. denied,* 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984).

 "'Generally, a witness' affidavit may not be disregarded simply because it conflicts with a prior deposition." *Independent Drug Wholesalers Group, Inc. v. Denton,* 833 F.Supp. 1507, 1520 (D.Kan.1993) (citation omitted). Some discrepancies simply go to the weight of the evidence and to the credibility of the witness. *Durtsche v. American Colloid Co.,* 958 F.2d 1007, 1010 n. 2 (10th Cir.1992). Courts should approach these discrepancies in a pragmatic fashion:

> "A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.
>
> . . . .
>
> The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness ... was stating the truth."

*Bank of Illinois v. Allied Signal Safety Restraint Systems,* 75 F.3d 1162, 1169–70 (7th

---

**2.** "[T]he nonmoving party need not produce evidence 'in a *form* that would be admissible at trial,' ..., but the content or substance of the evidence must be admissible." *Thomas v. International Business Machines,* 48 F.3d 478, 485 (10th Cir.1995) (citations omitted).

Cir.1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986)).

On the other hand, a court must remain on guard against tolerating a practice which could undermine " 'the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses.' " *Bank of Illinois v. Allied Signal Safety Restraint*, 75 F.3d at 1169 ("[T]he rule applies only to cases in which the statements are inherently inconsistent and in which the contradiction is not the result of an honest discrepancy or newly discovered evidence.") (quoting *Babrocky v. Jewel Food Co. & Retail Meatcutters Union*, 773 F.2d 857, 861 (7th Cir.1985)). " '[C]ourts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue.' " *Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir.1995) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)). In determining if a sham fact issue exists, the court weighs the following factors: "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks*, 796 F.2d at 1237; *see Rios*, 67 F.3d at 1551.

### B. Plaintiffs' Procedural Objections

The plaintiffs object that the defendants' five sets of uncontroverted facts: (1) include sentences unsupported by a citation to the record; (2) are packaged in an argumentative fashion; (3) cite inadmissible evidence; (4) cite information relative to matters outside the discoverable period of 1981–1985 [3]; and (5) cite their own self-serving statements to support summary judgment.

The court was mindful of these objections in finding the uncontroverted facts material here. Other than to say that the court's findings necessarily reflect its rulings on these different objections, the court shall not address them specifically.[4]

### III. STATEMENT OF GENERAL FACTS

1. Koch Industries, Inc. ("KII") is a diversified energy company based in Wichita, Kansas. During the period here in controversy, it employed about 7,000 persons and owned and operated a variety of assets including, but not limited to, refineries in Pine Bend, Minnesota and Corpus Christi, Texas; refined products terminals and service stations throughout the United States; a gas fractionation plant in Medford, Oklahoma; several thousands of miles of crude, refined product and natural gas liquids pipelines in the United States and Canada; a fleet of trucks engaged in hauling crude oil; natural gas liquids and refined products; petroleum coke trading facilities; coal mines; oil and gas exploration properties; gas processing plants; manufacturing facilities in the United States, Canada and Italy; ranches in Texas and Montana; and several hundred Chrysler automobile dealership facilities located throughout the United States.

2. As of December 31, 1982, KII had a book net worth of $1.54 billion and had just completed a record year, earning an after tax amount of $309 million. Its outstanding capital stock consisted of preferred stock, having an aggregate par value of $26.6 million, and 11.4 million shares of common stock, having a book value of approximately $133 per share.

3. As of June 4, 1983, the plaintiffs owned preferred stock having an aggregate par val-

---

**3.** On several occasions, the defendants cite testimony and documents concerning facts or circumstances outside the discoverable time frame set by the Magistrate Judge. For purposes of this summary judgment ruling, the court shall consider such matters only if they appear to be have been produced and/or discussed during discovery.

**4.** The court did not consider the defendants' statements which were not supported by a record citation, unless the plaintiffs otherwise chose not

to controvert the statement. The court also disregarded any statements which were found to be supported only by evidence which would be inadmissible at trial. Summary judgment evidence need not be " 'in a form that is admissible at trial,' *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, but the content or substance of the evidence must be admissible." *Thomas v. International Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995) (citation omitted).

ue of $10.6 million and 5.46 million shares of common stock, approximately 47.8 percent of the total common stock outstanding. Under the terms of the Stock Purchase Agreement ("SPA"), each plaintiff received a cash payment of $200 per share of common stock, an amount equal to par value for the preferred stock owned, dividends on the common and preferred prorated to the date of the Stock Purchase Agreement, and interest from such date to the date of closing. The total cash consideration paid by KII to or for the benefit of the plaintiffs was $1.106 billion. In addition, the plaintiffs received a distribution of their pro-rata share of Hueso.

4. This action was commenced on June 7, 1985.

5. In addition to KII, the defendants consist of Charles G. Koch (Charles), David H. Koch (David), Sterling V. Varner (Varner), Tom M. Carey (Carey) and Donald L. Cordes (Cordes). During the times relevant hereto, Charles was a director of KII and was its chief executive officer, Varner was a director of KII and was its president, David was a director of KII and was an executive vice president, Carey was vice president of finance of KII, and Cordes was vice president of legal affairs of KII.

6. The plaintiffs herein consist of basically three groups of former stockholders of KII:

*William I. Koch*

Related parties: Oxbow Energy, Inc.
Spring Creek Art Foundation, Inc.
Northern Trust Company

*Frederick R. Koch*

Related parties: The Fiduciary Trust Company International as Trustee

*Simmons Family*

Related parties: L.B. Simmons Energy, Inc. d/b/a Rocket Oil Company
Marjorie Simmons Gray
Gay A. Roane—daughter of Marjorie Gray
Ann Alspaugh—daughter of Marjorie Gray;
wife of James P. Linn
Louis Howard Andres Cox
Paul Anthony Andres Cox
Holly Antoinette Andres Cox Farabee
Ronald W. Borders, Trustee

7. Fred C. Koch founded KII and actively participated in its affairs until shortly before his death in 1967. He and his wife, Mary, had four children of their marriage. The eldest is Frederick R., followed by Charles and then the fraternal twins, David and William. In 1966 and 1967, Fred C. Koch gave all of his common shares of stock in KII to newly created trusts for each of his four sons. Such gifts were in equal amounts except that Frederick was not included in the gifts of stock made in 1967 with the result that Frederick's stock interest in KII was always less than that of the other three brothers.

8. During all times relevant to the issues in this case, until the closing of the Stock Purchase Agreement in June 1983, Charles, David and William each owned a little over 20 percent of the issued and outstanding common stock, voting and nonvoting, and Frederick owned a little over 14 percent.[5] The balance of the common stock (about 25 percent) was owned by the Simmons family (13 percent), the family of J. Howard Marshall II who was a member of the Board of Directors (about eight percent), and by employees and others (about four percent).

9. Charles began working for KII in 1961. He was made an officer in 1962 and

---

**5.** A substantial portion of the stock ownership of the four Koch brothers was in the trusts created by Fred C. Koch in 1966 and 1967. The income of the trusts was to be paid to charity for 20 years, and at the end of the time, the principal was to be paid to the Koch son/beneficiary or, if he was not alive, to his issue, or, if there be none alive, to the other brothers or their issue. Each Koch brother was a co-trustee of his own trust along with The First National Bank of Wichita.

was elected as president in 1966. In 1967, after the death of Fred C. Koch, Charles became chairman of the Board, a position he has held continuously since that date. David began working for KII in 1970 and has remained its employ to this date. He presently serves as executive vice president of the chemical technology group of KII and is in charge of the equipment manufacturing businesses.

10. William became a full time employee of KII in 1974. Prior to that he had attended the Massachusetts Institute of Technology from which he received bachelor, masters and doctorate degrees in chemical engineering in 1962, 1963, and 1971. While attending graduate school he worked one summer at the Pine Bend refinery in its engineering department. Between 1967 and 1974, William operated a venture capital company owned by himself, Charles and David, the purpose of which was to find high technology businesses for personal investment for the three brothers and for KII. In 1976, he became head of the Koch Carbon group, and in 1979, he was elected to the position of vice president of corporate development for KII. William continued in both positions until his employment was terminated in December 1980.

11. Charles, David and William served on the Board of Directors of KII since at least 1967, and between the years 1976 and 1980, the three of them also served on an executive committee of the Board. William resigned his position as a director on the closing of the Stock Purchase Agreement on June 10, 1983.

12. Frederick has never been active in the company, never attended stockholder meetings and never asked to have a representative on the Board of Directors of KII until March of 1981, when he caused S. Hazard Gillespie, a retired partner of the prominent New York law firm, Davis, Polk & Wardwell, to be nominated and elected as a director. Mr. Gillespie served as a director until his resignation on June 10, 1983, on the closing of the Stock Purchase Agreement.

13. The Simmons family acquired their interest in KII in the decade between 1940 and 1950 and have had a representative on the Board since that date. Mrs. Marjorie Simmons Gray was a member of the Board from 1967 until March 1981, when her family caused James P. Linn to be elected to the Board of Directors as a representative of the Simmons family. Mr. Linn is an attorney with an Oklahoma City law firm and, at that time, was the son-in-law of Mrs. Gray. Mr. Linn continued to serve as a director until the closing of the Stock Purchase Agreement on June 10, 1983.

14. At the Board of Directors meeting in March of 1980, William Koch proposed that the Company study stockholder liquidity. The Board discussed and informally approved the concept of studying ways to improve liquidity and cash flow for KII stockholders. The Board took no formal action during the meeting. In August of 1980, the Board of Directors discussed the matter further. Thereafter, Charles Koch developed an estate planning and liquidity program for the purpose of seeking ways to improve liquidity and cash flow to the stockholders of KII and to assist them in their estate planning needs. Pursuant to that program, Carey and Cordes arranged personal meetings with each of the principal stockholders to ascertain their needs and desires. On October 28, 1980, Carey and Cordes submitted a report to Charles Koch as to their findings and conclusions. Three days later, Charles sent to the principal stockholders of KII a copy of this report along with a questionnaire soliciting their views on the subject of going public and whether they would be willing to sell some of their stock in a public offering.

15. During the summer of 1980, William Koch had been talking to his brother, Frederick, to members of the Simmons family, and to the two sons of Howard Marshall II (E. Pierce Marshall and Howard III), about some ongoing concerns with Charles' control and management of the company. By the fall of 1980, William believed he had a defined group of "proponents" who were in favor of some changes on the Board of Directors. After reading Charles' letter dated October 31, 1980, and its enclosures, William was concerned that the proponents' plans might be upset if voting stock were sold to the Employee Stock Ownership Plan. William was also concerned by an agenda item for the

December 1980 Board of Directors meeting that proposed changing the non-voting common stock to voting stock. William believed this latter change would divest the two Marshall sons (who had been given voting stock by their father but had only a modest amount of non-voting stock) of their swing vote position (one voting share for 20 non-voting shares). After the letter dated October 31 was mailed, William talked to each member of his group and decided they needed to act then to change the Board of Directors. Howard Marshall III agreed with the proposal, and on November 25, 1980, William, Frederick, the Simmons family and J. Howard Marshall III, believing they controlled over 50 percent of the voting stock, issued a notice for a special meeting of stockholders of KII to be held on December 5, 1980 for the purpose of (a) removing the existing Board of Directors, (b) expanding the Board from seven members to nine members, (c) electing members to the newly expanded Board, and (d) making certain by-law changes. As of that time, the seven Board members of KII consisted of Charles, David, William, Varner, Carey, Marjorie Simmons Gray and J. Howard Marshall II.

16. William knew that the proponents did not control the necessary number of shares to elect a new Board unless they obtained a proxy from the First National Bank of Wichita as trustee under the trusts created by Fred C. Koch for William and Frederick. In November of 1980, William contacted the bank and asked for and received their proxy for the purpose of adding two new directors. He did not tell them that any directors would be removed. The trustee later revoked its proxy by letter dated December 1, 1980, stating in part that the purpose for the meeting as reflected in the Notice of Special Meeting "transcends those referred to in prior conversations and communications with William I. Koch; particularly, the stated purposes of voting on a motion to remove from office the entire Board of Directors." (DX–Gen 19).

17. Charles and David knew that the four percent of Koch's voting stock owned by Howard Marshall III represented the controlling interest which they needed as part of their group to remain majority shareholders. Charles and others arranged for Howard Marshall II to discuss with his son the situation and eventually purchase back all of his son's shares in KII for a total purchase price of $8 million. The effective selling price was $207 per share of common stock, voting and non-voting. Charles and David personally loaned the money to Howard Marshall II for the purchase of these shares. Howard Marshall II sold the shares to Charles and David several days later for the same price that he had bought them from his son.

18. On December 2, 1980, William cancelled his call for a special meeting.

19. At a special meeting of the Board of Directors on December 5, 1980, Varner "advised ... that Mr. William I. Koch had been requested to resign from certain offices and directorships in this corporation and certain of its subsidiaries," but that he had refused. Varner proposed a resolution adopted by a majority of the Board that terminated William as an employee and officer of KII and its subsidiaries.

20. Because of the sale and purchase of the voting stock held by J. Howard Marshall III and because of the assumption that the First National Bank of Wichita would vote the shares in trust in accordance with the desires of the remainderman of each trust, the voting percentage of William, Frederick, the Simmons family and related parties (hereinafter the "dissidents") dropped to approximately 47 percent and the voting percentage of Charles, David and the Marshalls was at 49.7 percent, with the remaining shares owned by employees and others.

21. During a telephone conference between Jim Linn and Cordes on December 2, 1980, it was agreed to meet and discuss making a deal to resolve the dispute. Cordes and Carey flew to Oklahoma City on December 10, 1980, to meet with Jim Linn and representatives of Frederick and William for the purpose of negotiating a deal. Although Linn had advised Cordes that everyone would be there and that they would have their "trading hats on," no one was present at the meeting except for Linn, Marjorie Simmons Gray and one of her grandchildren. William did not come to the meeting, al-

though he was in Oklahoma City at the time. At the meeting, Cordes and Carey outlined a proposal for purchasing one-half the dissidents' shares now at a price of $140 and then either going public or purchasing the other one-half later on a formula price.

22. In early 1981, KII entered into preliminary negotiations with Kerr McGee, an Oklahoma based oil and gas company that was publicly held. A representative of Kerr McGee approached KII about a possible merger that offered benefits to both companies, including a public market for the dissidents' shares. The Descriptive Memorandum of KII, which was later furnished to the investment bankers in 1981 and 1982, was initially prepared for the Kerr McGee negotiations. KII endeavored to follow the full disclosure rules of the Securities and Exchange Commission in preparing the Descriptive Memorandum. The negotiations eventually stalled as Kerr McGee's offers had valued KII's shares in the range of $130 per share while KII's offers had valued KII's shares in the range of $160 per share.

23. In early 1981, William employed the New York law firm of Davis, Polk and Wardwell ("Davis Polk") to represent him in his dealings with KII. Representatives of that firm met with Cordes in early 1981 and urged him to employ a New York investment banking firm to evaluate KII and propose a solution. In April 1981, KII agreed to Davis Polk's approach and looked for an investment banking firm. While preferring Lehman Brothers Kuhn Loeb ("Lehman"), KII employed Morgan Stanley & Company ("Morgan Stanley") as Frederick and William preferred them. The purpose of Morgan Stanley's study was to arrive at its opinion of the probable price which KII stock would bring if publicly traded and to resolve other matters and concerns with taking KII public. Lehman simultaneously conducted a similar study apparently at no charge to KII.

24. Morgan Stanley and Lehman concluded their studies by the middle of May 1981. Morgan Stanley presented their results in a meeting with representatives of KII and the dissidents on May 18, 1991. Morgan Stanley opined that KII stock would sell for between $150 to $170 per share in a secondary offering. Lehman's numbers, $140 to $160 per share, were presented to the Board at its meeting in May, along with a summary comparison of the two studies. Both firms had conducted asset valuations. Morgan Stanley had concluded that Koch's assets were worth $197 to $299 per share, and Lehman's range was $185 to $216 per share. Charles told the Board in May that Morgan Stanley's values were too high as they had not accounted for working capital. Charles also reported to the Board that Morgan Stanley believed KII's value was contingent upon the continuity of current management and its clear control of KII, that Morgan Stanley had said the Company was a "great private company and should stay that way," and that Lehman had said the Company should not go public "unless it really needs to." (PX 8, ¶ 16).

25. Immediately following the Board meeting in May of 1981, Cordes outlined a proposal to William Koch, James Linn and S. Hazard Gillespie, the effect of which would be the dissidents would exchange their voting shares for nonvoting shares from Charles, David, and J. Howard Marshall II. A registration statement would then be filed covering the nonvoting shares held by the dissidents plus an additional 100,000 shares offered by David and Charles. Cordes submitted this written proposal to Davis Polk on May 28, 1981. On July 30, 1981, Davis Polk responded that William agreed in principle with the proposal, subject to working out the details, but only if KII purchased up to 1,000,000 shares from the plaintiffs "at a price which would represent a premium over the public offering price." Davis Polk further suggested that William's sale of stock could be in exchange for the stock of Koch Carbon and for the specialty division of Koch Chemical. Cordes met with Davis Polk lawyers on August 26, 1981, and outlined KII's proposed valuation of Koch Carbon and the amount of working capital it would contribute to Koch Carbon and the Boston division of Koch Chemical. Cordes also proposed an exchange of these two business assets for about 555,000 shares of stock. After this meeting, there were no further negotiations with Davis Polk attorneys.

26. In October 1981, William and representatives of the other plaintiffs began having meetings with Goldman Sachs & Co., a Wall Street investment banking firm, for the purpose of employing that firm to advise the plaintiffs. In October 1981, William considered litigation against KII as one of his possible options. At the recommendation of Goldman Sachs, William was put in touch with Arthur Liman of the New York City law firm of Paul, Weiss, Rifkind, who had a reputation as a skilled business litigator. William employed Liman on a contingency fee arrangement similar to one that is described below between William and Goldman Sachs.

27. In December 1981, the dissidents/plaintiffs entered into a voting trust agreement which, among other things, provided that no beneficial owner of the stock subject to the voting trust could sell any KII stock, voting or non-voting, unless approved by all of the trustees of the voting trust, except that only a majority of the trustees need approve if all of the participants in the voting trust were given an equal chance to sell on the same terms.

28. Eleven months earlier in January of 1981, Charles, David, J. Howard Marshall II, and Varner entered into a voting trust agreement in which they agreed that a majority of them would determine how all shares held in trust would be voted for nominees to the Board and for other matters that would frustrate the purpose of the trust.

29. On February 4, 1982, William and the other dissidents formally employed the New York City investment banking firm of Goldman Sachs & Co. ("Goldman Sachs") to represent them. The engagement letter recites that Goldman Sachs was to represent the dissidents:

> ... in negotiations looking to (i) the possible sale of all or a portion of the capital stock of Company held by [them] ... by way of redemption, exchange of stock for assets, public offering or otherwise, (ii) the possible acquisition by the [dissidents] or the Company of all or a portion of the capital stock of the Company not owned by the [dissidents] by way of redemption, exchange of stock for assets or otherwise and/or (iii) the possible sale of the Company, by way of merger, a sale of all or a portion of the assets or stock of the Company or otherwise.

(DX–Gen 39, PW 00185). The engagement letter also provided that the fee to Goldman Sachs would be .50% of the first $150 per share of the aggregate consideration received by plaintiffs in any transaction plus 1.5% of the aggregate consideration in excess of such amount. Based on that formula, Goldman Sachs would have been entitled to a fee of over $8 million based on the $200 per share price obtained in the SPA.

30. In the early part of 1982, Cordes spoke with Linn to ascertain what had happened to the negotiations with Davis Polk. Linn advised that William had retained Arthur Liman of Paul, Weiss, Rifkind law firm in New York City. Linn further advised that they still wanted to find a resolution to the stockholder dispute. Linn and Cordes agreed to meet immediately after the next KII Board meeting scheduled for March 6, 1982. A meeting was held in New York City on March 10, 1982 at the offices of Paul, Weiss, Rifkind. Each of the parties was represented at such meeting by counsel. In addition, representatives of Goldman Sachs, as the investment banker for the plaintiffs, and Lehman Brothers, as the investment banker for KII, were at the meeting. It was agreed that all negotiations between the parties should be conducted by the investment bankers, that the existence of such negotiations should be kept confidential to protect the interests of the Company, and that the factual investigation required by the investment bankers would take about six weeks.

31. Goldman Sachs was considered one of the leaders in the investment banking industry. In its 1982 Annual Report, Goldman Sachs quoted the *Wall Street Journal's* appraisal of Goldman Sachs as "an adviser in more merger and acquisition transactions than any other firm on Wall Street." (DX–Gen 43, p. 35). Under the leadership of Steve Friedman, currently the co-chairman of Goldman Sachs, Goldman Sachs put together a six person team to conduct the study of KII and advise the plaintiffs on valuation and strategy. It was the function of the Goldman Sachs team to gather infor-

mation, conduct interviews of management, review documents and then analyze the data accumulated. This process began on March 11, 1982 when the Goldman Sachs team compiled a preliminary information request to be delivered to KII, consisting of twenty-five items of information and data, including annual, quarterly and monthly financial statements, oil and gas reserve reports, refinery operating data, pipeline information, real estate evaluations, corporate and personnel organization charts, description of activities of each subsidiary, tax information, crude oil purchase and sales agreements, and several other areas of information. This preliminary information request was delivered to William for his comments and, after taking several of his suggestions, the final list was sent to KII on March 13, 1982. Goldman Sachs sent its information requests to KII by mail directed through Cordes, and he took the lead in responding. KII also delivered its Descriptive Memorandum, which had been prepared during the Kerr McGee negotiations, along with a supplement dated April 1982. In addition, the Goldman Sachs team received information from the following sources:

(a) William provided files he had accumulated over the years including projects approved by the Board of Directors, exploration reports, maps, minutes, the Chrysler Realty (ABKO) acquisition, refinery expansion, etc., consisting *of some* 37 different subject matters. In addition, William briefed the Goldman Sachs team verbally on his knowledge of KII, including background on the heads of the various operating groups.

(b) The Goldman Sachs team met with members of KII management on several occasions. At those meetings, the Goldman Sachs team not only heard presentations from various KII personnel, but they received additional documents from them and were afforded and exercised the opportunity to ask detailed questions of both the KII employees and of their public accountants. The KII personnel participating in those meetings included: Charles; Varner; T.M. Carey, vice president-finance; B.A. Paulson, vice president-refining; W.W. Hanna, vice president-marketing; Joe Moeller, refined products marketing; Bill Hougland, vice

president-crude oil purchasing; Wes Stanford, vice president-oil field services; Bill Cummings, vice president-equipment manufacturing; R.W. Walton, vice president-exploration; Bud Ziser, Chick McCormick, and John Carraway of Koch Exploration; C.J. Nelson, president of ABKO; David Koch, vice president-chemical technology group; C.C. McCampbell, vice president-hydrocarbon group; George Ablah-chief executive officer-ABKO; Milton H. Hall, vice president; Donald L. Cordes, vice president-legal affairs. Mr. Eckert, the senior finance man on the Goldman Sachs team, testified that there was extensive questioning, that they were given a lot of detail, and that the KII personnel were trying to present the company in a light most favorable to them. Eckert also stated that he could not recall any question or information request to which they did not receive a satisfactory answer.

(c) KII also provided additional detailed information in a data room created specifically for the Goldman Sachs study. A great deal of detailed financial information was in the data room, and the Goldman Sachs team members were allowed and did take detailed notes. The data room included, in part: the quarterly review meetings for the third quarter of 1981 for the more than 30 operating divisions of KII, year end 1981 financial statements for all of such divisions, and many other documents such as lifting costs for the Canadian exploration division, operating expenses for the Pine Bend refinery, over/short reports for Koch Fuels, computer runs for each dealership of ABKO, and fourth quarter systems reports for Koch Oil Company and related pipeline operations.

(d) The Goldman Sachs team also searched financial and industry literature, such as the *Oil and Gas Journal,* for information that would relate to the study of KII. The team consulted with persons outside its members, such as Ray Hansen concerning oil and gas properties and Mr. Ballard concerning real estate.

32. On June 10, 1982, William and Arthur Liman had a meeting at which Goldman Sachs presented the first results from their study. At that meeting, Goldman Sachs presented tables and other materials. William

asked a lot of questions and requested that Goldman Sachs also perform comparisons with Morgan Stanley's valuation and others, more thorough evaluation on price/earnings rations, and discounted cash flow analyses with sensitivities for margin and volume.

33. Goldman Sachs completed the additional requested work, dated it June 18, 1982, and labelled it as the "Monday package." On Monday, June 21, 1982, members of Goldman Sachs merger department met to review the package for purposes of expressing opinions on value.

34. The Monday package consisted of almost 100 pages and contained a narrative description of KII; its historical earnings and balance sheets from 1977 through and including the plan for 1982; the footnotes to its audited financial statements; the latest financial statements (April 1982); financial comparisons with 11 other publicly held oil and gas companies; comparisons with certain acquisitions transactions involving oil and gas companies; a preliminary list of potential buyers of KII and/or its businesses; an analysis of the value of KII ranging from a low of $1.3 billion to $2 billion; and a separate analysis of the major segments of KII's business (including the oil gathering, refined products group, the hydrocarbons group, and the chemical technology group) which included a narrative description, historical financial data, comparisons with other companies, lists of potential buyers and range of values.

35. Following the Monday meeting on June 21, 1982, some or all of the members of the Goldman Sachs team met with William and his counsel, Arthur Liman and Bud Taylor, on June 25, 1982. Goldman Sachs' files include an agenda of the subjects to be covered at the meeting:

1. Review sale of the Company through a public offering.

2. Review sale of the Company to one or more purchasers.

3. Discuss redeeming the stock of the Minority for a combination of cash and liquid assets.

4. Discuss purchase of control by the Minority.

5. Review dividing the Company into groups of operating companies and liquid assets and distributing them among the shareholder groups.

6. Review tax aspects of various alternatives.

7. Discuss negotiating strategy.

8. Review presentation to Minority shareholders.

36. Goldman Sachs also prepared and distributed two additional sets of reports at the meeting on June 25, 1982. The first set of reports totalled seventeen pages and provided a valuation range of the major segments of KII and a total asset valuation range of $1.653 billion to $2.253 billion (which converts after subtraction of long term debt and preferred stock to a per share value of $135 to $187 per share, with a mean of $161); compared the valuation ranges previously offered by Lehman and Morgan Stanley; and listed and ranked the different alternatives shown on the agenda. For each alternative, it placed a valuation per share of stock ranging from a mean of $110 per share which could be realized from a public stock offering; to $140 per share if 100% of the KII stock were sold to a third party for cash; $171 per share if all of the KII assets were sold to a third party; $70 per share if the plaintiffs' stock were sold for cash to a third party; $92 per share if the plaintiffs' stock were sold to KII for cash; and $171 per share if the plaintiffs' stock were purchased by KII by the spin off of operating businesses plus cash. Of the potential businesses for spin off or distribution, the report listed the refined products group, the crude oil gathering group, and the United States exploration and production assets. The second set of reports provided by Goldman Sachs contained over 100 pages and resembled the Monday package except for including graphs showing discounted cash flow ("DCF") analyses of various business segments and a spread sheet valuing the ABKO subsidiary under various assumptions.

37. According to Eckert, William was a demanding client who asked a lot of good questions and wanted to make "sure no stone was left unturned." William asked numerous questions during the meeting on June 25, 1982. He questioned whether Goldman

Sachs had appropriately valued the company and whether they had done the DCF analyses correctly. After the meeting, William met for two hours with Mac Heller and made detailed requests for additional studies including a leverage study of the refined products group, additional data pertaining to returns and cash flows, comments concerning the "prospects of the business," and more DCF analyses including "testing the Refined Products DCF for its sensitivity to percent of capacity...." (DX–Gen 65, G00042).

38. William believed that Goldman Sachs' values were too low. William also expressed his concern that Goldman Sachs was trying to lower his expectations to a level where a deal might occur. As early as June 21, 1982, William sought the advice of Nathanial Rothschild, a former investment banker. Rothschild suggested that William get a second opinion and he recommended Bain & Co. William did in fact employ Bain & Co. at his first meeting with that firm on July 19, 1982. Earlier, William also sought advice from Henry Burkhardt, III, an independent investor and venture capitalist.

39. During the summer of 1982, William continued to review Goldman Sachs' work and asked them to do additional tasks. William worked most closely with Goldman Sachs because, among the dissident group, he had the most familiarity with KII. It was decided in July that the dissidents would not meet until September in order that Goldman Sachs could make its presentation to each of the dissidents before the meeting.

40. In the meantime, the preliminary report of Lehman Brothers was done by early June and was finalized on July 2, 1982. Lehman's opinion was that KII's common stock had a per share value of $161 to $188, with a mean of $175 per share. As a result, KII and Lehman were ready to commence negotiations.

41. In April 1982, a writer for *Fortune* magazine contacted KII and advised that they wanted to do a story on KII. Representatives from KII and Goldman Sachs agreed that the interviews should proceed but that the stockholder dispute, the investment banking visits and the valuations should not be discussed. William had telephone conversations with the *Fortune* writer which William had secretly taped. William had told his lawyer, Arthur Liman, that he had simply refused to talk with the reporter per Liman's advice. Liman was not aware of the taped conversations until they were produced during the 1982 litigation.

42. The article on KII was published by *Fortune* on July 26, 1982. It fully disclosed the existence of the stockholders' disputes, repeated many of the dissident group's allegations about the management style of KII and of Charles Koch. It also suggested that the battle for control was not over and that Charles might not ultimately be successful. KII and its management were distressed over the article and concerned about its potentially unsettling effect on customers and employees. KII management believed the dissident group or their representatives provided the information to the *Fortune* reporter.

43. In August, a special meeting of the Board of Directors was called, in part, to create an executive committee with "all the powers and authority of this Board of Directors in the management of the business and affairs of this Corporation...." (PX 14, K707601). The dissident board members and their representatives refused to attend this meeting objecting to its legality. The resolution creating an executive committee passed. Among the stated purposes for the creation of the executive committee were that the dissidents were hostile to management and would not hesitate to use sensitive information in a manner adverse to corporate interests and that frank discussions about sensitive matters would be difficult in Board meetings attended by dissidents.

44. William met with Bain & Co. on the 23rd and 25th of July at which time Bain suggested that they would have to do a "blitz" on the valuation since Goldman Sachs had already done their valuation and was ready to negotiate. Bain described the information they needed to determine the value of KII, and William delivered the same to them.

45. The first meeting between Goldman Sachs and representatives of Frederick was held August 3, 1982. Later in August, Fred

Eckert of Goldman Sachs and William met with Marjorie Simmons Gray in Colorado Springs. Besides going over values, Eckert discussed the different ways to split up KII and possible negotiating strategies for the dissidents. William discussed possible lawsuits, and Marjorie agreed with the litigation alternative and was not offended by it.

46. William had received advice from his friend and financial advisor, Mr. Rothschild, that William should not argue with Goldman Sachs over its valuation of KII and that he should just tell Goldman Sachs the value he wanted based on the other valuations.

47. After notice of the special August Board meeting was sent, Liman called Cordes and advised him that if the executive committee proposal was adopted, there would be no negotiations. After having Lehman check with Goldman Sachs about impending negotiations, the defendants were left with the impression that there was in fact no real prospect for negotiations. Consequently, the Board proceeded to form an executive committee and stated the reasons for its formation in the Board's minutes. Those minutes were sent to the dissidents' representatives on the Board along with a cover letter from Cordes that assured the dissidents of their willingness and desire to make a deal.

48. The defendants received no response or no overtures for negotiation until after the plaintiffs' first lawsuit was filed in October.

48. On October 12, 1982, William and the Simmons' interests filed a lawsuit in the United States District Court for the District of Kansas against KII, Charles Koch, Sterling Varner, David Koch, J. Howard Marshall,II, and his son, E. Pierce Marshall.

49. On October 19, 1982, Cordes received a call from Mary R. Koch who was distraught over the litigation and the ensuing publicity and asked Cordes to call William's attorney in an effort to negotiate a settlement. Cordes then called Liman, who advised that all it would take would be a call from Lehman Brothers to Goldman Sachs, that the matter wasn't so complex that a determination could not be made in short order as to whether a deal was possible. Cordes called

Bill Morris with Lehman Brothers with directions to contact Goldman Sachs.

50. At the brief meeting on October 19, 1982, between Goldman Sachs and Lehman Brothers, the Goldman Sachs people asked Morris to have KII make the first proposal. KII agreed to make the first offer, but it also decided that Lehman Brothers should first make a detailed segment by segment valuation presentation to Goldman Sachs. To that end, Barbara Byrne of Lehman obtained from KII information updated as of August 31, 1982. The update of Lehman Brother's analysis was completed in a week and a meeting was scheduled with Goldman Sachs for November 1, 1982. At the meeting on November 1, 1982, Lehman Brothers personnel presented their valuation analysis to Steve Friedman, Peter Sachs and Fred Eckert of Goldman Sachs. The presentation included both handouts and a slide presentation and a comparison of Lehman Brother's March 1982 values with their August 1982 values, the latter being a pre-tax range of from $168 to $198 per share and an after-tax range of from $140 to $160 per share. At the conclusion of the meeting, Bill Morris advised that KII was prepared to offer a price of $160 per share.

51. On November 3, 1982, William had a meeting with William Bennett and other personnel of Bain and Co. at which they reported their valuation conclusions and made recommendations on negotiating strategy. Bain had prepared approximately fifty pages of material and data underlying their value opinions on each of KII's major segments. Bain's conclusion was that the KII common stock was worth about $187 per share of common stock, after deducting a discount for trading profits. William and Bain agreed on a plan to make a counteroffer to KII of $240 per share, plus one-half of Hueso, while being prepared to come down. William testified that he developed a rationale for this plan prior to meeting with the other dissidents for the following reasons:

> Well, one is that I'm not sure that everyone in our group understood the implications of the range of values and logic behind it. No one in our group except for me bothered to calculate how much money

the company could afford to pay and therefore afford to pay us based upon the information that we had; and secondly, I was concerned that Goldman, Sachs had misunderstood the company because they had sent junior people out there and because they had viewed the company solely as a trading company and I thought their values were low and I thought there was a good rationale for a higher value, a higher objective value based upon all the work that Bain had done as well as all the work that other investment bankers had done and based upon the information that we knew at that time.

(DX–Gen 5, pp. 1716–17).

52. On November 4, 1982, the dissidents met for four hours at the Paul Weiss offices, attending was William, Goldman Sachs personnel, Bain & Co. personnel, and representatives of Frederick and the Simmons family. At that meeting, the group received an official report on the meeting with Lehman Brothers, heard an analysis of that offer, and considered the appropriate response to such offer. In addition, the group discussed the different strategies for the litigation, for the upcoming KII Board meeting, and for dealing with the First National Bank in Wichita. A comparative table of valuations was prepared and shown to the group which reflected that Lehman's valuations in July and October of 1982 were higher than Goldman Sachs' valuation in June of 1982. The dissidents decided to make a counter offer of $240 per share plus one-half of Hueso.

53. On November 5 or 6, 1982, representatives of Goldman Sachs advised that $240 was the price their clients had authorized them to offer and they wanted a distribution of their pro rata share of Hueso.

54. KII did not regard the $240 per share as being a good faith number responsive to the $160 offer and presentation that Lehman had made on November 1, 1982, and Bill Morris so advised Goldman Sachs after their meeting on November 5 or 6, 1982.

55. On November 17, 1982, William, his lawyers, members of Goldman Sachs, members of Bain & Co., the lawyers for Frederick and Harold Raiffer (a Harvard Business School Professor hired by William to give advice to the group on negotiations) met to discuss the lawsuit, receive an analysis from Bain, consider negotiation strategies, and receive Goldman Sachs' recommendation. By that time, Goldman Sachs had prepared a series of computations justifying what Goldman Sachs believed KII could afford to pay at various prices by using different combinations of cash and asset distributions to pay for the stock. The scenarios ran from an assumed purchase price of $190 per share to a high of $240 per share. Also by that time, Bain had revised its valuation concluding that KII had an asset value of $225 per share. William understood from the work done by Goldman Sachs and Bain that it would be financially difficult for KII to pay $240 per share. No conclusions were reached at this meeting.

56. By November 23, 1982, the dissidents had authorized Goldman Sachs to offer $155 cash per share plus domestic oil and gas reserves along with one-half of Hueso. The dissidents valued their offer at $225 per share plus their pro rata share of Hueso, based on Goldman Sachs' valuation of the reserves. Goldman Sachs had determined that KII could borrow the cash to finance the purchase of shares and then pay off the debt out of cash flow within three years. A copy of that projection was transmitted to KII by Goldman with the offer.

57. The above offer was communicated to Lehman and to KII on November 24, 1982.

58. On December 22, 1982, KII made a counteroffer to purchase the shares of the plaintiffs for a stated consideration of $167, with $95 to be paid in cash and $72 to be paid in 15 years with interest at ten percent. The plaintiffs did not consider this offer to be improvement over the defendants' last offer.

59. At that time, the litigation was bogged down in a discovery dispute over the defendants' request for a blanket protective order restricting public dissemination of all KII-produced documents unless and until the plaintiffs specifically requested certain documents for exemption.

60. No further negotiations took place until the spring of 1983. Goldman Sachs advised Bill Morris of Lehman that it had

been instructed by William to disengage. On March 8, 1983, Carey advised its bankers that while KII had been conserving cash in anticipation of making a deal with its dissident stockholders, KII had now concluded that no such deal was possible and, accordingly, the company was once again looking for investment opportunities.

61. After the Board of Directors meeting on March 5, 1983, Linn and Cordes met in the latter's office located near the Board room. In that meeting, Linn stated that the only way the case could be settled would be by the lawyers, and that the investment bankers could not do it.

62. The plaintiffs in the 1982 case had been taking the position that they would not disclose the valuation opinions or studies of Goldman Sachs on the grounds of an alleged privilege. Shortly after the March Board meeting, Linn inadvertently included some of Goldman Sachs' valuations in material from the Simmons family that Linn was producing for discovery. The inclusion of such reports in the Linn documents was a mistake.

63. Learning from these documents that Goldman Sachs' valuations were close to and even less than Lehman's valuations, the defendants believed the investment bankers would have a good chance of negotiating a reasonable settlement. Consequently, the defendants asked Bill Morris to contact Goldman Sachs again. Bill Morris reported back that Goldman Sachs said their principals were not ready to negotiate.

64. Bain and Co. began updating their valuation of KII in late March or early April using 1982 year end numbers. In addition to Harold Raiffer, the Harvard professor, William Koch had employed Richard Bird, of the Boston Consortium, to assist him in valuations and negotiating strategy. Bain's updated value of the assets on a per share basis was a range of from $232 to a high of $256 per share. The dissidents held a strategy meeting in New York on March 30th. The final strategy meeting was held in Oklahoma City on April 12, 1983, at the home of Jim Linn. No agreement on the price per share was reached. William held the view that the price was in the range of $212 to $245 per share and that they should receive on the

high side because of a premium for control. Dick Bird was of the view that KII could not afford to pay $250 per share but that it could pay $225 per share. Bain & Co. had advised William that he should not let the investment bankers set the price. The conclusion drawn at the April 12th meeting was that the plaintiffs would insist the negotiations now be conducted by the lawyers and that KII's proposal for the investment bankers to handle negotiations would be rejected.

65. On April 15, 1983, the plaintiffs filed a motion to hold defendants' counsel, Robert Howard, in contempt for not responding to certain discovery requests. In response to that motion, Howard sent Linn a letter stating:

> Following your phone call on Tuesday, counsel on our side of the case were able to confer with the various people involved, and we decided that we should agree to your suggested meeting the week of May 2 even though the proposed format was different from our prior discussions.

(DX–Gen 110, FS000007). The letter concluded, however, that the personal nature of the recent contempt motion would likely prevent any productive meeting between counsel.

66. After the contempt matter was resolved, counsel met on May 18, 1983. Those attending were attorneys Cordes, Howard and Richard Hite on behalf of the defendants (Richard Hite was representing KII), and attorneys Liman, Linn and Robert Martin on behalf of the plaintiffs. Prior to the meeting, William had asked Liman to try to get something around $220 per share. Mr. Liman did not state a specific price per share at the meeting, but he did say on behalf of the plaintiffs that in order to make a deal, KII would have to be prepared to pay a price which was at least $2xx per share.

67. After the meeting, the defendants and their counsel conferred and agreed that while they might consider paying $200 per share, they did not want to make an offer of $200 and be subject to upward negotiation. They agreed that a call should be placed to Jim Linn to gain an expression from him as to whether $2xx meant $200 or whether plain-

tiffs were really looking at a higher number. The call was made on May 20, 1983, and KII received the assurance from Linn that he would recommend $200 per share if KII would offer it.

68. William was advised on the 20th of May that Linn in negotiations with Robert Howard had agreed to $200 per share and Linn had told Howard he could get the rest of the dissidents to agree to $200 per share. William felt that Linn had breached the agreement that their lawyers would not negotiate price unless they were all together. William told Linn that he was not authorized to negotiate on William's behalf. William then proceeded to call various members of his group telling them that money was being left on the table and that he was disappointed with Linn's negotiations. William learned that the other dissidents believed this was a serious offer deserving consideration. William eventually advised his lawyer, Arthur Liman, that he would not accept $200 per share and that Liman should so advise KII. Liman reported that he had called Robert Howard and said that $200 was not acceptable.

69. The dissidents met on May 25, 1983 at the airport Marriott Hotel in New York City. Present at the meeting were William Koch, his attorney, Arthur Liman, and his advisors, Professor Harold Raiffer, Richard Bird of the Boston Consortium, and Bill Bennett of Bain & Co. Also present were Marjorie Gray, Gay Roane and James Linn representing the Simmons interests; Frederick Koch and one or more of his lawyers from the Davis Polk firm; and Robert Martin and Goldman Sachs personnel representing all of the members of the group. Much of the discussion turned on the cash price which plaintiffs should receive for their stock in addition to their pro rata share of Hueso. William advised the group that he felt the value of the common stock was between $210 to $250 per share and they should receive a premium over that price. William felt that the premium for control to which they were entitled was from ten percent to 50 percent above the range of values of $210 to $250 per share. Agreeing with William were Robert Martin and Richard Bird, the consultant

hired by William. Mr. Martin felt the settlement was premature and that the group could get an extra $20 a share if they continued the litigation for six more months. Dick Bird said the group should seek a higher number. On the other hand, Steve Friedman of Goldman Sachs felt that $200 was a fair offer. Harold Raiffer, the consultant hired by William to advise on negotiations, said he thought that $200 was a good offer, and Bill Bennett of Bain and Co. said that he thought that $200 was a good price. Liman stated that the principals would have to decide, but that he thought that if they litigated for two more years, they would have to get $225 per share to justify the two years of litigation hassle. The attorneys discussed the need for warranties that covered the information given the dissidents and the financial condition of KII and that survived the closing. At some point in the meeting the advisors were asked to leave and the principals, including Jim Linn, stayed to discuss the offer. Jim Linn told the group that he thought $200 was a good deal, that Bill Bennett was right but that Dick Bird was way off base. Marjorie Simmons Gray stated that in the interests of family harmony the settlement should be made, and Frederick Koch said he thought it was a reasonable price and should be accepted. William advocated going back at a higher price and then horse trading at around $220. Frederick was impatient with William. William believes that he agreed to the $200 subject to a lot of tough conditions in the contract.

70. Apart from the price of $200 per share of common stock plus the pro rata share of Hueso, there were several issues left to negotiate. The plaintiffs were concerned that KII would agree to $200 but would then come back to New York and "chisel" on the price. William expressed the desire to close the deal quickly so as to not give KII room to renege. Liman felt that the contract should be as self-executing as possible and that because of the strained relations, nobody should have a chance for a second look. To accomplish these objectives, Liman outlined a list of critical elements in the contract, including that the contract "has to be ironclad with no outs by either side"; (DX–Gen 112, A007646); that KII deposit a non-refundable

$200 million deposit upon signing of the contract; that KII be given only 90 days to close; and that if KII defaulted there would be liquidated damages and a provision for specific performance. Those terms were largely non-negotiable, and the plaintiffs agreed that the terms should be put to the company on "basically a take it or leave it deal." (DX–Gen 5, pp. 2347–48).

71. Liman's list of critical elements also included the stipulation for an "opportunity for prompt due diligence" and the "usual representations against any material change." (DX–Gen 112, A007648). KII took the position that the time for due diligence was past and that there was not enough time for due diligence. William and Linn agreed that there was not time for due diligence if they wanted to close the deal quickly, and they agreed that they would forego due diligence if they had strong warranties and representations that would survive the closing of the deal.

72. After telephone communications between counsel for the parties established that the price of $200 per share for the common stock plus a pro rata distribution of Hueso was acceptable, KII prepared a draft of a proposed contract which was mailed to Liman on May 26, 1983. William, however, insisted that the plaintiffs' counsel should write the first draft and work off of it because of his distrust of the defendants. Counsel for the parties met in New York City on June 3 to begin negotiating the final terms. The first draft by plaintiffs' counsel was presented to defendants on the morning of June 4, 1983. Paragraph 5(d) of that draft contained the following language:

Since December 31, 1982, there has been no material change in the assets, properties, business, operations or condition (financial or otherwise) of Buyer or of its subsidiaries. There is no event, condition or state of facts in existence on the date hereof which has not been disclosed in writing by Buyer to the Principal Sellers that materially affects, or may in the future materially affect, the value of Buyer or of shares of its capital stock. Without limiting the generality of the foregoing, neither Buyer nor any of its officers is

aware of any undisclosed discoveries of oil or gas related to any property of Buyer, there are no outstanding undisclosed offers or agreements to purchase all or any substantial part of the assets of Buyer and there are no undisclosed outstanding negotiations looking to any acquisition of Buyer or its shares or to any merger or consolidation involving Buyer or any of its subsidiaries or the acquisition by Buyer of stock or assets having a cost or value in excess of $30,000,000.

(DX–Gen 114, K704280). The defendants objected to certain terms of this provision and argued the terms were too broad. KII considered the first sentence to be too broad because it referred to "any subsidiary"; the second sentence to be objectionable because it ignored the plaintiffs' knowledge, it required KII to put every change in writing, it applied regardless of the knowledge of KII and its officers, it disregarded the standard of a prudent and knowledgeable investor, and extended to items which may have an effect only in the future; and the fourth sentence to be objectionable because it lacked the adjective "material" modifying discoveries of oil and gas or the sale of any subsidiary. The plaintiffs' counsel argued these provisions were only an effort to protect themselves from some non-disclosure of the magnitude of the "crown jewels." (DX–Gen 22, p. 144). Counsel for both parties then agreed upon and drafted the final provision, which provides:

Since December 31, 1982, there has been no material change in the assets, properties, business, operations or condition (financial or otherwise) of Buyer *and* any of its subsidiaries *taken as a whole.* There is no event, condition or state of facts in existence on the date hereof which *is known to the Buyer or any of its officers and* has not been disclosed [ ] by Buyer to the Principal Sellers *and is not otherwise actually known by the Principal Sellers which if fully disclosed might* materially affect [ ] *the valuation of the stock of the Buyer by a prudent and knowledgeable, investor, excluding events, conditions and states of fact which have an effect on the oil industry in general.* Without limiting the generality of the foregoing, neither

Buyer nor any of its officers is aware of any material undisclosed discoveries of oil or gas related to any property of Buyer, there are no outstanding undisclosed offers or agreements to purchase all or any substantial part of the assets of Buyer and there are no undisclosed outstanding negotiations looking to any acquisition of Buyer or its shares or to any merger or consolidation involving Buyer or any of its material subsidiaries or the acquisition by Buyer of stock or assets having a cost or value in excess of $30,000,000.

(DX–Gen 115, A000056–57) (Changes from prior draft include the addition of the underlined language and the deletion of language where brackets appear).

73. There were other changes in the language of the contracts which were negotiated throughout the sessions on June 4, 1983. Every change in wording in the contract was run by William for his approval, and Liman had "thousands" of discussions with William. By midnight Saturday, June 4, 1983, the final draft had been approved and was signed by parties from both sides, with the exception of David and Frederick who signed on the following day or days. The purchase was closed on June 10, 1983.

74. By the latter part of 1983, William had already begun an investigation of KII to determine whether he had been defrauded. His investigations led him to believe that KII had retained a secret interest in an oil and gas concession in Qatar, and his Wichita counsel made inquiry of KII as to the facts. Despite assurances from counsel for KII that no such secret interest had been retained by KII, this action was commenced in June 1985, purporting to allege fraud in connection with the Qatar concession and with respect to two other matters and alleging the existence of a general conspiracy to defraud the selling shareholders.

**6.** Section 78j(b) provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a

75. Frederick has testified that he has made no attempt to independently evaluate or determine the basis for any allegation or charge in the suit but has relied on his advisors. Immediately before filing the 1985 action, Frederick discharged his counsel, Davis Polk, and retained new counsel, Milbank Tweed, who joined in the filing of the action. Frederick's former lawyers from Davis Polk have stated that they were not consulted in connection with the filing of this action and have no knowledge as to the existing issues. The Simmons family also joined in the action and Jim Linn's law firm was their named counsel. The Simmons family did not do any investigation prior to the filing of this litigation, but instead relied on William Koch.

76. The plaintiffs did not interview or consult with Goldman Sachs representatives prior to filing the claims in this case.

## IV. LEGAL THEORIES

The plaintiffs couch their claims on four related legal theories: (1) federal securities fraud; (2) common law fraud; (3) common law breach of fiduciary duty; and (4) common law breach of express warranties. The court agrees that the controlling law with respect to each theory overlaps substantially. Nevertheless, the court will discuss the relevant elements and concepts under each theory.

### A. Federal Securities Fraud

The plaintiffs look to the general antifraud provision, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[6] as the legal basis for their federal securities claims. They also rely on this statute's parallel regulation, SEC Rule 10b–5, 17 C.F.R. § 240.10b–5.[7] Section 10(b) prohibits the

national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe. . . .

**7.** This regulation provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or

making of a material misstatement or omission or the commission of a manipulative act. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 177, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119, 132 (1994). " 'Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud.' " *Central Bank,* 511 U.S. at 174, 114 S.Ct. at 1447, 128 L.Ed.2d at 130 (quoting *Chiarella v. United States,* 445 U.S. 222, 234–35, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980)).

■ To recover under Rule 10b–5 on a primary liability claim, the plaintiffs must show: (1) that the defendants made an untrue statement of a material fact, or failed to state a material fact, (2) that the conduct occurred in connection with the purchase or sale of a security;[8] (3) that the defendants acted knowingly with the intent to deceive or defraud, and (4) that the plaintiffs justifiably relied on the misrepresentations or omissions and sustained damages as a proximate result of the misrepresentations or omissions. *Anixter v. Home–Stake Production,* 77 F.3d 1215, 1225 (10th Cir.1996); *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir.1992).

■ In securities fraud cases, " '[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding' " whether to buy or sell a security. *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).[9] "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Id.* This standard does not allow for "a single fact or occurrence ... always [being] determinative of" what is "an inherently fact-specific finding." , 485 U.S. at 236, 108 S.Ct. at 986. Rather, " '[t]he determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him.' " 485 U.S. at 236, 108 S.Ct. at 986 (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. at 450, 96 S.Ct. at 2133).

■ The application of the above standard of materiality is straightforward when the impact of the corporate development "on the target's fortune is certain and clear." *Basic Inc.,* 485 U.S. at 232, 108 S.Ct. at 984. The application becomes difficult when the corporate development is "contingent or speculative in nature." *Id.* The materiality of such

of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**8.** This element requires a causal relationship between the alleged deception or manipulation and the subsequent purchase or sale. *Arst v. Stifel, Nicolaus & Co., Inc.,* 86 F.3d 973, 977 (10th Cir.1996).

**9.** The Supreme Court noted that it struggled in *TSC Industries* with establishing a standard that would reach corporate matters of questionable significance:

"Acknowledging that certain information concerning corporate developments could well be of 'dubious significance,' (citation omitted), the Court was careful not to set too low a standard of materiality; it was concerned that a minimal standard might bring an overabundance of information within its reach, and lead management 'simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking.' (citation omitted)."

*Basic Inc.,* 485 U.S. at 231, 108 S.Ct. at 983. The Supreme Court later explained that the standard was not based on the assumption that investors are "nitwits:"

"The role of the materiality requirement is not to 'attribute to investors a child-like simplicity, an inability to grasp the probabilistic significance of negotiations,' (citation omitted), but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision. (citation omitted)."

*Id.* at 234, 108 S.Ct. at 985.

contingent or speculative information " 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' " *Basic,* 485 U.S. at 238, 108 S.Ct. at 987 [10] (quoting *Securities and Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2nd Cir.1968) (en banc), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)). Generally, materiality is a question of fact, but it may be resolved as a matter of law when "the information is 'so obviously important (or unimportant) to an investor, that reasonable minds cannot differ on the question of materiality.' " *Garcia v. Cordova,* 930 F.2d 826, 829 (10th Cir.1991) (quoting *TSC Indus.,* 426 U.S. at 450, 96 S.Ct. at 2133) (quoting in turn *Johns Hopkins Univ. v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970)).

▪ "Liability for failure to disclose only arises when the duty to disclose exists and the withheld information is material." *Connett v. Justus Enterprises of Kansas, Inc.,* 68 F.3d 382, 385 (10th Cir.1995) (citations omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 1018, 134 L.Ed.2d 98 (1996). " '[T]he duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " *Arst,* 86 F.3d at 981 (quoting *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 347 (10th Cir.1986)). " 'When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.' " *Central Bank of Denver,* 511 U.S. at 174, 114 S.Ct. at 1447, 128 L.Ed.2d at 130. In addition, the material omissions must qualify as manipulative or deceptive practices, that is, the omission causes the affirmative statements actually made to be misleading. *See Connett,* 68 F.3d at 385; *Jensen v. Kimble,* 1 F.3d 1073, 1077–78 (10th Cir.1993).

▪ "A private cause of action for damages under § 10(b) and Rule 10b–5 will not lie in the absence of proof of 'scienter,' defined as 'the intent to deceive, manipulate or

defraud.' " *Anixter,* 77 F.3d at 1232 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976)). The Tenth Circuit, as well as every other circuit deciding the issue, has held that "recklessness" qualifies as "scienter" for a § 10(b) violation. *Anixter,* 77 F.3d at 1232 n. 20 (citations omitted). This definition of "recklessness" is " 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Anixter,* 77 F.3d at 1232 (quoting *Hackbart v. Holmes,* 675 F.2d 1114, 1118 (10th Cir. 1982)).

▪ Because it establishes the causal link between the fraudulent act and the injury, reliance is an element to all 10b–5 actions. *Basic Inc. v. Levinson,* 485 U.S. at 243, 108 S.Ct. at 989. A plaintiff is excused from proving reliance and is entitled to a presumption of the same when the theory is that the defendant failed to disclose material information. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). This presumption of reliance is rebuttable by any proof that severs the causal link between the misrepresentation and the decision to purchase. *Basic,* 485 U.S. at 248, 108 S.Ct. at 992.

▪ Justifiable reliance is determined from an examination of all relevant factors to a transaction. *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1516 (10th Cir.1983). Distinct from any contributory negligence theory, the justifiable reliance requirement cuts off recovery only if the plaintiff's reckless conduct is comparable to that of the defendants culpable conduct. *Id.* "[A] plaintiff may not justifiably rely on a misrepresentation when its falsity is palpable." *Grubb v. Federal Deposit Ins. Corp.,* 868 F.2d 1151, 1163 (10th Cir.1989) (citing *Holdsworth v. Strong,* 545 F.2d 687, 694 (10th Cir.1976) (en banc), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1600, 51

---

**10.** The Tenth Circuit in *Garcia v. Cordova,* 930 F.2d 826, 829 n. 1 (10th Cir.1991) remarks that this measure of materiality may only apply in the

context of merger negotiation information and not other kinds of contingent or speculative information.

L.Ed.2d 805 (1977)). Consequently, the plaintiff is not under a duty of due diligence, that is, the duty to investigate the truthfulness of an intentional misrepresentation. *Holdsworth,* 545 F.2d at 694. Factors relevant in determining whether reliance is justified include:

> (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction; and (8) the generality or specificity of the misrepresentation.

*Zobrist,* 708 F.2d at 1516 (citations omitted). No single factor is determinative, and all that are relevant must be considered and weighed in deciding if the plaintiffs' reliance was justified. *Id.* at 1516–17.

**B. Common-law Fraud**

" 'The settlement of litigation ranks high in our public policy.' " *Lewis v. Gilbert,* 14 Kan.App.2d 201, 203, 785 P.2d 1367 (1990) (quoting *Jannarone v. W.T. Co.,* 65 N.J.Super. 472, 168 A.2d 72, *certif. denied,* 35 N.J. 61, 171 A.2d 147 (1961)). Because settlements have favored status, the courts will not permit parties to repudiate a compromise and settlement absent a finding of fraud or bad faith. *Connor v. Hammer,* 201 Kan. 22, 24, 439 P.2d 116 (1968); *Lewis v. Gilbert,* 14 Kan.App.2d at 203, 785 P.2d 1367.

▮▮▮▮ "Fraud is never presumed and must be shown by clear and convincing evidence." *Waxse v. Reserve Life Ins. Co.,* 248 Kan. 582, Syl. ¶¶ 1,3, 809 P.2d 533 (1991); *see also In re Estate of Hessenflow,* 21 Kan. App.2d 761, 774, 909 P.2d 662 (1995). "Clear and convincing" refers to the quality of proof, not the quantum. *Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986). For the evidence to be clear and convincing,

> the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979) (citations omitted). The evidence is clear "if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it." *Ortega v. IBP, Inc.,* 255 Kan. 513, 528, 874 P.2d 1188 (1994) (*citing Chandler v. Central Oil Corp.,* 253 Kan. 50, 58, 853 P.2d 649 (1993)).

▮▮▮▮ A claim of actual or affirmative fraud consists of the following elements: (1) "an untrue statement of material fact," (2) "known to be untrue by the person making it," (3) "made with the intent to deceive or recklessly made with disregard for its truthfulness," and (4) the alleging party "justifiably relies upon the statement and acts to his injury." *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 531, 739 P.2d 444 (1987) (citation omitted). A statement is not actionable unless it "relate(s) to past or present fact, as opposed to mere opinions or puffing or promised actions in the future." *Timi v. Prescott State Bank,* 220 Kan. 377, 389, 553 P.2d 315 (1976) (citation omitted). "A fact is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction involved." *Id.* The reliance element calls for both a subjective inquiry (Did the plaintiff actually rely on the misrepresentation?) and an objective inquiry (Was the plaintiff's reliance reasonable and justifiable?). *Kelley Metal Trading Co. v. Al–Jon/United, Inc.,* 835 F.Supp. 1339, 1341 (D.Kan.1993). "The injured party's reliance on a fraudulent misrepresentation 'must be reasonable, justifiable and detrimental.' " *Slaymaker,* 241 Kan. at 531, 739 P.2d 444 (quoting *Hutchinson Travel Agency, Inc. v. McGregor,* 10 Kan.App.2d 461, 464, 701 P.2d 977, *rev. denied,* 238 Kan. 877 (1985)).

▮▮▮▮ The elements required to prove fraud by silence or concealment include:

> (1) that defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable dili-

gence; (2) that defendant was under an obligation to communicate the material facts to the plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff.

*OMI Holdings, Inc. v. Howell,* 260 Kan. 305, 344–45, 918 P.2d 1274 (1996) (quoting *Lesser v. Neosho County Community College,* 741 F.Supp. 854, 863 (D.Kan.1990) (other citations omitted)); *see also Henry v. Office of Thrift Supervision,* 43 F.3d 507, 514 (10th Cir.1994). There can be no fraud based on nondisclosure absent a duty to speak. *OMI Holdings,* 260 Kan. at 344, 918 P.2d 1274. The duty to disclose arises from a relationship at the time of suppression or concealment, as in a fiduciary relationship "which may be created by contract or may arise from" the facts and circumstances of the relationship in which a party consciously assumes the responsibilities of a fiduciary. *Flight Concepts Ltd. Partnership v. Boeing Co.,* 38 F.3d 1152, 1158 (10th Cir.1994); *see DuShane v. Union Nat'l Bank,* 223 Kan. 755, 760, 576 P.2d 674 (1978). The duty to disclose may arise from a contractual relationship where "there is a disparity of bargaining powers or expertise." *DuShane,* 223 Kan. at 760, 576 P.2d 674. "When one party to a contract or transaction has knowledge of a fact material to the transaction and not within the fair and reasonable reach of the other party and which the other party could not discover by the exercise of reasonable diligence, the first party is obligated to reveal that material matter to the second party." *Horsch v. Terminix Int'l Co.,* 19 Kan.App.2d 134, 138, 865 P.2d 1044 (1993), *rev. denied,* 254 Kan. 1007 (1994). "A material fact is one a reasonable person would consider important in choosing a course of action." *Flight Concepts,* 38 F.3d at 1158.

### C. Breach of Fiduciary Duty

■■■■ Under Kansas law, fiduciary relationships can be created by contract or can be implied in law from the circumstances. *Denison State Bank v. Madeira,* 230 Kan.

684, 691, 640 P.2d 1235 (1982). "A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to act *primarily for the benefit of another.*" *Id.* at 692, 640 P.2d 1235. " 'The existence or non-existence of a confidential or fiduciary relationship is an evidentiary question or finding of fact which must be determined from the facts in each case.' " *Olson v. Harshman,* 233 Kan. 1055, 1057, 668 P.2d 147 (1983) (quoting *In re Estate of Relihan,* 4 Kan.App.2d 277, 279, 604 P.2d 1219 (1980)). Kansas law does not presume a fiduciary relationship but requires its proof by clear and convincing evidence. *Arst,* 871 F.Supp. at 1384; *Flight Concepts,* 819 F.Supp. at 1545.

■■■■ "Officers and directors of a corporation occupy a strict fiduciary relationship with respect to both the corporation and its shareholders." *Newton v. Hornblower,* 224 Kan. 506, Syl. ¶ 8, 582 P.2d 1136 (1978). As for the duty of an officer or director in a stock purchase, the Kansas Supreme Court has held:

"Where knowledge of facts affecting the value or price of stock comes to an officer or director of a corporation by virtue of his office or position, he is under a fiduciary duty to disclose such facts to other stockholders before dealing in company stock with them, even if they too are directors or officers, and regardless of whether these facts pertain to intracompany matters, such as the value of assets, or relate to events 'outside' the corporation, such as the existence of favorable contracts, the availability of additional financing, or any other matters which would tend to increase the value of the corporation's stock."

*Blakesley v. Johnson,* 227 Kan. 495, 503, 608 P.2d 908 (1980) (quoting *Sampson v. Hunt,* 222 Kan. 268, Syl. ¶¶ 1, 2, 564 P.2d 489 (1977)). In short, the officer or director has a duty "to disclose material information affecting the value of the corporate stock" before the stock sale, and the other shareholder has a "legal right ... to rely upon" the officer with superior knowledge "to make a full disclosure." *Id.* at 503–04, 564 P.2d 489.

For purposes of this motion, the defendants do not dispute a fiduciary duty to disclose.[11]

### D. Breach of Warranty

■ An express warranty is any direct or positive affirmation, promise or assurance concerning a matter of fact which is part of the contract and on which reliance is intended. *Corral v. Rollins Protective Services Co.*, 240 Kan. 678, 685, 732 P.2d 1260 (1987). The plaintiffs base this claim on two written express warranties appearing in the stock purchase agreement. When parties have carried on negotiations and then reduced their negotiations to a written agreement, it is this written agreement which constitutes the contract between the parties and controls the parties' rights thereto. *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 582, 738 P.2d 866 (1987). The overriding goal in the construction of a contract is to effectuate the intent and purpose of the parties which is ascertained, if possible, from the four corners of an instrument. *Heyen v. Hartnett*, 235 Kan. 117, 122, 679 P.2d 1152 (1984).

■ A written contract, free from ambiguity, can be construed as a matter of law. *Wood River Pipeline*, 241 Kan. at 582, 738 P.2d 866. It necessarily follows that whether an ambiguity exists in a written instrument is also a question of law. *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988). When the provisions of a written agreement are clear and unambiguous, the court must enforce the agreement by its expressed terms in order to give effect to the parties' intentions. *Bank of Oklahoma v. Fidelity State Bank & Trust Co.*, 623 F.Supp. 479, 486 (D.Kan.1985).

■ "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987). An ambiguity does not exist unless the application of the rules of interpretation leaves it genuinely uncertain which one of two or more possible meanings is the proper one. *Wood River Pipeline*, 241 Kan. at 582, 738 P.2d 866. There are several relevant rules of interpretation. Beginning with the most basic, terms are given their plain, general, and common meaning. *Wood River Pipeline*, 241 Kan. at 586, 738 P.2d 866. Language used anywhere in the instrument is considered and construed in harmony with other provisions. *Heyen*, 235 Kan. at 122, 679 P.2d 1152. The meaning of a contract should not be assessed from only analyzing a single or isolated provision. *Garvey Center, Inc. v. Food Specialties, Inc.*, 214 Kan. 224, 227, 519 P.2d 646 (1974). If a contract includes a series of writings, all writings that are part of the same transaction are interpreted together. *Burge v. Frey*, 545 F.Supp. 1160, 1169 (D.Kan.1982). Reasonable interpretations, rather than unreasonable ones, are favored by the law. *Seacat v. Mesa Petroleum Co.*, 561 F.Supp. 98, 105 (D.Kan. 1983). Interpretations which vitiate the contract's purpose or reduce its terms to an absurdity should be avoided. *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 624, 602 P.2d 1299 (1979). Under the guise of contract construction, the court must not rewrite or insert terms. *Garvey Center, Inc.*, 214 Kan. at 227, 519 P.2d 646. When the agreement settles a dispute, Kansas courts have said that the agreement "must be construed in light of its language and the circumstances surrounding its making." *In re Estate of Engels*, 10 Kan.App.2d 103, 106, 692 P.2d 400 (1984).

■ Reliance is an essential element to a breach of express warranty claim not governed by the Uniform Commercial Code. *Professional Service Industries, Inc., v. Kimbrell*, 834 F.Supp. 1305, 1311 (D.Kan. 1993); *Comeau v. Rupp*, 810 F.Supp. 1127, 1161 (D.Kan.1992); *see Land v. Roper Corp.*, 531 F.2d 445, 448–49 (10th Cir.1976).

11. In the litigation, the defendants deny they owed the extensive duties described in *Sampson* and adopted in *Blakesley* because of the mistrust and lack of confidence that already pervaded the relationships of the parties and because the stock sale occurred in the context of litigation settlement. The defendants, however, assume for purposes of this motion only that they owed the above fiduciary duties.

In this case, there are two warranties given by the defendant on which the plaintiffs rest their claims. The first concerns the financial statements audited in 1981 and 1982 and those financial statements unaudited through April of 1983. It simply warrants that financial statements fairly present the buyer's operations and results "in accordance with generally accepted accounting principles." (DX–Gen 115, A000055). The second warranty is more involved, as it provides in relevant part:

> There is no event, condition or state of facts in existence on the date hereof which is known to the Buyer or any of its officers and has not been disclosed by Buyer to the Principal Sellers and is not otherwise actually known by the Principal Sellers which if fully disclosed might materially affect the valuation of the stock of the Buyer by a prudent and knowledgeable investor, excluding events, conditions and states of fact which have an effect on the oil industry in general.

(DX–Gen 115, A000056).

■ To this latter warranty of material disclosures, there are three noteworthy aspects. First, it covers any "event, condition, or state of facts." These terms imply that the matter to be disclosed need not be consummated or completed. Thus, the warranty encompasses contingent matters. Second, the warranty requires disclosure of these matters unless the defendants have already "fully" disclosed the same or unless the plaintiffs "actually" know the same already. Third, the warranty requires disclosure of those matters "which if fully disclosed might materially affect the valuation of the stock ... by a prudent and knowledgeable investor." The plaintiffs read "might" in this sentence as requiring the defendants to resolve any doubt over the materiality of information in favor of its disclosure. The defendants read this warranty as simply tracking the materiality element to a 10b–5 claim. In the context of this warranty, the court reads "might" as referring to the possibility that the information could materially affect a prudent and knowledgeable investor's valuation. Thus, the defendants agreed that a matter was to be disclosed if it could, but not necessarily would, "materially affect" a prudent and knowledgeable investor's valuation of KII's stock.[12]

## E. Materiality

Common to these different legal theories is an element of materiality. As the defendants put it, the requirement of materiality "cuts across all four of plaintiffs' legal theories." (Dk.581, p. 12). In their motion, the defendants assume that a proven factual flaw with materiality will infect all of the plaintiffs' legal theories. The defendants further assume that fact-specific case law on materiality under one legal theory is "germane with respect to other theories, as well." (Dk.581, p. 12).

Since the materiality of a fact is necessarily a function of all relevant circumstances, the plaintiffs emphasize certain circumstances here. They were not public shareholders. They attended board meetings in which both "hard" and "soft" information about KII's operations were disclosed. They negotiated and agreed to express warranties from which arose certain expectations on their part and certain obligations on the defendants' part. Based on these circumstances, the plaintiffs argue the defendants' cited case law is distinguishable:

> Unlike their cited cases, the defendants were not forced to compress their information into a proxy statement or tender offer circular; nor did they have to risk misleading any faceless public shareholders with unexplained "soft" information. Defendants merely had to offer information to the plaintiffs that defendants thought they might not already know and might consider important in their decision, and then

---

**12.** As so interpreted on its face, the warranty differs from 10b–5 insofar as it based on the possibility rather than the substantial likelihood of the information having a material effect. Moreover, the possibility is judged from the perspective of a prudent and knowledgeable investor. "[A] 'reasonable' investor is not necessarily a 'prudent' or conservative' investor," *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 216 (4th Cir.1994), let alone a knowledgeable investor.

answer questions about the new disclosures.

(Dk. 597, pp. 30–31).

The plaintiffs offer both a quantitative viewpoint and a qualitative viewpoint for materiality. Quantitatively, the plaintiffs note that an expenditure of one million dollars or more required Charles Koch's personal approval. The plaintiffs say they too considered increments of one million dollars or more to be material in their valuation of the stock. Qualitatively, William Koch avers he would not have sold his stock had he known the defendants were "lying about . . . [KII's] financial position or . . . [were] hiding any information (even so-called 'soft' information) that might effect the valuation of our stock." (PX 8, ¶ 66). The plaintiffs summarize their position on materiality as follows:

> To defeat those claims on grounds of immateriality, defendants must, but cannot, prove beyond a reasonable doubt that the alleged nondisclosures and misrepresentations, both individually and in the aggregate, cannot meet either of the following criteria:
>
> > (1) that the dollar amount involved was greater than $1 million; or
> >
> > (2) that no evidence exists to prove, directly or by inference, that the defendants intentionally withheld or misrepresented the facts.

(Dk. 597, pp. 32–33).

The court sees no reason now to adopt or reject either side's approach to the common issue of materiality. Though the plaintiffs' definitive thresholds are attractively simple, their across-the-board approach downplays the importance of considering the relevant circumstances of the specific claim in determining materiality. The court will reserve additional comments on materiality for its analysis of the different claims.

## V. PINE BEND REFINERY [13]

### A. Statement of Uncontroverted Facts

For purposes of the pending motions only, the court considers the following facts to be uncontroverted.

13. The court shall follow the organizational

*Definitions and Concepts*

1. In 1983, KII owned a conversion refinery that was located near St. Paul, Minnesota. Called Pine Bend Refinery, it had the capacity to process heavy, high sulfur crude oil from Canada, Mexico and other countries. At that time, Pine Bend Refinery had two crude units, two vacuum units, two cokers, three desulfurizers, one hydrotreater, two naptha desulfurizers, two reformers, three sulfur plants and a dimersol, alkylation and polymerization unit.

2. For purposes of this motion, the parties agree the different units at Pine Bend basically functioned in the following manner.

A. The **crude units** distill the crude oil into (1) gas liquids, which go to a recovery unit to recover fuel gas, butanes and propane; (2) light naphtha which, after treating, goes directly into gasoline; (3) heavy naptha, which goes to a reformer after being desulfurized; (4) No. 1 fuel oil, much of which is marketed as jet fuel; (5) No. 2 fuel oil; and (6) bottoms.

B. The **vacuum units** further distill the bottoms from the crude unit producing gas oil and vacuum tower bottoms. The gas oil is combined with gas oil from the crude unit for further processing, and the bottoms are sold as asphalt or become feed to the coker.

C. The **coker** produces further light products from the vacuum tower bottoms. The coker's residue is petroleum coke which is marketed as an end product.

D. The **hydrotreater** removes the sulfur from gas oil coming from vacuum unit and the coker. Pine Bend had a large amount of distillate hydrotreating capacity for reducing the sulfur content from fuel oils and diesel fuel.

E. The **fluid catalytic cracker ("FCC")** cracks the oil from the hydrotreater into two lighter products: a gasoline stream labeled FCC gasoline and a light cycle oil that can be hydrotreated or blended into No. 2 fuel oil. The FCC also produces a catalytic "slurry" stream which is a heavy material used for fuel oil blending or as a

scheme used by the defendants in their briefs.

feedstock for the production of carbon black.

F. The **sulfur plant** recovers the sulfur from the $H_2S$ coming from various refinery process units. The sulfur is marketed as an end product.

G. **Dimersol, alkylation and polymerization units** convert the unsaturated light products coming from the FCC into gasoline.

H. **Reformers** take the heavy naphtha and upgrade its octane rating for production of gasoline.

3. A refinery often is described, in part, by the number of barrels of crude oil that it can process in a day. There are several kinds of refinery capacity as defined below.

A. **Calendar day capacity or operable refinery capacity** is the maximum number of barrels of input to crude units that can be processed in an average twenty-four hour period after considering (1) the capacity of the downstream units to absorb and store the output; (2) the types and grades of crude to be processed; (3) the types and grades of products expected to be manufactured; (4) the environmental constraints to be considered; (5) the estimated loss of capacity due to anticipated scheduled downtime for routine inspections, mechanical problems, maintenance, repairs and turnaround; and (6) the estimated loss of capacity due to unscheduled downtime for mechanical problems, repairs and slowdowns.

B. **Stream day capacity** refers to the total amount of crude which can be processed in a given twenty-four hour period without regard to scheduled or unscheduled downtime.

C. **Design capacity** is that which a refinery is designed to process per stream day.

D. **Rated capacity** is that which a government agency from a test has assigned to the refinery.

E. **Economic or balanced capacity** is the number of barrels a refinery can process before the last barrel becomes unprofitable.

A refinery may have different numbers for each kind of capacity, and each number depends on the refinery's definition of the respective kind of capacity. The *Oil and Gas Journal* publishes an annual survey of refineries reporting calendar day capacity and stream day capacity.

5. There are some accepted relationships between the different capacity measures. If stream day capacity is defined as the maximum capacity, then calendar capacity will be a percentage of stream day capacity. Koch Refining Company used a conversion factor of .97, while others in this area have used figures ranging from .90 through .97 as the percentages. If stream day capacity is defined again as "the maximum capacity, then design capacity generally is less because additional capacity is built in to assure that design capacity is reached." [14] Finally, economic or balancing capacity is usually lower than stream day capacity. Companies often describe their refineries in reference to economic capacity. [15]

6. If a capacity figure does not describe itself as stream day, calendar day, design or economic capacity, then one cannot tell the type of capacity represented by the figure unless the context suggests otherwise. In this situation, the type of capacity being represented sometimes may be evident from the circumstances. The plaintiffs' expert, John O'Brien, testified that he could not tell which type of capacity the plaintiffs were alleging in their complaint when they pleaded that their knowledge of Pine Bend's capacity was

14. Of course, some units may fail to reach their design capacity thereby making stream capacity less than design capacity.

15. In his draft report, the plaintiffs' expert, John O'Brien, opined "that quoted unit processing capacities, as provided by refiners to the OGJ, are often based on the optimum *economic* processing rate and not the maximum physical unit limitations." (DX–PBend 6, XMS 000700). In his affidavit, O'Brien says this statement is not an opinion that refiners report capacity more often one way than another. (PX 142, ¶ 14). O'Brien's affidavit qualifies but does not rule out O'Brien's prior opinion. In other words, O'Brien believes that refineries often base their reported stream day capacity on the optimum economic processing rate, but he does not know if refineries use the economic approach more often than the physical limitations approach.

limited to 127,300 bpd. Consequently, O'Brien made alternative calculations until he was told to assume that the plaintiffs only knowledge was that Pine Bend's stream capacity was 130,000 bpd.

7. At Board and stockholder meetings of KII, capacity was not described as stream day, calendar day, or design, but rather in general terms like how much could be run considering such factors as profits, efficiency, and design. For example, the coker expansion study given to the Board in May of 1981 stated: "The base case crude run of 127,552 B/D increases to essentially maximum capacity of 130,000 B/D in the coker case *since it becomes profitable to process additional volumes* of the heavier, less costly crudes." (PX101 at K307983) (underlining added). The same study in its working capital analysis recited "2,448 B/D of additional crude run with coker addition," and its economics summary recited a "97% service factor." (PX101 at K308010 and K308012).

8. From 1981 through 1985, KII used capacity limits or restraints in its linear program computer model ("LP") for managing daily refinery operations. Built into this computer model were the processing capacities of each of the refinery's units, based on their assumed stream day capacities, as well as certain other factors. After manually adding the expected product and feed stock prices, the computer program would tell the refinery what crudes were most profitable, which products should be produced, and how much capacity of each unit should be utilized. The reliability of the LP's results depends on the accuracy of the assumptions in place.

9. The utilization of Pine Bend's capacity was subject to seasonal fluctuations. From January through the middle of April, Pine Bend reduced its runs because of limited storage and a limited market for asphalt.

## Pine Bend's Production and Capacity as of June 1983

10. KII acquired a controlling interest in Pine Bend refinery in 1969. *The Oil and Gas Journal* reported in 1970 that Pine Bend had a stream day capacity of 80,000 bpd and a calendar day capacity of 77,300 bpd.

11. After acquiring Pine Bend, KII expanded its capacity. At the March 1976 stockholders meeting, Bernard Paulson, the president of Koch Refining Corporation, reported: "In December we ran a FEA test run to prove our crude capacity. We were able to run at 133,000 B/D, plus for three days. With the correction factors for down time this gave us a certified capacity of 127,300 B/D." (DXPBend 11). At the 1979 stockholders meeting, Paulson reported:

> Crude charge at the Pine Bend plant was at a record 116,161 B/D despite the two week turnaround on the No. 1 crude unit. The last quarter of 1978 our average was 128,289 B/D. This is above our DOE certified capacity of 127,300 B/D. This crude rate was possible because of our vacuum prestripper addition that went on stream in April, 1978.

At the 1980 stockholders meeting, Mr. Varner reported that the 1979 runs at Pine Bend had reached the record level of 126,000 bpd.

12. Average crude runs at Pine Bend were lower in 1980 and 1981. The upward trend resumed in 1982. The runs during the last quarter of 1982 averaged 132,000 bpd and in the month of November of 1982 averaged 134,000 bpd. This information was contained in the monthly financial statements given to all directors, including the plaintiffs or their representatives. This increase in production was discussed at the December 10, 1982 Board meeting, and, in response to a question from William Koch about why the refinery's performance in October was so good, Varner advised that runs were at an all time high (133,000) because, in part, an "engineer got around a sulfur capacity problem."[16] (DX–PBend 15, K301215 at p. 2).

---

16. William Koch's affidavit at PX–8 includes the following averment:

> 36. At the December 1982 Board of Directors meeting, I asked why Pine Bend's October 1982 results had been so good. Sterling Varner answered, among other things, that Pine Bend's output had been high because an

engineer had gotten around the "sulfur problem." This referred to the fact that Pine Bend had temporarily been running an unusual crude (called Great Canadian Oil Sands, or "GCOS"), which was a distressed product from Canada that was only partially refined. It had no heavy "bottoms" (so Pine Bend could

13. The higher level of production was projected to continue into 1983. The monthly financial statements given to the Board of Directors for April of 1983 projected monthly production of 134,000 barrels per day for the first four months of the year. Production, however, averaged only about 126,000 barrels per day, but this was still about 12,000 barrels per day greater than for the same period in 1982.

14. KII increased its calendar day capacity reported to the *Oil and Gas Journal* at the end of 1982 from 127,300 bpd to 133,000 bpd. Based on the 97% ratio, this converts to a reported stream day capacity of 137,000 barrels per day. These numbers were published in the March 1983 edition of the *Oil and Gas Journal*. According to the plaintiffs, the defendants did not give them these same numbers.

15. The plaintiffs' counsel told their expert witness, John B. O'Brien, to assume that the defendants had informed the plaintiffs' that Pine Bend's capacity as of June 1983 was 130,000 barrels per stream day. Mr. O'Brien has opined that the actual stream day capacity of the Pine Bend refinery was 145,000 barrels per stream day as of June 1983. At his deposition, Mr. O'Brien agreed that average runs over a month or two of

134,000 bpd would indicate that the refinery had a stream day capacity of 145,000 bpd. The defendants' expert witness, Lee Solomon, also expressed the opinion that, based on the 134,000 bpd scheduled to be run for the first four months of 1983, the stream day capacity of the Pine Bend refinery was at least 147,250 bpd as of June 1983. Mr. O'Brien used a relationship of .93 in converting from stream day to calendar day capacity, and Mr. Solomon used a relationship of .91.

16. The defendants represented in the Descriptive Memorandum given to Goldman Sachs that Pine Bend refinery had "a rated capacity of 127,300 bpd." (PX 100, p. 5). Lehman Brothers used the same capacity figure but with the understanding "the refinery was capable of running more than that" depending on other factors like the crude runs and on the goals set for different refined products. (PX106 at 252). In the 1981 coker study, the defendants represented that "[t]he base case crude run of 127,552 B/D increases to essentially maximum capacity of 130,000 B/D in the coker case since it becomes profitable to process additional volumes of the heavier, less costly crudes." (PX101 at K307983). In the 1982 feasibility

---

run more of it through the crude units than an ordinary crude) but had not been de-sulfurized. The GCOS was inexpensive, but Pine Bend was apparently at its capacity in desulfurizing this unusual feedstock. As I understood it, this was the "sulfur problem" referred to by Varner. The Board was not told that the capacity of the Pine Bend refinery had changed. Defendants did not report that the refinery's production level was a permanent development, and discussions at Board meetings throughout 1982 had indicated that the availability of GCOS was a fortuitous event which would not last.

The defendants in their reply brief argue that this averment is "an improper attempt to avoid the prior sworn testimony." (Dk. 602 at 10). The defendants cite William Koch's deposition where he was shown Hansen's notes from the Board meeting and then testified that he was unable to recall Varner's response or his question. (DX–PBend 16, pp. 791–94). William Koch in a supplemental affidavit filed in support of the plaintiffs' surreply (Dk. 605) now avers:

As I stated in my deposition, I do not have a specific recollection of the question and answer between me and Sterling Varner at the December 10, 1982 meeting of the Board concerning the "sulfur problem." (citation omitted). However, because we do have the notes taken at that meeting by the corporate secretary, Fritz Hansen, the question and answer are a matter of record and can be read in their context. Their meaning is clear to me from the notes, and is as stated in my February 14, 1994 affidavit. (PX8, ¶ 36). . . .

I think it is fair to say that one sentence in 36 of my February 14, 1994 affidavit ("As I understood it, this was the 'sulfur problem' referred to by Varner") can be read two different ways. My meaning was that I understood the sulfur problem which had been facing the Pine Bend Refinery as a result of its high utilization of Canadian GCOS crude. It was not my intent to say that I recalled the specific conversation with Varner on that subject, which I do not. I apologize if defendants were confused by this.

(PX 453 at ¶ 10). In short, William Koch does not recall the conversation or statements made by Varner at that Board meeting. His first affidavit is not based on his personal knowledge of what was said at that meeting but rather is simply his *post hoc* interpretation of Hansen's notes from that meeting.

study for the new sulfur plant, the defendants assumed total crude runs were limited to 130,000 bpd for the project basis and economic summary. William Koch states that the defendants never revealed that they had increased or had plans for increasing Pine Bend's capacity beyond the figures represented in the Descriptive Memorandum, coker study, and sulfur plant presentation.

17. The plaintiffs knew the calendar day capacity of the Pine Bend refinery as of June 1983 and could have calculated the stream day capacity by using whatever conversion factor they deemed appropriate.

### The Expansion Plans for the Pine Bend Refinery

18. In the late 1970s, plans to expand the refinery were discussed at virtually every Board and stockholder meeting.

19. Bernard Paulson, President of Koch Refining, having seen the capacity of the refinery increase to approximately 127,300 bpd without the construction of any new crude units, felt that the two existing units could be expanded to about 160,000 bpd through debottlenecking and other improvements. Paulson so advised the stockholders as early as March 1977 that the crude rate at Pine Bend could be increased to 160,000 bpd with the necessary reforming, hydrotreating, and coking capacity. William Koch's notes from the August 1977 Board meeting reflect a discussion of an expansion project taking the refinery to a capacity of 136,000 bpd from 120,000 bpd.

20. In November 1977, Mr. Paulson presented to the Board of Directors a 100–page bound study conducted by Koch Refining personnel with the assistance of the consulting firm of Brown & Root, Inc. The study outlined an expansion plan for Pine Bend. It was transmitted to the Board with a cover memo from Mr. Paulson advising that building "a pipeline into St. Paul will allow us to look at expanding the refinery to serve the large and growing market in the Twin Cities area." (DX–PBend 23). This plan was to expand the refinery in two phases. Phase I proposed modifying the FCC unit, constructing a propylene purification plant, and setting crude unit capacity at 130,000 bpd.

Phase II contemplated an increase in crude oil capacity to about 200,000 bpd with the construction of a coker, hydrotreaters, reformer and related items.

21. The total expansion outlined in the Brown & Root study was estimated to cost in excess of $270 million. The plan did not contemplate implementation on an immediate and full basis, but rather it would be done in phases over time. In fact, no preliminary design work had been done on Phase II at that time. The Board did not approve Paulson's plan when it was presented. The Board directed him to investigate the matter further. Some people considered Paulson's plan "a little grandiose" and sales people called it "Paulson's Folly" because they were concerned that the additional refined products could not be marketed. (PX 107, p. 68).

22. At the next annual meeting in March of 1978, Mr. Paulson advised of continuing work to expand by debottlenecking existing units.

23. In May 1978, Paulson sent a memorandum to the Board of Directors proposing a modification to Phase I of the plan stating:

In November 1977, we presented a detailed study covering projects which would increase crude runs at the Pine Bend Refinery to 200,000 b/d in two phases of construction. As you will recall, Phase I involved modifying the FCC unit and the construction of a propylene purification plant. The investment for these facilities was approximately $80,000,000 compared to $38,500,000 on our new plan.

We have looked at methods of partially expanding the FCC to accommodate a 130,000 b/d crude rate and limiting distillate production to 33,000 b/d. This m/odification has three distinct steps. They are: 1. Revamp FCCU to 52,000 b/d at 90 conversion. 2. Construct Dimersol Unit to process propylene to gasoline. 3. Revamp our two reformers to 20,000 b/d capacity.

(DX–PBend 24). This modification scaled down Phase I of the original plan. The Board approved this modified proposal in August 1978. Brown & Root were the design engineers, and their construction subsidiary was the contractor for the project.

**1498**

24. At the March 1979 stockholders meeting, Bernard Paulson reported on the above construction and further advised the stockholders:

> We are looking at a new 20,000 b/d reformer with continuous catalyst regeneration to produce 103 octane reformatted to produce up to 20,000 b/d of premium unleaded gasoline while making unleaded regular out of the balance of our gasoline. . . . It is adequately sized for 150,000 b/d plus crude rate.
>
> We are presently studying the expansion of our No. 1 crude unit from 40,000 b/d to 60,000 b/d with improved fractionation for additional recovery of gasoline components.

(DX–PBend 11).

25. On April 9, 1979, a follow-up memorandum was sent by Charles to William and David, with a copy to Varner, who together were operating as an executive committee of the Board. The memorandum recommended the construction of a 20,000 bpd reformer at a cost of approximately $47 million, stating that a "20MBD unit would match future reformer capacity to 200,000 BPD of crude capacity." (DX–PBend 26). The study refers to the 1980 refinery's capacity increasing only to 127,868 bpd with the new 20,000 bpd reformer. The study also refers to the "anticipated 1983 refinery" and attaches calculations depicting the hypothetical 1983 refinery as running crude oil at the rates of 140,637, 141,745 and 141,670 bpd with a reformer of 15,000, 20,000 or 25,000 bpd. These documents were also provided to Goldman Sachs in the course of their evaluation. On June 2, 1979, the Board of Directors formally approved the construction of the new 20,000 bpd reformer.

26. At the March 1980 stockholders' meeting, Sterling Varner reported on the construction projects in the refinery and discussed the construction plans for the hydrotreater and platformer and sulfur plant, all of which were originally discussed as parts of Phase II of the Brown & Root plan.

27. At the Board of Directors meeting on August 22, 1980, the reformer project was discussed, and the Board was advised that the next projects would be a coker and desulfurization, both of which were originally discussed as part of Phase II of the Brown & Root plan. It was also discussed that the strategy was to upgrade the units and improve the refinery's ability to handle poor crude oils. The subject of the coker and the desulfurization plant was discussed again at the December 1980 Board meeting.

28. In May 1981, the Board was presented with a proposal for the construction of the new coker at a total cost of $60,000,000. The economics for the coker reflect crude runs with the coker increasing from 127,000 bpd to 130,000 bpd, with only 70% of the capacity of the new coker being utilized. The subject of excess capacity was discussed at the Board meeting in May 1981. The coker report specifically stated:

> In addition to providing an attractive return rate on capital employed, the new coker will add to the refinery's flexibility and permit Koch to capitalize on opportunities that might otherwise be missed. For example, distressed resides in the midwest could be routed through the coker at sizeable margins. These opportunities have periodically existed in the past. Also, in times of tight crude supplies or soft asphalt markets, asphalt from the refinery's inventory could be converted to clean products.

(PX101 at K307994).

29. William's notes from the Board meeting on August 8, 1981, reflect that there was discussion of the coker, hydrocracker, new desulfurizer, power converter and other "interesting projects" at the refinery. (DX–PBend 33).

30. William's notes from the Board meeting in March of 1982 reflect a discussion of the completion of the Wood River Pipeline (which was the pipeline project referred to in Mr. Paulson's memorandum to the Board in November 1977 as being the stimulus for expanding the refinery). KII built this pipeline to connect Wood River, Illinois, with the refinery so as to provide an alternative source of crude oil from the Gulf Coast via the Mississippi River, in the event that Canadian crude supplies decreased. William's notes from this meeting further reflect the

Board was told that with the completion of the pipeline, the Company "can go ahead with expansion because of ability to get oil and not be shut off." (DX–PBend 34, A001790). William Koch has averred that his understanding of "expansion" as used after the Board's rejection of the Brown & Root plan was in reference "to enabling the refinery to handle more heavy crudes as a proportion of the crude slate and to produce unleaded product, not to increasing the refinery's total crude distillation capacity." (PX8 at ¶ 34).

31. At the June 1982 Board meeting, the Board approved the expansion of the sulfur plant. The written material supporting such expansion states:

> Upon completion of the Coker Expansion project, the refinery's capability to run additional heavy, sour crude and increase coker throughput above project volumes will be limited by sulfur plant capacity. Expanding the existing 235 ton/day sulfur capacity by building a 200 ton/day sulfur plant ... will provide additional capability to run heavy, sour crudes.
>
> Approximately 330 Tons/Day of sulfur capacity will be required to maximize heavy crude runs and coker throughput.

(DX–PBend 35, K302010). For its project basis and economic summary, the sulfur report assumed Canadian crude runs were limited to 70,000 bpd and total crude runs were limited to 130,000 bpd.

32. In its meeting on November 6, 1982, the Board was advised on the progress of the new coker construction and was told that upon completion, total coking capacity would be 44,000 barrels per day, which was about one-third of the crude capacity. At the same Board meeting, the Board was advised that management was looking at a new hydrocracker and hydrogen plant at a total cost of $85 million, and that they hoped to have a proposal for the Board by the time of the next meeting.

33. Sterling Varner's typed notes outlining his presentation to the June 1982 Board meeting include the following: "We are adding exchangers and piping to debottleneck No. 2 Crude Unit at Pine Bend. This should allow us to charge 100,000 B/D of heavy crude to the unit. This will put our nominal capacity to near 140,000 B/D." (DX–PBend 37, K302018). Varner testified that he advised the Board that because of debottlenecking, they thought the crude rate would get up to 140,000 bpd. William Koch denies that the plaintiffs were ever informed of any plans to increase the refinery's capacity above 130,000 bpd. At his deposition in 1992, William stated that he did not believe there was any such discussion about capacity or debottlenecking. His notes from the meeting do not mention either subject by name but do show "some discussion of technology of refinery." (DX–PBend 39, A006357).

34. The debottlenecking activities occurred as planned, and as a result, crude runs increased to an average of over 132,000 barrels per day in the last quarter of 1982. At the Board meeting on December 10, 1982, William referring to the October financial reports, asked why Pine Bend had done so well. The notes of KII's corporate secretary reflect that Varner answered: "We hit the market right, including futures. Refinery Output hit an all time high. An Engineer got around sulfur capacity problem—Bill Hougland got good Canadian supply." (DX–PBend 15, p. 2).

35. At the annual stockholders meeting in March of 1983, the last one attended by the plaintiffs before they agreed to sell their stock, Sterling Varner discussed the expansion activities at both Corpus Christi and Pine Bend and stated that the Company had to have major capital projects to stay competitive. He told the stockholders about plans to spend $100 million at Pine Bend, and plans to build a coker at Corpus and "possibly an additional expansion could result in $200 million at both Pine Bend and Corpus." (DX–PBend 40, A000887–A000888). Varner's notes show the $100 million was for the coker and sulfur units, which according to the plaintiff's expert, O'Brien, would not increase capacity.

36. At the Board meeting following the stockholders meeting in March of 1983, Charles explained to the Board that KII needed to loop the Minnesota pipeline in order to get more crude oil into the Pine

Bend refinery. Looping is an industry term meaning to expand a pipeline by laying a line on the same right of way. The Board was also given the proposed 1983 budget for capital expenditures which, for Pine Bend, totalled $75 million, including $3 million designated for No. 1 Crude Unit Expansion, $1.2 million for Heat Recovery–Crude Units, and $1.5 million for No. 2 Heat Recovery. These heat recovery projects were debottlenecking projects that were primarily designed as energy saving projects, but they also increased the volume of crude that could be handled. William did not ask any questions about the expansion or any of the capital expenditures at either meeting. William avers he was never told that these expenditures would lead to an increase in the refinery's capacity.

37. The monthly financial statements for the first four months of 1983 reflect the following financial results at Pine Bend. The refined products group suffered a loss in February of $1,419,000. As of the end of February 1983, the refined products group made only $3,821,000, as compared with $25,052,000 for the same two months of 1982, and it was behind in its profit plan for 1983 by over $10 million. The financial results improved over the next two months. The financial statement dated April 30, 1983, which was the last one received by plaintiffs prior to their sale of stock, reflected that the Pine Bend refinery earned over $7 million in April, which exceeded its profit plan for the month by $2 million. It also showed that the refined products group earned over $28 million for the four months ended April 30, 1983, and was now within $2.5 million of meeting its profit plan for the four-month period. The April 30 statement further showed that Koch Industries made more money in the first four months of 1983 (over $89 million) than it had for the same period in 1982, which was a record year in earnings. The April statements also indicated that April 1983 year-to-date ("YTD") sales for Pine Bend 6.43% below 1982 YTD and April 1983 YTD net operating revenue was 21% below April 1982 YTD.

38. The coker was completed in July 1983. The sulfur plant was completed and brought into operation during the refinery turnaround in late September or early October of 1983.

39. Because only 70% of the additional coker's capacity was being utilized at 130,000 bpd, there were more efforts made to debottleneck and, thus, increase crude throughput. An article found in Goldman Sachs' file reports that despite the industry's cut back efforts to deal with excess capacity, refinery capacity will actually increase "mainly as the result of modernization projects aimed at upgrading product slates and increasing capabilities to convert lower-quality crudes into final products. Almost all of these projects inadvertently add to increased throughput capacity." (DX–PBend 45, G00375). The plaintiffs deny they were told the new coker would mean a significant increase in the refinery's throughput.

40. During the fall turnaround in September and October of 1983, additional debottlenecking activities occurred, including an energy conservation project to add additional heat exchangers, pumps and piping at the No. 2 Crude Unit. These items were included in the capital expenditure budget presented to the Board in its March 1983 meeting. In addition, the packing in the crude tower was changed to the Flexipak packing described by Bill Cummings at the 1980 stockholders meeting. This was also thought to increase throughput capacity. The plaintiffs deny the defendants ever informed them that the projects planned for the 1983 fall turnaround would increase Pine Bend's capacity.

41. The capacity of a refinery is higher immediately after a turnaround. It was anticipated that, as a result of the planned debottlenecking activities and the completion of the coker and the sulfur plant, the refinery would be able to run more crude oil immediately after the turnaround. The amount of the increase, however, was not certain. Charles Koch stated in a speech to Koch Oil employees in May 1983 that the crude capacity at the Pine Bend refinery was increasing to 150,000 bpd and that he expected an increase of from 10,000 to 15,000 bpd. In a document prepared for the June 1983 Board meeting, the refinery was predicted to be at 145,000 bpd after the turnaround. The plaintiffs deny knowledge of this refinery in-

crease. In August 1983, the Board was advised that the modification to the No. 2 unit coupled with changes to the No. 1 unit could produce a capacity of up to 160,000 bpd or more. Other documents reflect even more optimism and projected 175,000 bpd. The plaintiffs deny they were ever told of these anticipated increases in capacity.

42. Immediately after the turnaround, the refinery was processing 155,000 bpd and averaged that amount for November 1983, and 150,000 bpd for December 1983. KII described the Pine Bend refinery in a commercial paper offering in late 1983 as a 155,-000 bpd refinery, and Charles Koch used the 155,000 bpd description in a letter to Pemex dated November 29, 1983.

43. By the end of December 1983, it began to appear that the refinery was not operating efficiently at the 160,000 bpd level. The fourth quarter report from the refinery manager reported that "The unit is capable of this operation; however, tower loadings are extremely high and off spec product probability is high." The plaintiff's expert, O'Brien characterizes the fourth quarter problems as temporary and due to operator inexperience. By the middle of February 1984, the volume of heavy crude at the 155,-000 bpd rate was producing excessive asphalt. O'Brien opines that Pine Bend had sufficient coking capacity to alleviate any asphalt restraint. The crude unit limit in the computer LP run was revised downward from 155,000 bpd to 145,000 bpd. Consistent with that, the report to the stockholders at the March 1984 meeting stated that the St. Paul refinery had a "full upgrading capacity of 145M B/D." (DX–PBend 56, K301120). Presentations to lending bankers in 1984 also reflect that KII reported that the full upgrading capacity was at 145,000 bpd.

44. Additional planning for expansion to an ultimate goal of 200,000 bpd continued into 1983 and beyond. The plaintiffs deny they were ever told of such plans. Back in 1979, Litwin had prepared an estimate summary for expanding the no. 1 crude unit to 60,000 bpd and 65,000 bpd. In early 1983, Litwin Engineering was asked again to examine the possibility of expanding the No. 1 crude unit from 40,000 bpd to 65,000 bpd. It was believed that this possible project, together with the approximately 10,000 bpd expansion to the No. 2 crude unit through debottlenecking activities, would provide a total refinery capacity of 175,000 bpd. Also being studied at that time were the purchase and modification of new hydrocracker/desulfurizers, the purchase of a new hydrotreater, and the construction of a new crude unit to get the total refinery capacity up to 200,000 bpd. The plaintiffs deny they were ever told of these opinions or studies.

45. The above mentioned proposal of expanding the No. 1 crude unit is described by plaintiffs' expert, Mr. O'Brien, as being a "firm plan" to expand to 175,000 bpd, and his calculations assume that units constructed pursuant to that "firm plan" would come on stream as of January 1, 1986. The "plan" referred to by Mr. O'Brien involved the expansion of the No. 1 crude unit. There are few documents evidencing the extent of actual work done by Litwin. In January of 1983, KRC officials asked Litwin engineers to prepare design packages and cost estimates for previously defined cases of expansion of the No. 1 crude unit. In February of 1983, Litwin turned in a $50,000 proposal for its additional work on these two previously defined cases. At its meeting in August of 1983, the Board heard about this proposal to expand the No. 1 crude unit. Later in August, Litwin was asked to present KRC "with the cost and time required to prepare a process package with major equipment specifications for a new 65,000 BPD Crude Unit." (PX 133, LECO00097). Litwin was also asked at that time to summarize its work done to date on the two previously defined cases of expansion. In November of 1983, KRC submitted permit applications to the Minnesota agencies for construction of a 70,-000 bpd crude unit, knowing that the application took typically one year to process. In December 1983, the Board of Directors was told that analysis continued on the possible alternative of constructing a new crude unit instead of expanding the No. 1 crude unit. The matter was still under study throughout 1984 and 1985 and in the Board meeting of August 9, 1985, it was reported that the most attractive alternative was not to expand the

No. 1 crude unit, but, rather to shut it down, and construct a new unit. In fact, the 175,-000 bpd study relied on by plaintiffs was never implemented, and plaintiffs' expert has now so admitted. Instead, the ultimate decision was to construct a new crude unit, which was not completed until 1988 and thereby finally achieving the goal of a refinery with capacity of 200,000 bpd or more.

46. Crude runs stayed at the level of about 144,000 bpd until August of 1984 when they increased to over 156,000 bpd. The crude runs during 1984 averaged over 148,-000 bpd and went up to 152,000 bpd in 1985.

47. Although crude runs increased in 1983 and 1984 from previous years, refinery profit margins went down. The net profits of the refinery and the refinery group as a whole in 1982, 1983 and 1984 were as follows:

| Year | Average Barrels Per Day | Pine Bend Refinery | Refined Group |
|------|------|------|------|
| 1982 | 124,302 | $107,780,000 | $127,608,000 |
| 1983 | 130,929 | 99,752,000 | $126,972,000 |
| 1984 | 158,569 | 64,722,000 | 97,668,000 |
| 1985 | 152,004 | 115,237,000 | ?????????? |

### Information Available to and Valuations by the Plaintiffs' Financial Advisors

48. Goldman Sachs, the lead financial advisor to the plaintiffs, had access to all of the information provided to William, including but not limited to all monthly financial statements from 1978 through April 1983, the profit plans for 1980, 1981 and 1982, all Board minutes since 1976, the detailed notes of William taken at Board and stockholders meetings, and outlines of speeches and presentations given to stockholders at annual meetings referred to above. In addition, William delivered to Goldman Sachs a file labeled "Refinery Expansion." Unfortunately, the contents of that file were empty when the defendants obtained it from William in the course of discovery in this case. William believes, however, that the contents of this file when delivered to Goldman Sachs included the Brown & Root study, the coker and sulfur plant studies, and other memoranda about refinery projects.

49. Goldman Sachs also had information delivered to them from KII, had access to additional information in the data room set up for them at KII and interviewed Koch Refining management personnel. Included in this information was KII's Descriptive Memorandum, which Goldman Sachs received in April 1982 and which described the Pine Bend refinery as having a "rated capacity" of 127,300 bpd. By the time plaintiffs sold their stock in June 1983, the Descriptive Memorandum was well over a year old. The defendants' investment banker does not recall discussing with Goldman Sachs a capacity figure in excess of 127,300 bpd.

50. In arriving at their evaluation of the assets of Koch Refining, Goldman Sachs analyzed stock prices and relevant data of publicly traded companies; made calculations as to the value of Koch Refining if its stock were publicly traded; analyzed sales of other refineries in the preceding years and compared them with Koch Refining; analyzed the industry for potential buyers of Koch Refining; and ran DCF analyses assuming 1982 income from the refinery would have a growth rate of from zero to five percent.

51. Based on the information it had received and learned, Goldman Sachs reached the conclusion that the value of the refined products group ranged from a low of $600 million to a high of $1 billion. Included in the refined products group were the Pine Bend refinery, the Corpus Christi refinery, Koch Asphalt, Koch Marketing, Koch Chemical, Koch Fuels, Koch Chemicals, Chase Pipeline, Minnesota Pipeline and Wood River Pipeline.

52. Bain & Co. also reviewed and evaluated the Pine Bend refinery on behalf of William Koch, who shared the results of Bain's analysis with the other plaintiff stockholder groups. The Affidavit of William L. Bennett, one of the lead advisors from Bain & Co., and the Bain representative who actually attended the May 1983 meeting of the minority stockholders at which the offer of $200 per share was approved, reflects that:

[I]n our evaluation of the refineries, we made the following observations about the general prospects of the refining industry:

A number of the key businesses may be subject to dramatic decline in profitability:

—refineries

—crude oil gathering

We noted that refinery gross profit margins were trending downward ... and we concluded that

Industry prospects dim

Refinery profits unlikely to exceed 1980–81 levels.

. . . .

D. Our analysis led us to the conclusion that the Pine Bend refinery had enjoyed a competitive advantage in the past, but that this advantage appeared to be under pressure with regard to the future.... For example, we observed that one of Pine Bend's competitors was the nearby Ashland refinery, and that new technology in that refinery would allow Ashland to produce higher yields of gasoline and light distillates, which are the most profitable types of refined products.

(DX–PBend 72, ¶ 7). Bain valued the Pine Bend refinery in the range of $660 million. William avers that Bennett was not a major adviser during Bain's work for him.

### Valuations by Plaintiffs' Testimonial Experts.

53. The plaintiffs' testimonial expert in this case, John O'Brien, has valued the Pine Bend refinery using a discounted cash flow method based on the following assumptions:

(a) That the gross margin on the base volume of crude oil processed and on future increases is in excess of $9.00 per barrel, which is approximately 50 percent larger than the gross margin realized by the Pine Bend refinery in 1981, 1982 and 1983.

(b) That the above gross margin is effective immediately in June 1983 and continues undiminished for 13 years.

(c) That the increased capacity after the turnaround in November 1983 is actually accomplished in June 1983.

(d) That all of the increased production can be sold at the same average price as the base volume.

(e) That the refinery proceeded with the plans to increase the capacity to 175,000 bpd at a capital expenditure $50 million, that it came on stream in 1986 and that all of such production could also be sold at the same margins for the ensuing 11 years.

54. Mr. O'Brien came to the conclusion that, using such assumptions, he would value the refinery as of June 1983 at over $1.2 billion, using the lower capacity level the plaintiffs claim they knew. O'Brien's opinion on value is for the Pine Bend refinery alone, and does not include (as did Goldman Sachs' value range of $600 million to $1 billion) the Corpus Christi refinery, Koch Fuels, Koch Marketing, Koch Chemical, Koch Asphalt and the related pipelines. Bain's valuation of approximately $660 million excluded Corpus and Koch Chemical, but it expressly included the related crude oil pipelines.

56. Mr. O'Brien was instructed by counsel to assume that the plaintiffs were told that the refinery had a stream day capacity of 130,000 bpd (which translates under Mr. O'Brien's analysis of 121,000 barrels per calendar day). Based on that assumption and using his hypothetical valuation described in the preceding paragraphs, Mr. O'Brien came to the additional conclusion that the alleged undisclosed capacity over and above 130,000 bpd had a value of $336.1 million—more than fifty percent of the value of the entire refinery per the opinions of Goldman Sachs and Bain.

### B. Scope of Claims

From the defendants' viewpoint, the plaintiffs' Pine Bend allegations show litigants in search of a claim, repeatedly shifting and switching their allegations in hope of finding something on which to base a claim. The defendants see the plaintiffs' draft of the pretrial order as the culmination of such efforts. The plaintiffs allege there, in part:

At the March 1983 KII shareholders and board of directors meetings, defendants made numerous false and misleading statements to the plaintiffs or their representatives regarding the dismal prospects for KII's refining business during 1983 and in the future. These statements included,

among others, defendants' assertion that it "would require a substantial recovery in refining margins" for KII to make its 1983 profit plan; that KII's "cash cows are sick"; that prices would fall even further and "could result in some heavy losses" on inventories; that the market is starting to fall greatly so that "[KII's] assets are deteriorating considerably"; and similar gloomy and pessimistic statements.

Contrary to these statements, defendants hid from the selling shareholders their actions and plans to increase the capacity of the Pine Bend Refinery, to maintain or increase refining margins while simultaneously increasing volumes—despite the industry's downward trend—and to gain access to greater volumes of low-priced Canadian crudes. Defendants' plans included delivering and selling the increased Pine Bend output into existing and new market territories to be accessed more effectively by the reversal of the direction of flow of the Williams Pipeline and by other means. Defendants expected that the Refinery's undisclosed plans for large capacity increases would be highly profitable.

(DX–PBend 61). In their initial memorandum, the defendants deny having any idea what the second paragraph above is intended to encompass and, therefore, do not address it.

The plaintiffs respond that this allegation is not new to the case and point to ¶ 55(a) of their third amended complaint, which reads: "Defendant made false and fraudulent representations to plaintiffs and failed to disclose and concealed the true and accurate extent, value, refining capacity, profitability, replacement costs and development plans for Koch Industries' Pine Bend, Minnesota, refinery." (Dk.522, p. 40). As for the defendants' understanding the above allegation in their draft of the pretrial order, the plaintiffs insist the defendants know the meaning of it and have known and acknowledged the Williams Pipeline reversal matter as an issue in this case. Specifically, the plaintiffs point to the fact that defendants responded without objection to the plaintiffs' discovery request

about the Williams Pipeline reversal. Moreover, this same matter was analyzed by experts for both sides.

In their reply brief, the defendants first tackle the plaintiffs' allegations concerning the reversal of the Williams Pipeline. In their surreply, the plaintiffs clarify that the matter of the pipeline reversal is simply "evidence to prove the pleaded allegations—to prove that the March 1983 statements [at the Board and shareholder meetings] were untrue. It is not a *claim* ...." (Dk. 605 at 12).

Regardless of whether the Williams Pipeline reversal issue is a claim or just evidence, the plaintiffs plainly allege now that the defendants were obligated and failed to disclose their negotiations with Williams and KII's strategy for reversing the flow on the pipeline. The Williams Pipeline reversal seems to fit within "development plans" as alleged in ¶ 55(a) of the plaintiffs' third amended complaint. The court, however, will indulge the defendants and entertain their arguments first advanced in their reply brief with respect to the Williams Pipeline reversal.

## C. Claim: Capacity as of the SPA

The plaintiffs here claim that by June of 1983, the defendants knew and failed to inform the selling shareholders that KII had increased the "crude processing capacity" [17] of its Pine Bend Refinery to approximately 145,000 bpd. (DX–PBend 61). The plaintiffs deny that prior to the SPA they knew of this fact or were told the same by the defendants.

### 1) *Arguments*

The defendants emphasize that the plaintiffs' claim depends on the opinion of their expert witness, John O'Brien, that Pine Bend's stream day capacity in June of 1983 was 145,000 bpd. Stream day capacity is the maximum crude run for a single day assuming no shut downs or slow downs. According to O'Brien, stream day capacity is based on the operation of the entire refinery, including all of its downstream units. Calendar day capacity is the average crude runs calculated over a longer period and, thus, affected by

---

**17.** This is the term the plaintiffs use in their proposed pretrial order.

shutdowns for maintenance and other slow downs. O'Brien considers calendar day capacity to be approximately .93 of stream day capacity.

Based on the above definitions, the defendants say they are entitled to summary judgment because the plaintiffs necessarily knew Pine Bend's stream day capacity in June of 1983. The defendants point to Pine Bend Refinery's 1982 actual crude runs for October of 132,000 bpd, for November of 134,000, and for the last quarter of 132,000 bpd. The defendants also single out the 1983 profit plan for Pine Bend Refinery which scheduled the refinery to run 134,000 bpd for the first four months of 1983. Treating the 134,000 bpd as its calendar capacity, Pine Bend Refinery's stream day capacity, in the defendants' opinion, is plainly 145,000 bpd.[18] Because the plaintiffs knew Pine Bend Refinery could run a calendar day capacity of 134,000 bpd and was projected to run the same, the defendants argue that the plaintiffs cannot claim lack of knowledge in June of 1983 that the Pine Bend Refinery's stream day capacity was 145,000 bpd.

The plaintiffs argue they were told repeatedly that Pine Bend Refinery's capacity was approximately 127,000 bpd and that the Refinery's geographically-restricted sales market curtailed any need for a significant expansion in capacity. Koch's Descriptive Memorandum given to Goldman Sachs in the Spring of 1982 said that Pine Bend Refinery had "a rated capacity of 127,300" bpd. In fact, all of the investment bankers, including the defendants' banker, Lehman Brothers, based their stock valuations upon a 127,300 bpd capacity. The plaintiffs say they were told the only development plans for Pine Bend Refinery were technological upgrades so that it could process "garbage crudes" and obtain higher margins, as opposed to plans for capacity expansions. The plaintiffs highlight statements found in the project proposals for the No. 3 Coker and the No. 4 Sulfur plant. Both of which remarked that Pine Bend's maximum capacity would only increase to 130,000 bpd upon completion of the projects. Finally, the plaintiffs say that Leh-

man Brothers, as late as November of 1982, told Goldman Sachs that Pine Bend Refinery's capacity was 127,300 bpd.

As for knowing about Pine Bend Refinery's higher actual crude run figures in the last quarter of 1982, the plaintiffs say that the numbers can be explained away as a temporary change of the crude slate. In its supplement, dated April 1982, to the Descriptive Memorandum, KII said that Koch Refining Company would have "access to significant quantities of undesulphurized synthetic crude oil ... until the middle of 1982. This is providing significant short-term profits to the St. Paul refinery because of the desulphurization capabilities of the refinery." (PX 145, G07189). According to the plaintiffs' expert, O'Brien, Pine Bend Refinery's capacity prior to July of 1983 was limited by its ability to handle bottoms. O'Brien also opines that the Great Canadian Oil Sands ("GCOS") crude does not contain heavy bottoms meaning that Pine Bend Refinery could run more total crude oil when processing GCOS. The plaintiffs further aver that the defendants never mentioned any increase in Pine Bend Refinery's capacity. With respect to the planned crude runs for 1983, the plaintiffs admit that one can calculate planned runs of 134,000 bpd from the monthly financial reports. Still, the plaintiffs contend they were not told how long Pine Bend Refinery would continue to receive the GCOS crude. In fact, the crude runs for the first quarter of 1983 did not exceed 130,000 bpd. Prior to the stock sale, the plaintiffs' last information of crude runs was for April of 1983. After that, Pine Bend Refinery's crude runs jumped to 138,753 bpd in May, 139,569 bpd in June, and 143,441 bpd in July. The plaintiffs' expert is of the opinion that Pine Bend Refinery's capacity as of the stock sale was 145,000 bpd.

In reply, the defendants argue the plaintiffs were given the facts from which they should have inferred that Pine Bend Refinery had a stream day capacity of 145,000 bpd. With respect to the plaintiffs' position on the GCOS source stock explaining the higher runs at Pine Bend Refinery, the de-

---

18. For purposes of this argument, the defendants accept the definition of calendar day capacity used by the plaintiff's expert, Mr. O'Brien. Calendar day capacity is .93 of stream day capacity.

**1506**

fendants ask the court to disregard the affidavits of William Koch [19] and O'Brien as improper attempts to avoid their prior sworn testimony. In his deposition, O'Brien concluded that Pine Bend Refinery had a stream day capacity of 145,000 bpd based in part on a quarterly report for September of 1982 showing the refinery ran that many barrels. O'Brien also testified that his opinion on capacity would not be affected by the particular crude slate that a refinery happened to be running. O'Brien subsequently qualified that opinion in his deposition:

Q. My question is, would you have to know—to reach that conclusion based on that one document and that crude rate on September 20, 1982, would you have to know the crude slate that the refinery was running on that day?

A. No.

Q. Why not?

A. It's sufficient to know that it ran at 145,000 barrels per day.

Q. Regardless of the crude slate being run?

A. Well, let me answer it this way. There were not major changes in the refinery crude slate over this period of time, therefore one could, one could take it from that that the crude slate was approximately the same as it had been over that period.

Q. Did you specifically look, before you cited this document in support of your conclusion that the capacity of the refinery in June of 1983 was 145,000 barrels per stream day, did you look, and see what crude slate the refinery was running on September 20, 1982?

A. No.

(DX–PBend, S–9 at 254–55). The defendants note that Pine Bend processed an average of 8,010 bpd of GCOS during September of 1982. In the defendants' opinion, because O'Brien did not adjust his stream day calculations for the GCOS mix in September of 1982, he cannot now aver that the GCOS mix kept the same production figures from being

a reliable indicator to the plaintiffs of Pine Bend's stream day capacity.

*2) Analysis*

 The defendants' main point is that the actual production figures from the last quarter of 1982 and the projected production figures for the first quarter of 1983 actually gave the plaintiffs all the facts needed to calculate Pine Bend Refinery's stream day capacity to be 145,000 bpd as of the SPA. The defendants maintain that stream day capacity was not relevant to the plaintiffs or their financial advisers in June of 1983 but that if it were relevant they could have calculated it from the information known to them. The defendants also downplay their representations about capacity as either silent concerning the type of capacity or supplanted by subsequent information given the plaintiffs. In short, the defendants insist the plaintiffs could not have justifiably relied on the defendants' representations in light of the production figures and projections.

As far as the plaintiffs' fraud claims, the issue is one of justifiable or reasonable reliance. As far as the plaintiffs' other claims, the issue is whether the plaintiffs actually knew Pine Bend's stream day capacity was 145,000 bpd. The plaintiffs' affidavits plainly create a genuine issue of material fact concerning actual knowledge. From the evidence submitted at this time, the court believes a reasonable jury could find that the plaintiffs also justifiably relied on the defendants' representations about capacity.

As late as November of 1982, the defendants knew the investment bankers, including KII's investment banker, were still relying on the capacity figure originally disclosed in the KII Descriptive Memorandum. The defendants say such documents were plainly outdated and supplanted by subsequent information. The defendants, however, offer no evidence demonstrating they told the plaintiffs that the documents were outdated or that the plaintiffs should look to other documents with regards to the Refinery's capacity. For that matter, the defendants offer no evidence that they themselves treat-

19. *See* footnote 17. In short, the court disregarded William's affidavit as he subsequently ad-

mitted it was only his interpretation of Hansen's notes.

ed the Descriptive Memorandum as outdated with respect to the Refinery's capacity. In fact, notes taken by Goldman Sachs' employees reflect they were told in April of 1982 that the "size of crude distillation units" at Pine Bend was 130,000 bpd and that its "crude" capacity was 130,000 bpd. (PX 144, GO1130, G00434, and G01171). The defendants do not point to any expansion of the crude distillation units after the interviews and before the SPA.

At this time, the court cannot say as a matter of law that a reasonable stockholder in the plaintiffs' circumstances would know the actual crude runs in the last quarter of 1982 indicated Pine Bend's stream day capacity had already exceeded 130,000 bpd. Nor can the court determine from the record that the plaintiffs necessarily understood the relationship between calendar capacity and stream day capacity. The plaintiffs' expert, O'Brien, believes it is reasonable for one to account for the increased runs as a temporary change in the crude slate. The reliability of O'Brien's opinion here is better treated as a credibility issue for the jury.[20] The conflict between O'Brien's sworn testimony and affidavit is more an apparent inconsistency than a direct contradiction.[21] The notes taken at the December 1982 Board meeting reflect that William asked about Pine Bend's good performance. The notes suggest that KII management responded without referring to Pine Bend Refinery's increasing capacity. Instead, the response emphasized the temporary nature of the increased profits: "We hit the market right, in dealing with futures. Refinery output hit an all time high. An Engineer got around sulfur capacity problem. Bill Hougland got good Canadian supply." (PX 175, K708960). Finally, William Koch avers that "[a]t no time, including at the June 1982 Board of Directors meeting, did Sterling Varner or any of the other defendants tell me or the other directors that the refinery's capacity or throughput was going to increase in 1982 or

1983 to a level higher than that stated in the Descriptive Memorandum and in the coker and sulfur plant presentations." (PX 8, 35).

It is for the jury to decide whether the plaintiffs knew that Pine Bend's capacity was 145,000 bpd in June of 1983 and whether the plaintiffs actually and justifiably relied on direct statements that Pine Bend's capacity was approximately 130,000 bpd. The court denies summary judgment on this claim.

## D. Claim: Future Expansion Plans to 155,000 bpd

In their proposed pretrial order, the plaintiffs allege that the defendants did not tell them and hid from them plans to increase the "crude processing capacity of the Pine Bend Refinery . . .; to approximately 155,000 B/D by the end of 1983." (DX–PBend 61).

### 1) Arguments

The defendants call this claim "preposterous" as the expansion of Pine Bend had always been an overriding goal well known to directors and shareholders alike. The defendants argue that there was no misrepresentation or omission with respect to refinery expansion plans and that the plaintiffs knew of the expansion plans.

The defendants note that capacity increases were published in the *Oil and Gas Journal* and were regularly discussed at board and shareholder meetings. Marjorie Gray, a member of KII's Board of Directors until 1981, testified that refinery expansion was a regular topic at board and shareholder meetings. The Brown and Root plan, first presented in 1977 and modified in 1978, called for a refinery expansion to 200,000 bpd. Paulsen had discussed increasing capacity in 1974 by "debottlenecking" and in 1977 advised shareholders that these continued efforts to "debottleneck" could increase capacity to 160,000 bpd with the necessary changes to reforming, hydrotreating and coking capacity. From 1979 through 1982, the new

---

**20.** O'Brien's deposition testimony could be interpreted as hedging to the extent of allowing for the situation where the crude slate is uniquely situated as to permit a refinery to operate temporarily at levels exceeding its capacity.

**21.** Even if the conflict amounted to a direct contradiction, the defendants' own expert has testified that by the end of 1982 the refinery's management was aware that capacity was over 150,000 bpd.

reformer, coker and sulfur plant were discussed and approved in terms of matching future capacity needs in the range of 200,000 bpd. At the March 1983 shareholders meeting, Varner reported plans for spending $100 million at Pine Bend and for "possibly an additional expansion [that] could result in $200 million at both Pine Bend and Corpus." (DX–PBend 40, A000887–A000888). At its meeting in March of 1983, the Board received the proposed 1983 capital expenditures for Pine Bend that totalled $75 million, including $3 million expressly designated for "No. 1 Crude Unit Expansion." (DX–PBend 41, A003012). At the same meeting, the Board heard that there was a need to get more crude oil into the Pine Bend. Neither William Koch nor any of the plaintiffs' representatives asked questions about the planned expansion or need for more crude oil.

Besides the above, the defendants allege the plaintiffs also knew that the new coker and sulfur plant were coming on stream in the summer of 1983 and that debottlenecking efforts during the 1982 fall turnaround had increased crude unit capacity between 7,000 to 10,000 bpd. The defendants argue the plaintiffs and their representatives were knowledgeable not only of the actual expansion plans but of the relative uncertainty in predicting the capacity increases that could result from the new projects and turnaround work. Based on the total mix of information, the defendants insist they "were not required, under any legal theory, to take plaintiffs' representatives by the hand and say to them: 'now you understand that the Pine Bend refinery may be able to run more barrels by the end of 1983 than it is running in June.'" (Dk. 581, p. 35).

The plaintiffs respond that the Brown & Root plan was never approved and that the idea was abandoned. William Koch avers, in relevant part:

The Board of Directors rejected the proposals in the Brown & Root study in 1978 and replaced them with a less ambitious, less costly, scaled-down plan that entailed upgrading the downstream processing units, but not an expansion of the crude distillation capacity.

. . . .

34. Based on statements made by defendants, it was my understanding that references to "expansion" at Board meetings after the rejection of the Brown & Root study referred to enabling the refinery to handle more heavy crudes as a proportion of the crude slate and to produce unleaded product, not to increasing the refinery's total crude distillation capacity. The coker and desulfurization projects were not presented to the Board as part of the Brown & Root study that had been rejected in 1978. Nor were those projects presented as part of any effort to increase the overall capacity of the refinery . . .

35. At no time, including at the June 1982 Board of Directors meeting, did Sterling Varner or any of the other defendants tell me or the other directors that the refinery's capacity or throughput was going to increase in 1982 or 1983 to a level higher than that stated in the Descriptive Memorandum and in the coker and sulfur plant presentations.

(PX 8, pp. 10–12). The plaintiffs point to comments at a Board meeting in May of 1981 stressing the limited size of Pine Bend's market. The plaintiffs note that the linear program used at Pine Bend included calculations of an "economic marketing limit." The plaintiffs say the defendants' explained their different projects as refinery upgrades intended to improve the refinery processes and profit margins rather than to increase the refinery's crude distillation capacity.

In January of 1983, KRC contacted Litwin Engineers & Constructors, Inc. ("Litwin") about the following:

1. The purpose of the meeting was to establish a basis for design to expand Koch's St. Paul Refinery No. 1 Crude Unit to 65,000 BPD. The unit presently operates at approximately 39,000—40,000 BPD. Koch is currently making modifications which will increase capacity to approximately 50,000 BPD.

2. Target for processing 65,000 BPD would be start of summer, 1984.

(PX 166, KR 512977). The plaintiffs deny the defendants ever told them about the

planned modifications and the expectation that this would increase capacity of the No. 1 crude unit by 10,000 bpd.

According to the plaintiffs' interpretation of KII documents, Koch Engineering also had recommended changes in February of 1983 to the No. 2 crude unit to improve its operations at 110,000 bpd level. In April of 1983, it already had been decided to expense the cost of these modifications. The plaintiffs deny they knew about these plans.

As for the $3 million budgeted to expand the No. 1 crude unit, the plaintiffs say this expenditure was "inconsequential" in size and did not suggest any major planned increase in capacity size. Moreover, the plaintiffs say they were never given the 1983 Profit Plan which show a budget of more than $30 million for the future expansion of the No. 1 crude unit. William Koch recalls Varner mentioning an aggregate capital expenditure of $200 million for both refineries, but $94 million of the $100 million earmarked for Pine Bend was for the coker project and the sulfur and SCOT units which had already been discussed as not causing a significant increase in capacity. With respect to the defendants' expressed need for enlarging the Minnesota pipeline, the plaintiffs note that the defendants did not link this information to any specific capacity numbers.

In reply, the defendants highlight their constant efforts to expand, the increase in capacity forecasted by the coker project, and the $3 million capital budget for expansion of No. 1 crude unit. The defendants dispute that the plaintiffs were repeatedly told that Pine Bend was only upgrading and not expanding because of its limited market. According to the defendants, the technology upgrades meant the refinery was extracting more gasoline and other light products from the same amount of crude. Thus, the projects increased gasoline output in the same way as if crude capacity had increased. The defendants point to language in the coker study projecting increases in gasoline production and identifying the need to penetrate more markets. (PX 101, K307986–K307987).

In their surreply, the plaintiffs argue and offer the supplemental affidavit of William Koch that the self-described strategy at Pine Bend had been to upgrade so as to handle cheap crudes and to produce more gasoline but not to expand crude distillation capacity like other refineries. Finally, the plaintiffs point to testimony from KII staff indicating that Pine Bend product marketing was always an issue and problem.

### 2) Analysis

It is uncontroverted that the defendants can show from the distributed coker and sulfur project reports that the plaintiffs knew crude runs would increase in the range of +3,000 bpd after these improvements came on stream. As far as the plaintiffs actually knowing that Pine Bend's capacity would increase by 10,000 bpd by the end of 1983, this remains a genuine issue of material fact. The plaintiffs present evidence showing the defendants in early 1983 had planned and anticipated this capacity increase by the year end. The plaintiffs deny the defendants ever disclosed this anticipated increase. What should have been disclosed here is a function of what the defendants did know from their planning and whether that known information "might materially affect" a knowledgeable investor's valuation of the stock. On this record, both factors are material issues of fact.

The summary judgment standards preclude this court from finding actual knowledge when the plaintiffs deny knowledge in a manner that is not wholly unreasonable. These standards also keep the court from finding constructive knowledge as the inferences argued by the defendant are controverted by other facts presented by the plaintiff. It may well be true that the defendants were not required to tell the plaintiffs that Pine Bend would be able to process more crude at the end of 1983 as a result of previously disclosed improvements coming on stream. Even so, the warranties in the SPA and the law governing the plaintiffs' fraud and fiduciary duty claims seem to require disclosure of the defendants' other firm plans to increase capacity in conjunction with those improvements and their expectations concerning the total increase in capacity. Quite simply, the record is not one on which this court may grant summary judgment.

### E. Claim: Future Expansion Plans to 175,000 bpd

In their proposed pretrial order, the plaintiffs allege that the defendants did not disclose and hid from them plans to increase the "crude processing capacity of the Pine Bend Refinery ...; *to* approximately 175,000 B/D within the next two years" after the SPA. (DX–PBend 61). The plaintiffs' expert, O'Brien, opines in his written report that "KRC had firm plans in June 1983 to raise capacity to as high as 175,000 B/D." (DX–PBend 20, p. 3).

#### 1) *Arguments*

The defendants argue it is "preposterous" to assert that KII had "firm plans" to expand capacity to 175,000 bpd by 1986 or that the KII should have disclosed whatever contingent planning existed. The defendants note that O'Brien relies only on a memorandum from a meeting with Litwin engineers. This memorandum recounts that Litwin engineers were asked "to establish a basis for design to expand" Pine Bend's No. 1 crude unit from 40,000 bpd to 65,000 bpd. (DX–PBend 59, KR 512977). According to the defendants, this proposal was given only a "cursory look" by Litwin and never advanced to the engineering phase. The defendants say this proposal never got beyond the stage of a "concept," and was abandoned by August of 1985 in favor of building a new crude unit. The defendants argue they are entitled to summary judgment as there were no "firm plans" to expand to 175,000 bpd in June of 1983 which should have been disclosed.

In response, the plaintiffs' expert, O'Brien, avers that KII had a "firm plan" to expand the No. 1 crude unit and that the "engineering analysis" done in early 1983 "was far from 'cursory' and was apparently presented to the Board in August 1983." (PX 142, ¶ 32). The plaintiffs submit additional documents showing some of the engineering work done. The supplemental information submitted at the Board's meeting in December of 1983 shows there were some changes to the status of the project. (PX 142, Ex. K, K300573). Though projections of Canadian crude availability were down, "crude expansion still appear[ed] ... economically attrac-

tive." (PX 142, Ex. K, K300573). Permit applications were submitted in November of 1983 for the construction, but they were now analyzing whether to expand the no. 1 crude unit to 70,000 bpd or to construct a new 70,000 bpd crude unit and shut down the existing No. 1 crude unit. (PX 142, Ex. K, K300573).

In reply, the defendants note that the plaintiffs do not produce a final report from Litwin, a market study, a detailed budget, or even anything resembling a recommendation. The defendants say that the plaintiffs did not depose any personnel from Litwin. As for Koch personnel, Mr. Paulson testified that Litwin gave it a cursory look and that the report was rejected as too expensive. O'Brien admitted that KII had estimated a capital expenditure of $30,000,000 to expand the No. 1 crude unit but that the linear program would not run the extra barrels unless vacuum capacity also was expanded at the additional cost of $20,000,000. In short, the defendants maintain there were no "firm plans" but only discussions and evaluations between engineers. According to the defendants requiring such disclosure "would be ludicrous:"

> [T]he Company has hundreds of employees in all of its divisions, whose duty it is to look for ways to expand and grow. No one even slightly acquainted with KII could help but notice that it had grown substantially and was dedicated to growth. This is why the plaintiffs have alleged the non-existent "firm plans" to expand, because in the "total mix" of information available to plaintiffs, they could not rely on anything less.

(Dk. 602, p. 18).

In their surreply, the plaintiffs respond, "so what," to the defendants' arguments that they were still analyzing whether to choose between expanding the existing unit or building a new unit. (Dk.605, p. 13). As far as documentary evidence of "firm plans," the plaintiffs complain that for even the expansion projects which did occur, the defendants produced in discovery "few, if any, documents" like those they now argue the absence of shows the lack of firm plans.

2) *Analysis*

 Is there enough evidence from which a reasonable jury could find that as of June of 1983 KII had firm plans to expand Pine Bend's capacity to 175,000 bpd within two years? There certainly is evidence that officials with KRC in January of 1983 wanted a design for expanding crude unit No. 1 to 65,000 bpd and had set a target date for this expansion for the apparent purpose of obtaining the design packages and estimates from Litwin engineers. In February of 1983, Litwin submitted a $50,000 work proposal to evaluate either expanding No. 1 crude unit to 60,000 bpd or 65,000 bpd or building a new 65,000 bpd crude unit. At the Board's meeting in August of 1983, this project was presented. In December of 1983, the Board was told that the alternatives were still being evaluated. This project remained in the study stages throughout 1984 and 1985 and was never implemented.

After viewing the evidence in the light most favorable to the plaintiffs, the court believes a reasonable jury could not find that the defendants in June of 1983 had reasonably firm or definite plans to expand Pine Bend's capacity to 175,000 bpd within two years. At most, the evidence sustains the inference that KRC officials believed in early 1983 that the economic forecasts and other projections were sufficiently favorable that they should reconsider now increasing refinery capacity under two previously defined cases. The defendants' officers asked Litwin to update and modify their design package and cost summaries. The plaintiffs do not submit any evidence from which one can reasonably infer that as of the SPA the defendants had already decided on a specific schedule for expanding refinery capacity regardless of Litwin's engineering results and cost summaries. Instead, the evidence overwhelmingly indicates that the defendants remained uncertain about the timing, amount and type of any expansion and that any decision to expand remained contingent on among other things, Litwin's results. The mere decision to consider refinery expansion and to set parameters for estimating costs is not what the plaintiffs allege in this claim. They allege that the defendants planned to expand the refinery to 175,000 bpd within two years. Quite simply, the plaintiffs do not come forth with the evidence to sustain this allegation of "planned" expansion.

**F. Detrimental Reliance**

1) *Arguments*

The defendants argue that the economic analysis used by the plaintiffs in valuing their stock in 1983 proves they did not detrimentally rely on the defendants' representations or omissions concerning Pine Bend's capacity. The defendants point to the plaintiffs' financial advisors in 1982 and 1983 who had concluded from their own studies that the future of the refinery business was not bright. The defendants maintain none of the plaintiffs' advisors ever believed the refinery margins would behave as the plaintiffs' expert O'Brien now assumes for his opinion. Indeed, the defendants say capacity considerations, like capacity creep, "were dwarfed by the more pressing matter of refinery profit margins." (Dk.581, p. 37). The defendants rely on the affidavit of William Bennett, one of the members of the Bain & Company team who gave advice to William Koch prior to the SPA. (PBend SoF ¶ 52). The defendants say the relative unimportance of capacity considerations is revealed in the plaintiffs' own failure to inquire about the expansion reflected in the capital expenditure plan for 1983 which included three million dollars for expansion of crude unit No. 1. Finally, the defendants say the predictions were correct as Pine Bend's net profits for 1982 were substantially higher than 1983 and 1984 even though its average daily production for the latter two years exceeded the figures for 1982.

The plaintiffs argue that the declining profits were due to crude oil prices and that refined product volumes and netbacks were higher in 1984. According to the plaintiffs, the volumes and netbacks are important numbers evaluated by a shareholder in deciding whether to sell his stock. The plaintiffs also argue that when market prices in 1985 returned to a more normal spread Pine Bend exceeded its 1982 profit levels as a result of its already improved volumes and netbacks. The plaintiffs submit affidavits from Alfred

Eckert, the lead member of the Goldman Sachs' team for the period of March through August of 1982, and from Zachary Shipley, a member of the Bain & Company team who conceived and executed the analysis used to value that portion of Pine Bend Refinery based on its capacity and other factors. They aver that the capacity of the refinery either was "important" or "fundamental" to their "analysis and valuation of KII," as was the size of Pine Bend's product market and the level of its margins. (PX 451, ¶ 7; PX 452, ¶ 6). Both say that if they had known of circumstances from which the market might expand or margins might increase, then they would have studied the matter further, asked more questions, and adjusted their valuations accordingly. *Id.* Shipley avers: "Such information would have affected our assessment of the refinery's ability to utilize its capacity, its ability to expand its capacity and improve its margins—all of which directly affect value to a material degree." (PX 452, 6). Eckert offers a similar opinion. (PX 451, ¶¶ 7–8).

### 2) *Analysis*

The court believes there is a genuine issue of material fact whether the plaintiffs actually relied to their detriment on any of the claimed representations and omissions. It is enough that the plaintiffs' investment bankers aver the information would have been material to their valuation and analysis. While Mr. Bennett does aver that there were some economic assumptions made, he does not aver that the omitted information would not have been material to Bain's analysis and valuation. At this time, the court considers the issue reserved for the jury's determination.

### G. Claim: False Statements at the March 1983 Meetings and Material Omissions Prior to the SPA

In their proposed pretrial order, the plaintiffs claim the defendants made the following false statements:

At the March 1983 KII shareholders and board of directors meetings, defendants made numerous false and misleading statements to the plaintiffs or their representatives regarding the dismal prospects for KII's refining business during 1983 and in the future. These statements included, among others, defendants' assertion that it "would require a substantial recovery in refining margins" for KII to make its 1983 profit plan; that KII's "cash cows are sick"; that prices would fall even further and "could result in some heavy losses" on inventories; that "the market is starting to fall greatly so that [KII's] assets are deteriorating considerably"; and similar gloomy and pessimistic statements.

The plaintiffs also claim that contrary to these statements the defendants failed to disclose the following matters either at the March 1983 meetings or anytime before the SPA:

[T]he defendants hid from the selling shareholders their actions and plans to increase the capacity of the Pine Bend Refinery, to maintain or increase refining margins while simultaneously increasing volumes—despite the industry's downward trend—and to gain access to greater volumes of low-priced Canadian crudes. Defendants' plans included delivering and selling the increased Pine Bend output into existing and new market territories to be accessed more effectively by the reversal of the direction of flow of the Williams Pipeline and by other means. Defendants expected that the Refinery's undisclosed plans for large capacity increases would be highly profitable.

(DX–PBend 61.)

Before discussing the arguments, the court will set out what the plaintiffs in their memorandum have alleged in support of this claim. Pine Bend's market area was Minnesota, the northwest half of Wisconsin, and the eastern third of North Dakota. Transportation of Pine Bend's product included short distance truck hauls within Minnesota and a pipeline delivery system extending east into Wisconsin and west and north into the Dakotas. Pine Bend lacked pipeline transportation south for its products. Williams Pipeline ("Williams") had a common-carrier pipeline connecting Minneapolis with Des Moines, Iowa, but Williams had only run northbound carrying refinery products into Minnesota.

The plaintiffs allege that during the summer and fall of 1982 the defendants engaged in secret negotiations with Williams in an effort to reverse the flow of products on the pipeline into Minnesota. Such a change would mean Pine Bend could sell greater quantities of refined products because of its larger market. In April of 1982, Williams proposed a tariff schedule for movement of Pine Bend's product south on the pipeline. In September of 1982, KII officials gave Williams their estimates of the monthly volume of products that Pine Bend would need to put in the pipeline. In December of 1982, Williams' president wrote about ongoing concerns with its pipeline design meeting Pine Bend's expected needs in 1983. As revealed in a study paper dated June 9, 1983, and sent to Bill Hanna, Charles Koch and Sterling Varner, KII officials as of the SPA were aware that an arrangement existed for shipping Pine Bend product south on Williams' pipeline:

> In 1982, Williams pipeline supplied 11.0 MB/D of the market area demand from the south. This volume was primarily needed to push jet fuel north from Des Moines. These imports have essentially been eliminated with the increased jet fuel production at Pine Bend. The ability to pump gasoline south on Williams will allow production above the current 80 MB/D economic marketing limit. By fall, 1983 movements south to Des Moines will be possible and by early 1984, products can be supplied to Chicago or to terminals in the Southern Williams system.

(PX 158, K401001). The plaintiffs see the significance of this reversal revealed in what Koch wrote in its 1984 "Competitive Advantage and Market Review:"

> Pine Bend enjoys a geographic and market position advantage for its market area. With Williams pipeline reversed, the product realizations at Pine Bend exceed the Gulf Coast spot prices by approximately 5¢ /gal....
>
> ....
>
> A significant effort has been underway to improve netbacks. At Pine Bend, average netbacks have improved by over .6¢ /gal since 1982. This primarily was accom-

plished by eliminating Gulf Coast exchanges and replacing them with Group III and Chicago exchanges. The reversal of Williams pipeline has also strengthened our market position and expanded our market area.

(PX 169, K300652, K300654). William Koch avers that the "reversal of the Williams Pipeline and Koch's negotiations to accomplish the reversal were never discussed at Board meetings, and ... [he] was not aware of the reversal before ... [he] sold ... [his] stock." (PX 8, ¶ 45). The plaintiffs allege they did not know of the pipeline reversal strategy, the negotiations or meetings with Williams, the southbound tariffs or schedule for reversed flow, the deal struck at Lakeway, or the beneficial impact of these events and the eventual pipeline reversal on Koch's competitive market position.

### 1) Arguments

In their motion, the defendants do not refer to this claim in the form as it has been alleged in the proposed pretrial order. . Nor do they specifically attack the claim with respect to the alleged false and misleading statements. Of the alleged omissions, the defendants in their reply brief, argue for summary judgment on the reversal of the Williams pipeline. The defendants say the reversal did not occur because of any secret agreement in 1982 but because the continuing expansion at Pine Bend displaced northbound shipments and allowed for additional shipments into southern markets. The defendants consider the paper dated June 9, 1983, to be nothing more than part of its study to determine the economic feasibility of the hydrocracker. The opinions therein were used for a linear program and additional evaluations, and the opinions were "not intended to be a hard solid prediction of the future." (Dk. 602, p. 28). The defendants reiterate that the plaintiffs did not question the authors of these documents about these matters.

### 2) Analysis

The court cannot say as a matter of law that the arrangements and negotiations with Williams pipeline prior to June of 1983

were immaterial. Even if there never was an agreement, one can infer that the meetings and negotiations led to southbound tariffs and to Williams' willingness to move Pine Bend's product southward. By late 1983, Williams had begun to move this product as discussed and planned for in late 1982 and early 1983. The pipeline reversal was expected to and did lead to the strengthening of Pine Bend's marketing position. Such a prospect contrasts with the opinions held by the investment bankers' in late 1982 that questioned Pine Bends's market advantage. The court denies summary judgment on this remaining claim involving Pine Bend Refinery.

## VI. CANADIAN AND UNITED STATES OIL AND GAS PROPERTIES

### A. Statement of Facts

For purposes of the pending motions only, the court considers the following facts to be uncontroverted.

*Information Generally Available to Plaintiffs and Their Advisors with Regard to the Company's Exploration and Production Activities*

1. Through January of 1981, the plaintiffs received detailed monthly financial statements that were provided to the Board of Directors. From May of 1981 through February 1982, the plaintiffs received abbreviated monthly financial statements. The defendant KII resumed sending the detailed monthly statements in February of 1982 until the *Fortune* article in July of 1982. At that point, abbreviated monthly statements were sent until the filing of the Koch I lawsuit when the detailed monthly statements were again sent.

2. The Board also periodically received narrative reports of exploration activities from Koch Exploration Canada, Ltd. ("KEC"), formerly known as Great Northern Oil Company. William Koch's notes from the Board of Directors meeting on March 6, 1982, reflect that by Robert Walton, president of Koch's exploration division, discussed various Canadian properties, including the Giltedge property. William's notes conclude with the comment: "Canada at this moment looks very encouraging." William's notes from the Board meeting on June 19, 1982, reflect Charles Koch's statement that "reserves in Canada fantastic but worth only 10 cents." (PX 201, A003109).

3. Also at the Board meeting on March 6, 1982, there was a discussion of reserve estimates. The Board received a report entitled, "Koch Industries Total Reserve Summary." The summary disclosed "Proved" reserves for the United States and Canada and remarked that these figures were developed by Ryder Scott Company ("Ryder Scott"). The summary disclosed "Indicated Additional" reserves and remarked that these figures had been developed by Koch engineers. The summary also disclosed "Most Likely" reserves and reported them as the total of "Proved" and "Indicated Additional" reserves.[22] The report or summary does not

---

22. The plaintiffs repeatedly refer to some internal reserve summaries in which KII added "potential" reserves to its calculation of "most likely" reserves. These reserve summaries were for the Cold Lake field and the Giltedge field. KII explains that these internal Canadian forms are plainly erroneous in the manner of calculating "most likely" reserves. The forms mistakenly defined "most likely" reserves as the total of "proved developed" reserves, "proved undeveloped" reserves, "additional probable" reserves, and "potential" reserves. The form disclosed the separate estimates for each of these reserves and directed the preparer to total these estimates in calculating "most likely" reserves.

The court believes there is no genuine issue of material fact that these internal forms used at KEC were in error. The plaintiffs come forth with no evidence showing that KII's main offices

ever acted upon these erroneous calculations or ever determined "most likely" reserves using the same erroneous calculations found on these forms. In fact, one can calculate the "most likely" reserves as that term is defined by KII. The mere use of the erroneous forms in Canada does not demonstrate that it was KII's corporate practice to treat "potential" reserves as part of "most likely" reserves. The deposition of Lance Hogarth, one of the preparers of the erroneous forms, agreed that KII used in 1983 the reserve definitions found on exhibit KQ100439 which was provided to Goldman Sachs in 1982. (DXE & P 36, p. 242–43). The plaintiffs never questioned Mr. Hogarth about the conflict between the form's apparent definition of "most likely" reserves and KII's definition of the same. Indeed, KEC engineers did not consider "potential" reserves in Canada to have a unique mean-

mention "potential" reserves and does not imply that "potential" reserves are included within any of the other reserve figures.

4. During its evaluation of KII in 1982, Goldman Sachs requested and received a variety of information concerning the KII's exploration and production activities. Goldman Sachs received the reserves studies performed and reported by Ryder Scott for the years of 1981 and 1982. William Koch received the 1983 Ryder Scott report at the Board meeting on March 5, 1983. These reports set forth Ryder Scott's analysis of the KII's "proved reserves" for all of KII's properties, both in the United States and Canada. Each Ryder Scott report provided:

The proved reserves reported herein conform to the Securities and Exchange Commission ("SEC") definition of proved reserves. *The SEC defines proved reserves* as the estimated quantities of crude oil, condensate, natural gas, liquids and natural gas which geological and engineering data demonstrate with reasonable certainty to be recoverable by primary producing mechanisms and by improved recovery techniques in future years from known reservoir under existing economic and operating conditions. In general, the economic producibility of the estimated proved primary reserves is supported by actual production or a conclusive formation test; however, in certain instances proved reserves are assigned to reservoirs on a basis of a combination of electrical and other type logs and core analyses which indicate these reservoirs are analogous to similar reservoirs in the same field which are producing or have demonstrated the ability to produce on a formation test. Reserves which are to be obtained from improved recovery techniques are included in the proved category, on the basis of a pilot project or an installed program which has demonstrated the success of the improved recovery technique.

(DX–E & P 6, G12553).[23]

5. Goldman Sachs also requested that KII provide its in-house analysis of reserves in the "probable" category, which are reserve estimates that are not supported by sufficient data to qualify them as proved reserves. KII routinely used the designation of "indicated additional" for the category of "probable" reserves. In the information supplied to Goldman Sachs, KII defined "indicated additional" and "most likely" reserves as follows:

**Indicated additional** represents that incremental increased recovery that when added to the proven reserves will result in the **most likely** recoverable reserve. **Most likely** reserves represent the reserves estimate used in justifying capital expenditures. **Indicated additional** will include primary and secondary that does not qualify as proven but where engineering and geological data demonstrate reasonable certainty. It would include primary where production tests are not available and secondary that has not been piloted. **Indicated additional** reserves are reserves confined to established productive acreage.

(DX–E & P 6, G12551) (emphasis added).[24] At Goldman Sachs' request, the KII provided its in-house reserve estimates for indicated

---

ing for they described them as "nebulous, 'hairy-fairy' sort of category, so much risk of uncertainty putting a number to it." (DX–E & P S–2, Leopold Dep. p. 147). Since KII did not consider the forms accurate with respect to the calculation of "most likely" reserves and since KII did not rely on those forms for those particular calculations, the plaintiffs are unable to base a claim on KII's withholding of these erroneous calculations. *See* Statement of Uncontroverted Facts, ¶ 32.

23. The plaintiffs deny that all relevant information necessary for evaluating KII's exploration and production activities were disclosed. They complain that they did not receive information of the 1981 Suncor proposal to farm-in a 60% interest in a substantial portion of KII's Cold Lake holdings and to spend approximately $27 million for the steam project on KII's property. The plaintiffs also point out they were not told that an in-house engineer had reduced Giltedge proved estimate reserves by one-half prior to Goldman Sachs evaluation. The defendants deny that this additional information is material.

24. The plaintiffs do not effectively controvert the statement that the defendants actually used this definition of "most likely" reserves in preparing these estimates and in conducting its relevant operations. Most importantly, this definition is the one to be used in testing the accuracy of the defendants' disclosures.

additional reserves on the ten largest fields in the United States, and the ten largest fields in Canada.

6. Goldman Sachs received certain information concerning the KII's undeveloped leasehold acreage in the United States and Canada. The information included the net acres covered by licenses and permits, the net acres covered by oil sands leases, and the capitalized cost for each. The information also separately disclosed the undrilled or undeveloped acreage covered by licenses and permits.

7. In its presentation to Goldman Sachs, KII expressed proven reserves, indicated additional reserves, and the total of the two, most likely reserves, quantitatively in terms of numbers of barrels. Doubting their ability to come up with a meaningful estimate of "potential" reserves in terms of number of barrels, the defendants provided a narrative description of the areas in the United States and in Canada that had the most significant future potential.[25] In the information supplied to Goldman Sachs, the Company defined this potential as follows:

> In this report, potential reserves refers to those low risk additional reserves which lie outside existing proven productive areas. The potential reserves referred to in Exhibits 11 and 12 are those which could significantly affect Koch Exploration's future net income.

(DX–E & P 6, G12551). KII gave descriptions on both Giltedge and Cold Lake.

8. As a part of its evaluation work, Goldman Sachs retained its own petroleum engineer, Mr. Ray Hansen of Houston, to assist in the analysis of KII's exploration activities. Mr. Hansen is a former Ryder Scott employee and had assisted Goldman Sachs in other petroleum evaluations on a number of occasions. In addition to the information detailed in the preceding paragraphs, Mr. Hansen, together with other Goldman Sachs representatives, attended meetings in Wichita with the operating personnel of Koch Exploration. At these meetings, there were presentations concerning KII's exploration activities in the United States and Canada. Goldman Sachs, and specifically Mr. Hansen, had the opportunity to question KII personnel about any aspect of the KII's exploration business and to request any additional information they desired. Mr. Hansen has testified that his questions at these meetings were answered in a way that indicated KII personnel "were forthcoming with everything." (DX–E & P 9, p. 62).

9. In the course of Goldman Sachs' work, Mr. Hansen also made several visits to the Ryder Scott offices in Houston. He was provided the opportunity to review all of the Ryder Scott working files with regard to KII and to interview the Ryder Scott personnel who were involved with the KII's reserve analysis.

10. In addition to the meetings in Wichita and the visits to the Ryder Scott offices, a representative of Goldman Sachs, visited the KII's offices in Calgary, and interviewed Mr. John Miller, then president of Koch Exploration Canada, for most of one afternoon. According to Miller, he disclosed everything they knew or were asked about with regards to the undeveloped properties.

### Cold Lake Undeveloped Acreage

11. The plaintiffs knew that KII's Canadian exploration division held a substantial leasehold position of over 50,000 net acres in an area of Alberta province, known generally as the Cold Lake region. As of 1982 and 1983, KII's interest in these leases had been held for a number of years, dating back to the latter part of 1960's decade. Cold Lake is generally recognized for its deposits of very heavy oil, also known as bitumen. These deposits are located in shallow, sandy formations known as "oil sands." The leases specifically covering these formations are referred to as "oil sands leases" and typically

---

25. The plaintiffs point to internal summaries where KII had estimated potential reserves in barrels. The plaintiffs allege these numbers are "meaningful," but offer no proof of what particular "meaning" or reliability is behind these numbers. The plaintiffs offer no proof that anyone at KEC or KII acted on or relied upon these internal estimates. The mere fact that these estimates may exist and were kept for internal purposes hardly proves they would be meaningful or reliable in estimating the value of the potential reserves.

carry a term of twenty-one years that is renewable.

12. The huge deposits of heavy oil in the Cold Lake area were widely known in the oil industry. For example, in an article that appeared on the front page of the business section in the *New York Times* on June 2, 1983, the Cold Lake area was described as "an oil man's dream: three times more oil than the Middle East . . . ." (DX–E & P 12). It was also generally known, however, that the heavy oil deposits were "thicker than molasses" and required extremely expensive production techniques in order to bring the deposits to the surface. *Id.* The *New York Times* article, described production costs as 20 times greater than "that of Saudi Arabia's gushers." *Id.*

13. As of June 4, 1983, KII's only interest in a developed, producing property in the entire Cold Lake area was as a minority (35%) partner in a small pilot project operated by the majority partner, Drummond Petroleum. This project was known as Ardmore. Since this was KII's sole producing property, the only proved reserves reported by Ryder Scott Company related to KII's minority interest in the Ardmore project.

14. The Ardmore project's results were mixed. In 1983, the project yielded a modest operating profit before deducting the costs associated with capital expenditures and the fuel costs incurred for consuming the gas reserves. As reflected in minutes from an in-house meeting on June 7, 1983, the operators of the project were cautious about any major expansions of the project:

> The economics of Pilot expansion as discussed in the June 3, 1983 memo are very sensitive to oil price, operating costs, royalties, taxes, calendar day oil rate and steam oil ratio. Any adverse movement in any one of these items from the base case assumptions will "kill" the economics of expansion. Therefore, we need more information and greater degree of confidence before a major expansion should be undertaken.

(PX 212, K605488). Two years after the SPA, an article appearing in *Nickle's Petrole-*

*um Recovery Week* described the project as "ten years to break even." (DX–E & P 15, p. 4). The article, noting the tenth anniversary of the start of the pilot project, described its current status as follows:

> Oil production now pays for all of the project's variable costs and even, occasionally, springs for a small capital expenditure. The $924,000 spent on the initial construction of the surface facilities, however, remains to be recouped.

(DX–E & P 15, p. 4). The senior engineer from the Ardmore project was quoted in that same article opining: "If we can fix that problem [the injected steam breaking through to the underlying water] and at last commercially exploit Ardmore, we will be able to apply all our learned technology to our other, similar 12 sections at Muriel Lake. You can see why this is very important to us." (DX–E & P 15, p. 4).

15. The production technology used to recover the heavy oil deposits in the Cold Lake area consisted of either cyclical steam injection or a steam flood process. This technology was used by a number of companies in their in-pilot projects, including KII's partner, Drummond, at the Ardmore project.[26] At KII's Ft. Kent pilot project, described below, this same technology was used. There was nothing unique about the technology that Koch used in its Ft. Kent project.

16. KII's undeveloped leasehold interests in the Cold Lake area totaled more than 50,000 acres, and this information was provided to Goldman Sachs in connection with its work in 1982. Goldman Sachs was also provided with a description of the potential for KII's undeveloped leasehold interests in the Cold Lake area. In the section of the information provided to Goldman Sachs entitled "Canadian Exploration and Production Division—Potential Reserves," the following appears:

> *Cold Lake*
>
> Great Northern is the sixth largest land holder in the Cold Lake oil sands area. Since 1974 it has been involved as a partner in a thermal experimental scheme in-

---

**26.** The plaintiffs' cited material does not contro- vert this statement.

volving the steam stimulation ("huff and puff") of a dozen wells [the Ardmore project referred to above]. Results have generally been disappointing in terms of both recovery and economics. Recently, however, pressure communication was established between four of the wells in the scheme and a steam drive was initiated utilizing one well as an injector and three as producers. Operations are presently in progress to expand the steam drive to include two more producers.

Preliminary results of the steam drive suggest that this process may be better suited to the area of Great Northern's land holdings than the steam stimulation process. Economic parameters have yet to be established, but under a favorable price and tax regime **the potential could be very large.** (DX–E & P 6, G12601) (emphasis added). As noted earlier, potential reserves had been defined in the same information given to Goldman Sachs as those reserves "which could significantly affect Koch Exploration's future net income." [27]

17. In addition to this written information, the plaintiffs' advisors with Goldman Sachs interviewed Koch Exploration's operating personnel both in Wichita and in Calgary. Goldman Sachs's notes reflect that Cold Lake potential was discussed in the meetings in Wichita. As mentioned before, a representative of Goldman Sachs met with John Miller in Calgary in the late spring or early summer of 1982. Mr. Miller recalled that he and the Goldman Sachs representative talked for most of one afternoon with the greater part of their discussion dealing with KII's undeveloped properties in Canada, including the Cold Lake area.

18. Goldman Sachs assigned value to the KII's undeveloped acreage in Canada based on KII's cost. Bain & Co. assigned value to the KII's undeveloped acreage on a dollar per acre basis, ranging from $30 per acre to $80 per acre. One of the plaintiffs' experts in this litigation, Mr. Coles, valued the Com-

pany's Cold Lake acreage using publicly available information on other transactions. The plaintiffs' other expert in this case, Mr. Grandville, performed discounted cash flow evaluations based on the hypothetical development of future projects at Cold Lake.

19. There is no contention that plaintiffs and their advisors were unaware of the number of acres of undeveloped oil sands leases held by KII in the Cold Lake area.

20. The plaintiffs do contend that they were not informed about KII's acquisition in January of 1983 of an additional 44,000 acres of leases having a retroactive effective date of December 1981. These additional leases did not cover the oil sands but shallower zones. They were called Petroleum and Natural Gas ("P & NG") leases and were issued to all holders of the underlying Oil Sands leases for nominal consideration. KII acquired these leases believing the shallower zones might contain gas reserves that could be used in developing the Cold Lake oil sand reserves. One of the plaintiffs' experts assigned no value to the P & NG leases, and the other expert estimated a value of $700,-000.

21. As of June 4, 1983, KEC had not drilled any oil wells on its undeveloped acreage in the Cold Lake area except for the pilot wells drilled as part of the Ardmore project, of which the plaintiffs were aware, and except for several other initial wells drilled and abandoned in either the 1960s or the 1970s. In December of 1982, a gas well identified as Koch Charlotte Lake 15–17–61–3W4M was drilled on a P & NG lease. After testing, the gas well was plugged and abandoned.

22. As of June 4, 1983, KEC had not made any application to any Canadian regulatory authority for approval to drill any new wells on its undeveloped acreage in the Cold Lake area.

23. As of June 4, 1983, KEC had not assigned any proved reserves, or indicated additional reserves to any Cold Lake proper-

---

**27.** The plaintiffs assert here that the defendants also should have disclosed additional information, including the 1981 Suncor offer that was rejected, KII's application for a conversion of P & NG lease to an Oil Sands Lease, its program

beginning in January of 1983 to evaluate its Cold Lake Oil Sands Leases, and the fact that KII had mapped its net oil and gas pay contained in the reservoirs under their Cold Lake acreage.

ty over and above those already disclosed to Goldman Sachs. The plaintiffs or their representatives possessed the following reserve estimates for the Cold Lake region. Ryder Scott's proved reserve estimate was 271,678 barrels in 1982, and its 1983 report provided in March of 1983 showed 450,537 barrels in proved reserves. The plaintiffs also had KII's 1982 in-house estimate of 261,000 barrels of indicated additional reserves. Adding together the estimate of 261,000 barrels with the proven reserve estimate from the 1983 Ryder Scott report, the total is 711,537 barrels. This total is more than the estimate of 653,500 barrels for proved reserves and indicated additional reserves found on the January 1983 in-house summary which was not provided to the plaintiffs prior to the SPA.

24. Before 1983, the geological mapping of the Cold Lake region consisted of the following. KEC's predecessor had prepared unit and total net pay maps sometime before 1976. As part of its November 1982 application to convert P & NG leases to Oil Sands leases, KEC included some geology maps that had been recently made. KEC also completed some regional and net oil pay maps in the last part of 1982 and the first three months of 1983.

25. In 1983 and 1984, KEC personnel, including geologists and geophysicists, carried out a geological and geophysical evaluation of its undeveloped Cold Lake properties. A memorandum dated January 21, 1983, and entitled "1983 Goals Canadian Exploration and Production Division" states the 1983 program goal for KII's Oil Sands acreage, as follows:

1. Carry out a complete geological, geophysical, and engineering evaluation of the gross 60,000 (net 50,000) acres held by Koch in the Cold Lake Oil Sands area. The purpose will be to high grade areas of

potential economic interest. Delineation test wells may be drilled to confirm geological and geophysical anomalies.

2. An engineering evaluation of the existing 35% interest Ardmore steam flood pilot operated by Drummond Petroleum will be completed. Should the pilot be expanded, continued in its present form, or abandoned?

3. A number of proposed oil sands projects in which Koch has been invited to participate will be reviewed in sufficient detail to determine whether such participation might offer advantages over development of our own properties.

4. The option of farming out our Cold Lake acreage will again be reviewed in the light of the results of the above described studies and the prevailing economic and regulatory situation.

26. The evaluation process consisted of nine stages with the last stage not performed until the fall of 1983. Seven of the remaining eight stages had expected completion dates no later than May of 1983. A status report in March of 1983 showed three of the nine stages completed before May of 1983 and five more stages completed in May and June. The last stage was a seismic program which consisted of experimental testing in March and a more extensive testing in the fall and winter of 1983. The authorization for expenditure ("AFE") for the experimental seismic program in March described this phase of the last stage as follows: "Successful identification of these sand units could lead to a more extensive exploratory seismic program to aid in locating areas with oil sands potential." (DX–E & P 24).

27. As of June 4, 1983, KEC had not selected any Cold Lake sites for actual development or economic analysis of potential reserves.[28]

---

**28.** The plaintiffs do not effectively controvert this statement. The plaintiffs point to the in-house "Summary of Changes in Reserves" for the Cold Lake Ardmore field which includes a statement that "adjustment made on May 31, 1983, due to economic run." ((DX–E & P 34, KQ108320). In their brief, the plaintiffs assert this statement "meant: 'We [KEC's engineers] would not include reserves that weren't economical at the time of the evaluation.' (PX207, Leopold 136–41)." The plaintiffs, however, do not cite or

offer the reserve file in which this document was found and from which KEC's engineer Gerhard Leopold was deposed. The defendants attach to their reply the entire reserve file. The only economic runs found in that file were for probable additional reserves, not potential reserves. Referring to that file, the plaintiffs' counsel deposed Leopold about whether economic runs were done for potential reserves:

**1520**

28. KEC also employed outside consultants. KEC personnel drew regional maps as an initial overview to identify areas for further study. The mapping was considered to be a preliminary step in the KII's exploration activities on its undeveloped acreage. In terms of analysis, a significant variety of additional work must be done after the mapping before a decision is made to develop a particular area. Even before a test well is considered, there must be extensive work in the following areas of seismic results, engineering review and design, and economic evaluations showing whether an area can be developed considering such things as current prices and governmental regulations. Assuming this work results in a proposal to drill a test well, and assuming that test is successful, more work, well testing, and detailed economic evaluation is still required before a pilot project can proceed.

29. This evaluation process did not result in the drilling of any well until 1984. Two experimental wells were drilled in an area of Cold Lake near the town of Ft. Kent in late February and early March 1984, and steam injection testing on the wells was not completed until July 1984. No economic analyses were performed with regard to the Ft.

Kent pilot project in the Cold Lake area until the spring of 1984, and the first of those analyses was transmitted from Calgary to Wichita in late May 1984.

30. The corporate secretary's notes from KII's Board of Directors' meetings reflect that the Board first discussed on June 1, 1984, a possible project in the Cold Lake area as a result of the work done in 1983 and early 1984. No Cold Lake project was presented to the Board for approval until August 31, 1984, when the Ft. Kent pilot project was approved at a cost of $10.4 million. Following the Board's approval, an application was filed with the Canadian regulatory authorities on November 30, 1984, for approval of a fifteen-well experimental pilot project in the Ft. Kent area of Cold Lake. The Board in March of 1985 learned that the application submitted to the Canadian government had been scaled down from what had been approved and that the new project was anticipated to cost only $5.8 million. Approval from the Canadian regulatory authorities came later in 1985, and the Ft. Kent pilot project began steam injection in December of 1985.

Q. ....—which is Exhibit 32 [entire reserve file], can you tell me for sure whether at that time you did or didn't do economic runs on the "potential" category?
A. I can't recall that we did or didn't do them, but if they were done, they would have to be in there. That was definitely stipulated, that all supporting work would have to be added to the file.
Q. Okay.
A. You can't just leave it off. Even if it meant photocopying work done during the year, you have to document it, too.
Q. Okay. But since we don't—you can't say for certain whether this file is complete, can you?
A. It is complete. If that is what was in the original file, then that is complete, but to my knowledge, in terms of—how should I put it? Not all files look the same, obviously, so you can't really say for sure if anything's missing or not, but I know for a fact, as I tried to mention earlier, that in the earlier years, being that we're getting started in this whole process of reserves evaluation, we put an emphasis on the more certain reserve categories and tried to work them out as accurately and objectively as possible.
So when it got down—it did occur at times, when it got down to a time constraint—"poten-

tial," because it is such a nebulous, "hairy-fairy" sort of category, so much risk of uncertainty putting a number to it, at times we did volumetric calculations and assigned some sort of recovery factor based on technical information from other areas.
Q. Do you know if that was the case with 1/1/83 reserve that's Exhibit 32?
A. It could be. As I say, in the early years, we took that approach to "potential," and in the later years, we did make an economic run for "potential."
Q. It could be or it might not be; is that fair? I mean, you can't say for sure?
A. I cannot say for sure.
(DX-E & P S-2, Leopold Dep. pp. 146–48). While Mr. Leopold agreed he was unable say to a certainty that economic runs were not done for the potential reserves, he did testify that if the runs were done then they should have been in the reserve file and that during the earlier years economic runs were not done for potential reserves. The reserve files did not contain economic runs for the potential reserves. Based on all the evidence, including Leopold's explanation, a reasonable jury could not conclude from this evidence that the potential reserve numbers found on KQ108320 were the result of an economic run.

31. The 1983–84 evaluation and review of KII's entire Cold Lake undeveloped acreage, described in the preceding paragraphs, resulted in no other project in that area prior to the end of 1985.

32. Documents from KEC's Calgary files plainly reflect that as of early 1983, an engineer had estimated approximately 32,145,000 barrels of "potential" oil reserves in the Cold Lake area. The same documents add this "potential" reserve figure with "proved" and "probable additional" reserve figures into a total column labelled "most likely." The testimony is undisputed that the set up of the form of these documents was simply a mistake. The error was caught and corrected on May 20, 1987, by the president of KEC who noted on a page preceding the page containing the Cold Lake numbers, that "most likely reserve numbers appears to include potential reserves. This is an error. Most likely = proved + prob. additional." [29] (DX–E & P 33, K633674). There is no evidence that these form documents were ever sent from the Calgary office to Wichita. As reflected in various other documents, KII's working definition of "most likely" reserves included only the total of proved reserves and indicated additional (probable) reserves. The depositions of numerous KII personnel have confirmed this definition, and there is no testimony that the KII's working definition of "most likely" reserves ever included estimates of mere "potential" reserves.[30]

33. Ray Hansen, the reserve engineer retained by Goldman Sachs, testified that a value was not given to the potential reserves as "these are—as I remember, these were areas that they would arm-wave about, but you couldn't assign anything." (DX–E & P 9, p. 92).[31] One of the plaintiff's experts, Mr. Grandville, testified that he values crude reserves based on the likelihood of recovering the crude and uses three categories of likelihood—proved, probable and possible. The possible category refers to reserves having only a fifteen percent chance of recoverability.

34. On January 1, 1984, KEC reduced its estimate of potential reserves in the Cold Lake area by almost 18 million barrels. This reduction was a result of the geological evaluation that took place during the year 1983, referred to in the paragraphs above.

35. Geologist David W. Richardson has averred that his notes referring to "200 million barrels of recoverable reserves" is not a calculation of proved or probable reserves. Based on a series of assumptions, he hypothesized this amount of recoverable reserves. Richardson has no knowledge of anyone at KEC or KII using his notes and speculations anytime before he left KEC in 1986.

*The Giltedge Producing Properties*

36. The Giltedge area is located in east central Alberta. The area holdings of KEC or other Koch subsidiaries were basically divided into two parts. The first part was a field known as Giltedge East that was operated by Husky Oil Operations, Ltd. ("Husky"). Koch was a minority interest partner in Giltedge East with a working interest slightly in excess of 12 percent. Immediately west of that field was Giltedge West, the second part of KII's area holding. KII was the operator and 100 percent working interest owner of Giltedge West.

37. Both Giltedge East and Giltedge West were under waterflood. A waterflood is a recovery technique consisting of the injection of water into a formation in order to

**29.** The timing of this correction does not create a credibility issue for the jury. The plaintiffs say they disclosed the issue of Cold Lake reserves on January 11, 1986, in their brief opposing dismissal (Dk.70). Whether or not the defendants knew the reserves were an issue, the plaintiffs simply offer no proof that KII ever used or relied on the erroneous "most likely" reserve calculations found on those documents or that KII ever used the same erroneous definition of "most likely" reserves with respect to any of its other holdings.

**30.** The court does not consider the definition of "most likely" found in the records given Goldman Sachs or to the Board prior to SPA to be controverted by KEC's erroneous forms. There is no evidence that the KEC's erroneous forms were ever sent to KII's main office for any business purpose.

**31.** The portions of Hansen's deposition cited by the plaintiff do not show that he had categorized the Cold Lake reserves as probable. Consequently, the court does not find the above statement to be controverted.

maintain the pressure of the formation and produce additional reserves that would not be otherwise obtainable by primary production. The waterflood scheme in the Giltedge East field, where Koch was a minority interest holder, was initiated in 1976. As of 1983, the property consisted of over 40 producing oil wells, and approximately 15 water injection wells. There is no contention in this case that the selling shareholders and their advisors were unaware of the existence of Koch's minority interest in the Giltedge East field.

38. The Giltedge West field, owned and operated 100 percent by Koch, was produced under primary operations until late 1979, at which time a waterflood scheme was initiated. As of 1983, there were 31 producing oil wells and eight water injection wells on the property. There is no contention in this case that the selling shareholders and their advisors were unaware of the existence of Koch's ownership interest in the Giltedge West field.

39. The Ryder Scott reports, provided to the selling shareholders and their advisors, contained estimates of remaining proved reserves made by Ryder Scott for both Giltedge West and Koch's minority interest in Giltedge East. Those proved reserve estimates are set forth below.

| As of | Giltedge West | Giltedge East |
|---|---|---|
| January 1, 1982 | 4,648,689 bbls. | 472,473 bbls. |
| January 1, 1983 | 4,164,795 bbls. | 341,621 bbls. |

(DX–E & P 39, Tables 584 and 602 (1982) and 620 and 636 (1983))

The Giltedge West/Giltedge East area was Koch's largest producing interest in Canada.

40. As with its other fields, the Company also provided to the selling shareholders and Goldman Sachs its in-house estimates of reserves in the indicated additional (probable) category, as defined earlier herein. The combined 1982 in-house estimate of indicated additional reserves for the Giltedge West/Giltedge East area was 810,000 barrels.

41. As set forth above, Ray Hansen, the independent petroleum reserve engineer retained by Goldman Sachs in the spring of 1982, had complete access to the Ryder Scott files with regard to their estimates of the reserves for the Giltedge areas. Mr. Hansen also had access to the Ryder Scott engineers who had actually been involved in the work for Koch Industries, and to the engineers' work in estimating the KII's proved reserves for January 1, 1981 and January 1, 1982.

42. The Ryder Scott files available to Mr. Hansen included information received from KEC concerning the Giltedge fields. Included in Ryder Scott's files was Koch's original application to the Canadian Energy Resources Conservation Board (the "ERCB") for permission to initiate the waterflood scheme in the Giltedge West field in 1979. That application contained KII's estimate of waterflood reserves made before the waterflood operations actually commenced. This initial estimate was 9,880,000 barrels. When the ERCB later approved the waterflood project, it likewise estimated initial waterflood reserves of 9,800,000 barrels.

43. ERCB information of this type is also a matter of public record. The ERCB routinely establishes its own estimate of reserves at the beginning of a project like the Giltedge West waterflood. The ERCB may reevaluate its reserve estimate at a later time. In the case of the Giltedge West property, the ERCB had not changed, as of 1983, its estimate of reserves initially made in 1979. The ERCB's published reserve number for Giltedge West was its initial estimated reserves less the cumulative production from 1979. As a property produces over time, and additional production information about field performance is received, the original estimates of reserves may change. Such facts are well known generally in the oil and gas industry.

44. The Giltedge West waterflood had not performed as well as anticipated when the application to the ERCB was filed in 1979. This is evidenced in part by a memorandum found in William Koch's files that is dated February 29, 1980, from John Miller, stating:

> Giltedge proven waterflood reserves have been reduced by 890,000 barrels in recognition of the fact that at least 25 percent of the reservoir will not be affected by the waterflood which has recently been installed.

Between 1981 and 1982, KII's in-house proved reserve estimate for Giltedge West was also lowered. The in-house reserve estimates of proved reserves for Giltedge West for the years 1981, 1982, and 1983, together with Ryder Scott's estimates as of the same dates, are set forth in the table below.

Giltedge West Proved Reserves

| | Koch Exploration Canada Internal Estimate | Ryder Scott Estimate |
|---|---|---|
| January 1, 1981 | 8,036,000 | 4,792,897 |
| January 1, 1982 | 4,089,000 | 4,648,689 |
| January 1, 1983 | 3,616,300 | 4,164,795 |

(DX–E & P 33 and 44).

45. The plaintiffs do not contend there were new wells drilled in either the Giltedge West or Giltedge East waterfloods of which they were unaware when they sold their stock in June 1983. There is likewise no claim or contention that any additional acreage had been acquired in either area. Nor is there any contention in this case that Ryder Scott, in its estimating of KII's remaining proved reserves for the Giltedge areas, did anything intentionally wrong or that Ryder Scott intentionally underestimated the reserves. For that matter, the plaintiffs do not have any evidence that KII withheld any information from Ryder Scott in the course of its work or that KII provided false or misleading information to Ryder Scott concerning the facts or production history of Giltedge West or Giltedge East.

46. It is generally known in the oil and gas industry that different petroleum engineers, utilizing precisely the same data with regard to a producing property, can each reach different conclusions as to the estimate of proved reserves, through the exercise of their own independent professional judgment. The plaintiffs' expert, Mr. Coles, assumed without reservation that Ryder Scott engineers exercised their own professional judgment in the assigning of proved reserves to the Giltedge properties. Mr. Coles testified that if two different reserve engineers observed the same data and reached estimates of remaining reserves, he would not consider those opinions to be materially different so long as they were within plus or

minus ten percent of one another. The reserves expert for Goldman Sachs, Mr. Hansen, testified that he would expect the range of difference to be ten to fifteen percent.

47. The Giltedge West field, owned 100 percent by KII, is the most valuable of the two parts of KII's holdings in the Giltedge area. Indeed, KII's minority interest in the Giltedge East field is much smaller by comparison. With regard to the Giltedge West field, the plaintiffs' expert, Mr. Coles, offers an estimate of remaining proved reserves, as of June 1983, which is within ten percent of Ryder Scott's estimate of proved reserves for that field on the same date. Mr. Coles' report reflects, at page VI–2, that he estimated the remaining reserves as of June 1, 1983 for the Giltedge West field to be 4,492,600 barrels. (DX–E & P 45). Page V–4 of his report reflects that Ryder Scott's estimate of proved reserves on the same date was 4,080,-000 barrels, a difference of less than 413,000 barrels, approximately a ten percent variance. (DX–E & P 45). Mr. Coles' estimate of net present value is significantly higher than Ryder–Scott's estimate, as he opines that Ryder–Scott's use of decline curve analysis results in an "inappropriately conservative" estimate of value. (PX 223, p. 6).

48. There is no contention in this case that Ryder Scott did not have accurate production data when it performed its work on the Giltedge properties. Ryder Scott specifically analyzed the production data in connection with these properties each year and exercised its judgment as to the proper estimates of reserves, based on that performance data.[32]

49. There is no contention in this case that the Company had increased its own internal estimates of proved reserves for either Giltedge West or Giltedge East prior to June 4, 1983 and failed to disclose such change to the selling shareholders.

50. For the years 1980 through 1982, monthly and annual oil production at Giltedge West increased. Despite these changes, as of June 4, 1983, neither KEC nor Ryder Scott changed its estimates of proved

---

32. The cited deposition testimony of Harry Gaston does not controvert this statement. He does not opine that Ryder Scott actually used methodologies that it knew were improper.

reserves. In fact, KEC did not increase its internal estimate of proved reserves for Giltedge West in either 1984 or 1985, nor did Ryder Scott Company increase its estimate of those reserves. Instead, KEC and Ryder Scott decreased their reserve estimates each year. The defendants' expert, Noel Cleland, testified that as of the SPA he would not have used a decline curve analysis because of the historic increases in production. Cleland also opined that an engineer seeing production increases after a waterflood must still forecast how long the production will last.

51. KII officials received and reviewed Ryder Scott reports. They also received quarterly review reports that indicated production from the different fields and commented on certain production. One cannot reasonably infer from the evidence that the defendants were aware that Ryder Scott had erroneously estimated proved reserves for the Giltedge properties or was using erroneously a decline curve analysis.[33]

52. In their reserve estimates dated January 1, 1984, Ryder Scott increased its reserve estimates for Giltedge East apparently based on sufficient increases in production there. An engineer at KEC did the same. The reserve estimates for 1983, 1984 and 1985 for Giltedge East are set forth in the table below:

Giltedge East Proved Reserves
Koch's Fractional Interest

| | Koch Exploration Canada Internal Estimate | Ryder Scott Estimate |
|---|---|---|
| January 1, 1983 | 268,000 | 341,621 |
| January 1, 1984 | 747,700 | 698,796 |
| January 1, 1985 | 871,000 | 704,934 |

There is no evidence that the decisions to increase these reserve estimates were made prior to the SPA in June 1983. Neither Ryder Scott nor KEC changed their reserve estimates for the west side of the field based on this change in the performance on the east side. The plaintiffs' expert, Mr. Coles, determined that as of June 1983, Koch's 12 percent interest in the Giltedge East field should have included an additional 336,000 barrels of reserves, over and above the Ryder Scott reserves. This is less than the increase in reserves made by Ryder Scott on January 1, 1984. The value Mr. Coles attributes to these reserves is $700,000.

53. In the information provided to Goldman Sachs with regard to areas with future potential, the following appears:

*Giltedge*

The greater part of the Giltedge heavy oil field is under waterflood. The exception is a small area on the western flank where oil gravities are too low and viscosities too high for successful waterflooding. Laboratory tests indicate that this area may be amenable to fireflooding. An application to the ERCB is being prepared requesting approval of a small fireflood pilot scheme to be installed in 1982. If the pilot is successful the scheme may be expanded to include substantially all the area not presently under waterflood. At some future date it may be possible to apply fireflooding to the remainder of the field as a tertiary recovery process following termination of the waterflood.

54. The fireflood project was considered a pilot project that eventually proved unsuccessful.[34] The plaintiffs' expert, Mr. Coles, states in his report:

Due to the experimental nature of the recovery scheme, only potential reserves have been assigned to the fireflood pilot. A review of 1983 operating costs suggests the project is uneconomic or marginally economic at existing producing rates excluding any additional future capital expenditures.

Coles' analysis of this pilot project was based on information available as of June 1, 1983.

55. Documents from the Calgary files of KEC reflect that as of early 1983, an engi-

---

**33.** The plaintiffs argue that KEC personnel and management would have been aware of this analysis. The plaintiffs, however, do not support their argument with any evidence. It rests with the plaintiffs to show their claim is more than a mere factual assumption. The plaintiffs do not cite any testimony from KEC engineer Leopold that during the relevant period he knew or learned that Ryder Scott was using decline curve analysis.

**34.** The plaintiffs' citations do not support their argument that KEC believed at the time of the SPA that the waterflood would probably be successful.

neer had estimated approximately 22 million barrels of "potential" reserves at Giltedge West and Giltedge East. The documents clearly label this figure of 22 million barrels as "potential" reserves. On the documents referenced, this 22 million barrels of potential reserves was added together with "proved" and "probable additional" into a total column labelled "most likely." The testimony is undisputed that the set up of the form of these documents was simply a mistake. The error was caught and corrected by the president of KEC, who noted that "most likely reserve numbers appears to include potential reserves. This is an error. Most likely = proved + prob. additional." (DX–E & P 33, K633674). There is further no evidence that these form documents were ever sent from the Calgary office to Wichita.[35] As reflected in various other documents, KII's working definition of "most likely" reserves included only the total of proved reserves and indicated additional (probable) reserves. The depositions of numerous KII personnel have confirmed this definition, and there is no testimony that KII's working definition of "most likely" reserves ever included estimates of mere "potential" reserves.

### The Capa Madison Property in North Dakota

56. The Capa Madison claim in this case involves a fireflood pilot project on a field located in North Dakota, known as the Capa Madison unit. Koch Exploration acquired the unit in 1983. A fireflood is a form of enhanced oil recovery ("EOR") which consists of the injection of air into a reservoir, through one or more injection wells, at extremely high pressures. This high pressure injection of air is designed to cause the oil in the reservoir to ignite, which creates a burning front in the reservoir. The burning front

progresses through the reservoir from the injection well or wells toward the producing wells. As it does so, the burning front, in theory, raises the pressure in the reservoir and drives oil toward the well bore of the producing well where it can be recovered.

57. For a number of years before 1983 and its purchase of the Capa Madison Unit, Koch Exploration had been involved in the same type of EOR fireflood project at a field in South Dakota, known as Buffalo. The Buffalo project was discussed on a number of occasions at KII Board meetings. For example, William Koch's notes of the Board meeting on March 6, 1982, reflect that Robert Walton, president of Koch Exploration, discussed the air injection project at the Buffalo field. William's notes describe the project as injecting air at pressures higher "than anyone in the world." (DX–E & P 1, A001823). William Koch's handwritten notes from the same meeting reflect that the proposed capital expenditures for the calendar year 1982 included $20 million for the acquisition of additional tertiary properties, in connection with KII's new air injection technology at the Buffalo project.

58. In the course of performing its work on behalf of the selling stockholders in the spring and summer of 1982, Goldman Sachs was provided with information concerning the Buffalo fireflood project. The Buffalo field was discussed with Goldman Sachs representatives, including Ray Hansen, during the presentations made by Koch Exploration operating personnel.[36]

59. As was disclosed at the Board meeting on March 6, 1982, the proposed capital expenditures for 1982 include $20 million for property acquisition in connection with KII's new air injection technology at the Buffalo project. Consistent with the above, Koch Exploration studied in 1982 a number of

---

35. The plaintiffs' citations do not controvert this statement. None of the citations show that Charles Koch or other KII management ever received the "most likely" reserve reports based on the same erroneous format used on KEC's in-house reserve summaries. That KEC did report at one time its "potential reserves" to KII management does not prove that KEC reported "potential reserves" as part of "most likely" reserves or that KII relied on any same report.

36. The plaintiffs complain that the Buffalo field was not an asset at issue on which discovery was permitted. The court agrees with the defendants that such additional discovery was not needed in this case. The only point relevant here is what facts about the Buffalo fireflood project did the plaintiffs learn prior to the SPA. The plaintiffs do not articulate how additional discovery about the Buffalo project would be material to their Capa Madison claim.

properties owned by third parties for possible acquisition as EOR candidates. The first contact concerning the Capa Madison unit occurred in July and/or August of 1982. Production in the Capa Madison field had begun in the early 1950s and, through the years, the field had been produced on both primary production and pursuant to a waterflood project. By 1982, the property had been unitized, which means that the interests of all of the different well owners had been combined into a single unit, with the various interest owners sharing on a percentage basis in all of the production from the entire unit. In 1982, Mr. H.E. Sutton, a resident of Louisiana, owned 92.7 percent of the unit, with the remaining interests owned by a small number of individuals or companies. While a waterflood had been implemented on the property between 1961 and 1967, only primary production had occurred since that time, continuing to 1982.

60. During the fall months of 1982, Koch Exploration personnel evaluated the Capa Madison unit as a potential EOR fireflood prospect. Mr. Sutton was made aware during the negotiations that Koch Exploration intended to implement an EOR project on the property if acquired.

61. KII management in late November of 1982 authorized an offer of $3 million to purchase the property from Mr. Sutton. That offer was rejected by Mr. Sutton, and further negotiations continued into the spring of 1983. On February 10, 1983, Koch Exploration increased its offer and presented the alternatives of $4.3 million in cash at closing or $5 million payable over five years. Mr. Sutton countered with an offer of $5 million in cash at closing, or $4.3 million plus an agreement from Koch Exploration to participate in future wells. On March 2, 1983, Koch Exploration offered to purchase all of Mr. Sutton's interest in the Capa Madison unit for the sum of $4.3 million. Mr. Sutton accepted this offer by letter dated March 3, 1983, and Koch Exploration received Sutton's letter on March 4, 1983.

62. The annual meeting of the stockholders of Koch Industries was held the next day, March 5, 1983. William Koch's notes of that stockholder meeting reflect that Sterling Varner reported that Koch Exploration had bought "reserves yesterday" without naming the Capa Madison unit.

63. At the Board meeting on March 5, 1983, following the shareholder's meeting, the capital expenditures planned for the year 1983 were discussed. A line item in the 1983 plan contained an entry for "Special Projects," with a proposed budgeted amount exceeding $100 million. As reflected in William Koch's notes from that Board meeting, it was discussed that the planned capital expenditure for "Special Projects" included the acquisition of properties on which the fireflood technology from the Buffalo project would be used.

64. The purchase of Mr. Sutton's interest in the Capa Madison unit was closed on May 2, 1983. Due to the time required to deliver equipment before beginning the air injection in the fireflood project, Koch Exploration did not actually begin the air injection process until 1984, approximately a year after the acquisition. This long lead time before the project could begin was anticipated at the time of acquisition. The fireflood project at Capa Madison was operated by Koch Exploration throughout 1985. It was a technical success as there was increased oil production, but it was not an economic success. Due to unfavorable economics, including high operating costs and a decrease in the price of oil, Koch Exploration discontinued air injection and shut down the fireflood project in March 1986. The field has continued on only primary production from 1986 to the present time. KII's investment in the project was written down to zero by 1986, including a write down of $3.1 million in 1985.

65. As part of its pre-acquisition analysis of the Capa Madison property, Koch Exploration did an enhanced recovery feasibility study. The study analyzed the property as a fireflood prospect, including the potential additional reserves that might be recoverable by fireflooding, over and above the remaining primary reserves. The analysis evaluated the costs involved in installing and operating a fireflood project and included the particular risks of failure. All of these factors were combined into a discounted cash flow analysis to arrive at a net present value for the

property. This analysis assisted Koch Exploration in determining an appropriate acquisition price.

66. Koch Exploration recognized from the beginning of its evaluation of the Capa Madison unit that there was an element of risk, primarily due to the presence of fractures in the reservoir. Fractures in a reservoir can limit the amount of pressure that may be built up in the reservoir by dissipating the pressure increase expected from the burning front.

67. In its preacquisition analysis, Koch Exploration valued only the enhanced oil recovery area of the CapaMadison field and applied a fifty percent risk factor in the economic evaluation. This risk factor means that the proposed project was believed to have a fifty percent chance of failure. Mr. Vickrey admitted not only that Koch Exploration's use of a fifty percent risk factor was reasonable, but that had he been doing the work himself in 1982 or 1983, knowing what Koch Exploration personnel knew at that time, he also would have applied a fifty percent risk factor in evaluating the project.[37]

68. In its discounted cash flow analysis of the Capa Madison property prior to acquisition, Koch Exploration personnel displayed a range of discount rates, with the highest being twenty percent. The higher the risk involved in a project, the higher the discount rate used and the lower the resulting net present value. Mr. Vickrey admitted that use of a fifteen percent discount rate was common in 1983 for evaluating oil and gas acquisitions.

69. Koch Exploration's analysis of the Capa Madison property prior to its acquisition reached the conclusion that, using a fifteen percent discount rate and employing the fifty percent risk factor referenced above in ¶¶ 62 and 63, Mr. Sutton's 92.7% interest in the Capa Madison unit had a net present value of $4.4 million. Koch Exploration acquired the property from Mr. Sutton for $4.3 million. Koch Exploration's analysis reflected that the future value of the Capa

Madison property could certainly be higher than $4.4 million if the fireflood project, which would not start for at least a year, was successful. On the other hand, there was a fifty percent chance of failure, and the failure would be known only after the expenditure not only of the purchase price for the property, but also several more millions of dollars.

70. There is no documentary evidence from 1982 or 1983 showing that the management of either Koch Exploration or Koch Industries, considering the risks of failure that were involved in the proposed Capa Madison fireflood, and the capital expenditures necessary to determine whether the project would succeed or fail, believed that the value of the Capa Madison property in the spring of 1983, either in the open market or as an asset of Koch Exploration, materially exceeded its purchase price from Mr. H.E. Sutton of $4.3 million.

## B. Claim: Cold Lake Reserves

The plaintiffs allege that throughout 1982 and through June of 1983 the defendants misrepresented the extent of its reserve holdings at Cold Lake and withheld information concerning the nature and extent of technological and economic developments at Cold Lake in the year prior to the SPA. As set forth in the plaintiffs' proposed pretrial order, the allegations can be broken down into the following five non-disclosures:

1) In the year prior to the SPA, KII participated in pilot projects that proved the operating and economic parameters for its Cold Lake reserves;

2) KII acquired extensive "P & NG" leases at Cold Lake for gas as a fuel source for future oil recovery projects;

3) KII planned its Pine Bend Refinery expansions on the assumption of using large volumes of cheap, sour, high-sulfur crude from Cold Lake;

4) KII engineers mapped the reserves in detail and estimated that KII had 200,000,-

---

37. The plaintiffs do not effectively controvert the testimony cited in support of the defendants' statement. For purposes of this statement, it does not matter how KII accounted for the fifty

percent risk factor in its economic analysis, for the point is that the plaintiffs' expert agrees that KII's fifty percent risk factor was reasonable.

000 barrels of recoverable reserves at Cold Lake;

5) Shortly before the SPA, KII increased its "most likely" reserves to 32,000,000 barrels of oil.

In arguing against summary judgment, the plaintiffs essentially group these five alleged non-disclosures under two headings. The plaintiffs treat the first, second and fourth as "Undisclosed Development Activities." The plaintiffs combine the third and fifth under the heading of "Reserve Changes." The court will follow the plaintiffs' grouping and address the alleged non-disclosures under the two respective headings.

### 1) *Undisclosed Development Activities*

#### a. Factual Overview

KII owned extensive oil and gas rights in over 50,000 net acres in the Cold Lake region of Alberta, Canada. As of 1983, Cold Lake was widely known in the oil industry to have huge deposits of very heavy oil known as bitumen. The oil deposits were located in shallow, sandy formations known as oil sands. It was also widely known that the heavy oil deposits were viscous and that their extraction depended on very expensive production techniques.

Prior to the SPA, KII's only participation in actual production off its Cold Lake lease-holds was as a minority partner in a small pilot project known as Ardmore. The production technology used was either a cyclical steam injection or a steam flood process, both of which were used by a number of other in-pilot projects. The Ardmore project enjoyed only mixed results. The economics of the project were extremely sensitive to fluctuations in the more common variables, such as oil price, operating costs, royalties, and taxes. Excluding the costs associated with capital expenditures and fuel costs, Ardmore had experienced a modest operating profit.

In its presentation to the plaintiffs' financial advisor, Goldman Sachs, KII quantified its estimates of "proven" reserves and "indicated additional" reserves consistent with its definition of those reserve categories. As for "potential" reserves, KII defined this catego-

ry as "those low risk additional reserves which lie outside existing proven productive areas." (DX–E & P 6, G12551). KII did not quantify "potential" reserves choosing instead to give narrative descriptions. For the Cold Lake region, the narrative description reads in relevant part:

Results [from the Ardmore project] have generally been disappointing in terms of both recovery and economics. Recently, however, pressure communication was established between four of the wells in the scheme and a steam drive was initiated utilizing one well as an injector and three as producers. Operations are presently in progress to expand the steam drive to include two more producers.

Preliminary results of the steam drive suggest that this process may be better suited to the area of Great Northern's land holdings than the steam stimulation process. Economic parameters have yet to be established, but under a favorable price and tax regime **the potential could be very large.** (DX–E & P 6, G12601) (emphasis added).

In January of 1983, KII acquired P & NG leases at Cold Lake covering the shallower gas reserves for a nominal price so that the gas could be used as a fuel for the oil exploration technology. To KII, the value of the P & NG leases was exclusively a function of the potential for developing the oil sands.

In 1982 and 1983, KEC undertook a geological and geophysical evaluation of its undeveloped Cold Lake properties. As part of this evaluation, David Richardson, a petroleum geologist employed by KEC, geologically mapped the Cold Lake region. As of June 4, 1983, KEC had not selected any Cold Lake sites for either actual development or economic analysis of potential reserves as a result of this evaluation process. Nor were any oil wells drilled as a result of this evaluation process until 1984.

#### b. Arguments

The defendants deny there are any facts supporting the plaintiffs' allegations. KII had participated in only the one pilot project, the Ardmore project, and its experience under the project had not "proved" that other acreage in Cold Lake could be profitably

developed. The other project at Ft. Kent did not start any drilling or conduct any economic analysis until 1984, well after the SPA. The defendants insist that the plaintiffs knew of the Ardmore project and that the narrative description accurately describes that project in a general manner. To the defendants, the value of the P & NG leases depended entirely on the potential for developing production from the oil sands. Finally, the defendants deny that the reserves were mapped or evaluated in such detail as to sustain any claim that the notion of two hundred million barrels of recoverable reserves at Cold Lake was anything more than speculation. The defendants submit the affidavit of David Richardson, a geologist formerly with KEC, who denies that his handwritten notes about "KOCH 200MM BBLS" "constitutes a calculation of proved reserves, or even indicated additional (probable) reserves." (DX–E & P 22, ¶ 10). Richardson explains that based on "a series of assumptions" he "hypothesized that there might be as much as 200,000,000 barrels of recoverable reserves on the Company's Cold Lake acreage." *Id.* The defendants emphasize that the geological mapping simply identified areas of potential and that the point of determining the feasibility of actual production would not be reached without a great amount of additional work. All of these activities, according to the defendants, was the normal evaluation process that any exploration company uses in determining where future development might be economically feasible.

The plaintiffs begin their defense against summary judgment with this statement: "Just days before the stock sale, Koch executives boasted privately to their bankers that Koch's book value 'ignores the *hidden* value of the oil/gas holdings.'" (Dk. 597, p. 72, quoting PX 200, B000060). The plaintiffs insist that between June 1982 and June of 1983 Koch's pilot project at Ardmore "became profitable, and its oil recovery technology finally worked." (Dk. 597 at 72). The plaintiffs say that beyond the written narrative description in March of 1982 the defendants did not disclose anything more about Cold Lake reserves except for Charles Koch's disparaging comment at the board meeting on June of 1982: "Reserves in Cana-

da fantastic but worth only 10 cents." (PX 201, A003109).

The plaintiffs allege that in 1982 the Ardmore pilot demonstrated a high recovery rate, received a higher price for its oil by reason of NORP ("new oil reference price") effective April of 1982, and began seeing operating profits. The plaintiffs say that KEC increased its activity on the leaseholds near the Suncor/Canadian Worldwide pilot project. In January of 1983, it acquired more than 44,000 acres of gas leases "because it was thought that they may contain gas reserves which could be of use in developing the Cold Lake oil sands reserves." (PX 228, Miller Aff. ¶ 2). In late 1982, KEC told the Canadian Department of Energy and Natural Resources that it would conduct "a major work program directed at characterization of its reserves in the Cold Lake area." (PX 231). The plaintiffs highlight features of the net pay maps prepared by David Richardson for the Cold Lake region that charted and noted the location of oil deposits; the thickness of oil, water, and shale layers; and his opinion on whether the oil was exploitable or recoverable. The plaintiffs say the mapping project of Cold Lake naturally led to KEC's review and subsequent increase of reserve estimates.

In reply, the defendants explain that the plaintiffs' opening salvo is wide of its mark for the comment about "hidden value" was a comment written by the banker upon evaluating the very same figures disclosed to the plaintiffs in the 1982 financial statements. The defendants note that the plaintiffs cite nothing for their assertion that the recovery technology at Ardmore finally worked in the last half of 1982 and the first half of 1983. The defendants also offer proof that Ardmore did not become profitable just in the last half of 1982 but, in fact, had achieved profits for every month of the first half of 1982. Nonetheless, the engineers and managers were still concerned whether the profits were enough to recoup the capital investment involved with expansion. As of the SPA, the value of those rights was mostly a matter of speculation largely because the acreage was undeveloped, the pilot projects were having mixed results, and the econom-

ics of developing the acreage were questionable at best. The plaintiff's financial advisers prior to the SPA assessed Cold Lake's value based on either KII's cost or a per acre value.

### c. Analysis

■ To avoid summary judgment, the plaintiffs must come forth with facts from which a reasonable jury could find: (1) that development activities occurred at Cold Lake which were not disclosed, and (2) that the undisclosed activities constitute material facts. The court believes the plaintiffs have failed to come forth with sufficient facts to defeat summary judgment.

The evidence of record does not show that in the year before the SPA the Ardmore project proved the operating and economic parameters for KII's Cold Lake reserves. In fact, as of June of 1983, the operator of the project, Drummond Petroleum, remained uncertain even about the project's own prospects of expansion and commercial development:

— The economics of Pilot expansion ... are very sensitive to oil price, operating costs, royalties, taxes, calendar day oil rate and steam oil ratio. Any adverse movement in any one of these items from the base case assumptions will "kill" the economics of expansion. Therefore, we **need more information and greater degree of confidence before a major expansion** should be undertaken....

....

— Piloting objectives should be to obtain the most information in the lease (sic) amount of time with the ultimate goal of establishing a process that can be applied on a commercial scale.

(PX 212, K605488) (emphasis added). The operator held this opinion even though it was then enjoying the favorable circumstances of modest monthly profits, the right to receive a

higher price for its oil, and a good recovery rate. Such caution on the part of someone having no apparent stake or interest in the SPA is compelling evidence that the Ardmore project still had not proved the operating and economic parameters for the profitable development of the Cold Lake reserves.

Acquired in January of 1983, the P & NG leases covered the shallower zones where natural gas might be found but where the oil sands did not exist. The leases were issued to all holders of the underlying oil sands leases on their application and payment of a nominal consideration. (DX–E & P 20). KEC obtained these leases for their possible value in providing a fuel gas for the oil exploration efforts. The court agrees with the defendants that the acquisition of these leases is not material. The value of the leases rests principally, if not entirely, on the potential for developing the oil sands. There is no evidence showing that these leases had any direct effect on the potential development of the oil sands.

Nor does the evidence demonstrate that from the geological mapping and evaluations done in 1982 and up through June of 1983 KEC had proved the operating and economic parameters for the Cold Lake reserves. The map preparer, David Richardson, has averred that he did not map KEC's reserves in detail and that the maps and the descriptions written thereon were intended simply "to identify areas of potential interest for further study and evaluation."[38] (DX–E & P 22, ¶ 7). Richardson further averred that the "mapping was only a preliminary step in the Company's exploration activities" and that much additional work needed to be done before a test well was even considered and that even more work would be required before proceeding with a pilot project. *Id.* at ¶ 8. The opinions of one in-house geologist identifying potential areas for development on a map do not amount to "operating and

---

38. Richardson currently works for the province of British Columbia as Section Head—Reservoir Geology and Regulatory Applications. He left the employment of KEC in March of 1986. The plaintiffs did not depose Richardson, although Richardson recalls he was interviewed by the plaintiffs' counsel and expert about some of these same documents. The plaintiffs' counsel and expert deny having any substantive discussions about Cold Lake with Richardson or having him review any documents for them. In this summary judgment proceeding, the defendants have submitted Richardson's affidavit in which he generally explains his preparation of the documents on which the plaintiffs now rely.

economic parameters" and, more importantly, do not amount to sufficient proof of economically recoverable reserves existing, as to be material to a reasonable selling shareholder.

Nor does KEC's 1983 goal for completing a geological, geophysical, and engineering evaluation of the Cold Lake acreage prove that operating and economic parameters had been established as of the SPA. The more extensive seismic testing was not even scheduled to occur until after the SPA and did not occur until then. Indeed, as of June 4, 1983, KEC had not selected any Cold Lake sites for actual development or economic analysis of potential reserves.[39] It is uncontroverted that the evaluation process had not progressed to the point of establishing the parameters alleged by the plaintiff. In addition, there is nothing material in the fact that an exploration company like KEC was engaged in the process of evaluating its undeveloped acreage for potential production. Had the evaluation advanced to the point of determining probable reserves, this would be material, but the plaintiffs offer no evidence of this.

2) *Reserve Changes*

a. Factual Overview

Except for the Ardmore project, in which KII had a minority interest, no oil wells had been drilled on the Cold Lake acreage. Consequently, outside the Ardmore project, there were no proven reserves assigned to the acreage. The defendants disclosed to the plaintiffs that Cold Lake's proved reserves on 1/1/1983 had increased to 450,000 barrels from 271,000 barrels on 1/1/1982 and that Cold Lake's indicated additional reserves on 1/1/1982 were 261,000 barrels. The defendants also disclosed the total acreage and provided the narrative description quoted above in ¶ 16 of the Statement of Facts under Section VI. In addition, the plaintiffs' financial advisers met with KII and KEC officers and discussed the Cold Lake area. Unfortunately, no one recalls the particular topics of those discussions.

Everyone knew that the Cold Lake area was rich in oil but that the current technology was too expensive for profitable large-scale commercial exploitation. As Charles Koch described it at the board meeting in June 1982, "reserves in Canada [are] fantastic but worth only ten cents." (PX 201, A003109).

Within KEC's internal files at Calgary, there are documents reflecting that as of early 1983, an engineer had estimated approximately 32,145,000 barrels of "potential" oil reserves in the Cold Lake area. Also on these forms, the "potential" reserves were added with "proved" and "probable additional" reserves into a column titled "most likely" reserves. (DX–E & P 33, K633676). In 1987, John Miller, the President of KEC, made a notation on one of these forms that the form was incorrect in including "potential" reserves in the calculation of "most likely" reserves. (DX–E & P 33, K633674). KEC's definition of "most likely" recoverable reserves provided to the plaintiffs in 1982 was the total of "proven" reserves and "indicated additional" reserves. (PX 202, G12551). This same definition of "most likely" reserves was employed in KII's "Total Reserve Summary" dated March 4, 1982, that was provided to the Board at its March 1982 meeting. (DX–E & P 2) and (PX 8, ¶ 49).

b. Arguments

The defendants argue that the plaintiffs bank their claims here on KEC's internal forms which employ a definition of "most likely" reserves that is obviously inconsistent with the operating definition provided in documents given to Goldman Sachs and with the definition used in Board meetings. Consequently, the defendants say the plaintiffs know their claim is false that the defendants increased the "most likely" reserves for Cold Lake in 1983 to 32,000,000 barrels. The only increase was to "potential" reserves, which were in KII's management's judgment too speculative to be defined quantitatively for the plaintiffs. The defendants point out that

---

**39.** As set forth in ¶ 29 above, the evaluation process did not result in any test wells near Ft. Kent until the first part of 1984, and an application for the pilot project was not filed until November of 1984. Steam injection at this project began in December of 1985.

the plaintiffs were free to value the potential reserves from whatever information they chose to request. There is no evidence that the plaintiffs' financial advisers were denied access to requested information or that their financial advisers' questions at the different meetings with KII and KEC officers were not answered. The defendants discount the handwritten notation of "200,000,000 barrels of recoverable reserves at Cold Lake" as the ruminations of one KEC geologist who has since explained his notation as a hypothesis rather than any calculation of proved or probable reserves. The defendants argue the case law establishes there is no duty to disclose "potential" reserves. Finally, the defendants deny there is any evidence linking Pine Bend Refinery's expansion to the speculation of larger potential reserves in KII's Cold Lake holdings.

Relying on KEC's in-house reserve summaries, the plaintiffs insist the defendants withheld information of a 32,000,000 increase in "most likely" reserves. The plaintiffs read the summary as attributing the adjustment to an "economic run." (DX–E & P 34, KQ108320). The plaintiffs argue KII received reports of "most likely" reserves, including those calculated on KEC's in-house reserve summaries, and used this reserve estimate to justify capital expenditures for development. The plaintiffs argue that Richardson went beyond the results of the Ardmore project and used a series of stated assumptions in calculating "that Koch might have a 'recoverable reserve' of 200,000,000 barrels at Cold Lake." (Dk. 597, pp. 77–78).

The plaintiffs also argue that the defendants' efforts to explain away the "most likely" reserve calculation found on KEC's in-house reserve forms are jury arguments going to witness credibility that are inappropriate for resolution on summary judgment. In the plaintiffs' judgment, the defendants needed to include "potential" reserves in their "most likely" reserve calculations, if they were ever to justify expanding the production area. The plaintiffs say the timing of Miller's correction of the forms is suspicious. The plaintiffs correspond Richardson's 32,-000,000 barrel estimate of "potential" reserves to the 1983 change on KEC's in-house reserve summaries. Finally, the plaintiffs argue that "potential" reserves are a justifiable basis for assigning value to unproved acreage and that under the facts of this case these reserves should have been disclosed. In fact, because the defendants define "potential" reserves as "low risk additional reserves which lie outside existing proven productive areas," (DX–E & P 6, G12551), the plaintiffs believe KII's estimate of "potential" reserves was "not at all speculative." (Dk. 597, p. 79).

### c. Analysis

No reasonable juror could find from the evidence of record that as of June of 1983 the defendants considered themselves to have in excess of 32,000,000 barrels in "most likely" reserves at Cold Lake. The relevant in-house forms entitled "Summary of Changes in Reserves" and "Net Recoverable Reserves as of _____" found in KEC's files plainly separate out the individual estimates for "proved," "probable," and "potential" reserves but then total these three separate estimates for purposes of "most likely" reserves. This calculation of "most likely" directly contradicts the established definition of "most likely" used in KII's reports given to Goldman Sachs and to the plaintiffs at the Board meetings. It is uncontroverted that these forms were organized using an erroneous definition of "most likely" reserves.[40] Quite simply, there is no reasonable basis in fact for finding that these forms indicate an engineer actually considered the 32,000,000 barrels of described "potential" reserves to be more than "potential" in nature simply because he then followed the erroneous set up of the form and added

---

40. The court does not believe this issue is inappropriate for a summary judgment ruling. Because the error in the forms is obvious after contrasting them with KII's controlling definitions of reserves and with the reports distributed to the Board, the court need not rely on Miller's testimony. As for Miller later correcting the error, the court finds that the circumstances alleged to be suspicious by the plaintiffs do not create a genuine issue of material fact. In addition, there is no evidence that those forms were actually transmitted to KII or that KII ever relied on or exploited these forms for the calculation of "most likely" reserves.

them towards "most likely" reserves.[41] If they were not just "potential" reserves, then the engineer would have placed them in either the "proved" or "probable" column. The evidence of record demonstrates that KEC's definition of "potential" did not differ from KII's definition. Nor does the evidence show that the "potential" reserve numbers found on the relevant KEC's forms were the product of economic runs or of any other process that made them more reliable than other "potential" reserve estimates. The defendants are entitled to summary judgment on the plaintiffs' claim that KII had increased its "most likely" reserves to 32,000,-000 barrels of oil shortly before the SPA.

In their brief, the plaintiffs argue that the defendants are wrong in their position that "potential reserves don't count."[42] The plaintiffs argue this because they claim the defendants should have disclosed KEC's in-house 32,000,000 estimate of potential reserves, as well as, Richardson's ruminations that KII could have as much as 200,000,000 barrels of recoverable reserves in Cold Lake.

The plaintiffs cite no case law recognizing a duty to disclose estimates of "potential" reserves or estimates of "recoverable" reserves as information important to a reasonable selling shareholder. The case law squarely rejects the imposition of such duty in most circumstances.[43] As the plaintiffs point out, the policy reason underlying this rule is that reserve estimates for other than proved reserves would be misleading to investors who are not experts in the industry. *See, e.g., Sunray DX Oil Co. v. Helmerich & Payne, Inc.,* 398 F.2d 447, 450–51 (10th Cir. 1968) (Relied on SEC practice of permitting only disclosure of "proved" reserves in oil proxy statements). Concerning the materiality of potential oil reserve information, one court has said:

> Hazards inhere when one tries to disclose sufficient information to a shareholder who, with or without expert assistance, attempts to make an independent decision concerning value. Involved is either a selection of data to be disclosed or presentation of all conceivable relevant information, both of which are potentially burdensome and/or potentially misleading. [*Denison Mines Limited v. Fibreboard Corporation,* 388 F.Supp. 812,] *Id.* at 820 [ (D.Del. 1974) ].

The information contained in the appendices to the Reserve Report is both complex and speculative. How much of it would have to be disclosed to aid a share-

---

**41.** The plaintiffs argue the defendants had to include "potential" reserves within the "most likely" category to justify the capital expenditures needed to expand the productive area. (Dk. 597, pp. 79–80). The argument is not persuasive, for it plainly oversimplifies KEC's evaluation and expansion process which from what has been described is an involved and extensive one. (DX–E & P 22, ¶¶ 8–10). In addition, the plaintiff does not demonstrate at what point in this process did KII or, for that matter, any other reasonable developer would begin to justify the expected capital expenditures by potential reserves.

**42.** While the court does not understand the plaintiffs to have alleged a claim that the defendants should have disclosed the 32,000,000 estimate of "potential" oil reserves, the plaintiffs apparently think otherwise. (Dk. 597, pp. 82–83).

**43.** *See, e.g., Starkman v. Marathon Oil Co.,* 772 F.2d 231, 242 (6th Cir.1985) ("[N]o duty to disclose ... reports [which] contained estimates of the value of probable, potential and unexplored oil and gas reserves which were based on highly speculative assumptions regarding the path of oil and gas prices, recovery rates and the like over a period of thirty to fifty years."), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Sunray DX Oil Co. v. Helmerich & Payne, Inc.,* 398 F.2d 447, 450–51 (10th Cir.1968); *Rice v. Hamilton Oil Corp.,* 658 F.Supp. 446, 448 (D.Colo.1987) ("Tender offer materials must disclose 'soft' information such as appraisals, estimates and forecasts with respect to oil and gas discoveries only if there is a substantial certainty that these estimates will increase 'proved' reserves." (citations omitted)); *Platsis v. E.F. Hutton & Co. Inc.,* 642 F.Supp. 1277, 1295–96 (W.D.Mich.1986) (The exemption for estimates of probable or possible reserves from public filings with the SEC "is evidence that the information sought ... is not 'material' and probably misleading."), *aff'd,* 829 F.2d 13 (6th Cir.1987), *cert. denied,* 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988); *Caspary v. Louisiana Land and Exploration Co.,* 579 F.Supp. 1105, 1109 (S.D.N.Y. 1983), *aff'd,* 725 F.2d 189 (2nd Cir.1984); *Resource Exploration v. Yankee Oil & Gas, Inc.,* 566 F.Supp. 54, 63, 64 (N.D.Ohio 1983) (This "soft" information "is not material in this tender offer context because it contains speculative information concerning potential oil and gas reserves.").

holder in making an independent evaluation that the figures are correct is far from certain. Even if the figures were found to be correct, such predictions may not necessarily be reliable for the shareholder's decision to sell stock. In White's testimony, it was admitted that even Resource uses this information only as a planning or in-house device.

*Resource Exploration v. Yankee Oil & Gas, Inc.*, 566 F.Supp. 54, 63 (N.D.Ohio 1983). The same problematic dilemma exists here in the disclosure of any estimates of Cold Lake's potential reserves. The plaintiffs make no attempt at showing that the disclosure of these estimates would be reliable and certain in themselves or that a modicum of other information would firm up the reliability of these estimates.

KEC's own treatment of these estimates reveal the speculative nature to them. Based on DX–E & P 34, numbered KQ108320, the potential reserves estimate in 1982 was 17,600,000 barrels, and the estimate increased to over 32,000,000 barrels in 1983, and the estimate fell to 14,600,000 barrels in 1984. Such fluctuations hardly bespeak of estimates that are "substantially certain to hold," *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). There is no evidence of record that KEC's in-house estimates of potential reserves ever left KEC or were used or relied upon for any significant business purpose. For that matter, Richardson's hypothesizing that KII may have as much as 200,000,000 barrels of recoverable reserves at Cold Lake amounts to the opinion of one geologist. An opinion that the plaintiffs have found expressed in only one place, Richardson's handwritten notes. And, according to Richardson, these notes and speculations were never used in anyway by KEC or KII prior to his departure from KEC in March of 1986.

Even for experts, as demonstrated by this case,[44] estimating the value of "possible" or "potential" reserves involves much speculation and guesswork, such that many experts prefer to avoid this high uncertainty and deal with acreage values as a more reliable indicator of market value. *See Del Noce v. Delyar Corp.*, No. 72–1819, 1976 WL 813, at *10, *11 (S.D.N.Y.1976) (Fed.Sec.L.Rep.95,670). Of course, nothing kept the plaintiffs in 1982 and 1983 from using this recognized method of calculating the value of the undeveloped acreage based on comparable land transactions. Goldman Sachs[45] or Bain & Co. could have done in 1983 what their expert Fred Coles has now done. Since there was no apparent recorded value anywhere by KII for these reserves, such work from the plaintiffs' financial advisers seems quite reasonable whether or not the plaintiffs had any suspicions about the defendants. The plaintiffs do not show that Coles's calculation of undeveloped acreage value in any way depended on information not previously disclosed to the plaintiffs' financial advisers. The plaintiffs cannot blame the defendants for what the plaintiffs' financial advisors did in 1982 and 1983, that was, relied on Koch's cost basis or on a per acreage value less than Coles's appraised value.

The plaintiffs also argue that in *Starkman* the court had discussed a "gradual evolution" in the SEC practice which permitted as of March of 1982, the disclosure of "estimated" reserves "where such estimates have previously been provided to a person who is offering to acquire or merge with the subject company." 772 F.2d at 239–40. As of 1983, the SEC's policy remained that estimates of

---

**44.** One of the plaintiffs' experts, Fred Coles, valued the oil sands leases on an acreage basis using "publicly available information for industry transactions during the period March 1975 through June 1983." (PX 223). Coles estimated the lease value at $20,100,000 based on an average of $253 per acre. *Id.* The plaintiff did retain an expert who performed discounted cash flow evaluations by hypothesizing that (1) KII would invest $52 million in Cold Lake development; (2) that production would not come on stream until 1990; and (3) that the project would have a fifty percent chance of success. (DX–E & P 14).

Considered together, these assumptions plainly demonstrative the significant contingencies involved in valuing potential reserves and particularly those at Cold Lake.

**45.** When Ray Hansen with Goldman Sachs was asked to explain why he did not include any value for the potential reserves, he answered: "I think these are—as I remember, these were areas that they would arm-wave about, but you couldn't assign anything." (DX–E & P 9, p. 92).

probable and potential reserves should not be disclosed. *See Platsis v. E.F. Hutton & Co. Inc.*, 642 F.Supp. 1277, 1295 (D.Mich.1986) (As originally contained in item 2 of Regulation S–K from 1978 until 1982 and then deleted and placed in Guideline 2 adopted in SEC Release N. AS–306, effective May 24, 1982, an exemption exists keeping "[e]stimates of probable or possible reserves and any estimated value thereof" from disclosure in any document publicly filed with the *SEC.*), *aff'd*, 829 F.2d 13 (6th Cir.1987), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988). This is compelling evidence that such information "is not 'material' and probably misleading." *See Platsis v. E.F. Hutton & Co. Inc.*, 642 F.Supp. at 1295–96.

Relying on the test for materiality from *Basic*,[46] the plaintiffs argue that even though qualifying as soft information, the estimates of potential or recoverable reserves are material here because of the magnitude of the estimates, because of the face-to-face representations, and because of the express warranties in the SPA. The Tenth Circuit identified the following factors as dispositive when the soft information is other than merger negotiations: "the nature of the undisclosed predictive information and its importance, reliability and investor impact as determined from the facts of each case." *Garcia*, 930 F.2d at 830 (citation omitted). As discussed above, these estimates were speculative, hypothetical, and unreliable. There is no

evidence that KII considered these estimates significant for any business reason. For that matter, there is no evidence that potential or recoverable reserves were quantified for the Board or ever discussed at a Board meeting prior to the SPA. The plaintiffs do not attempt to show that these same estimates of recoverable reserves exceed what a reasonable person would expect from an area so rich in oil deposits that it was described as "an oil man's dream." (§ VI, Statement of Fact ¶ 12). Finally, the warranties do not affect the court's conclusion that these estimates are, as a matter of law, too speculative and unreliable to be material. The defendants are entitled to summary judgment on the plaintiffs' Cold Lake claims.

### C. Claim: Giltedge Producing Properties

The defendants object that the plaintiffs' claims here rest on entirely new allegations that were never part of the plaintiffs' third amended complaint. With respect to the Giltedge area, the plaintiffs alleged the following in their third amended complaint:

48. On or about March 30, 1982, Koch Industries, through defendant Cordes and at the direction of defendants Charles Koch, Varner, Carey and David Koch, caused to be forwarded to William Koch and others a report prepared by Ryder Scott, ..., in which defendants represent-

46. "[M]ateriality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d [833] at 849 [(2nd Cir. 1968)]." *Basic Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988). The Tenth Circuit in *Garcia v. Cordova*, 930 F.2d 826, 829 (10th Cir.1991), said it did "not feel obligated to apply that test to the facts of this case, however, inasmuch as the Supreme Court in *Basic* specifically limited its decision to the context of merger negotiations and disavowed any attempt to 'address ... any other kinds of contingent or speculative information such as earnings forecasts or projections.' " (citations omitted). Following *Garcia*, this court does not feel obligated to rely conclusively on this test except in the context of merger negotiations.

The plaintiffs also quote from *Texas Gulf Sulphur* that the mineral drilling results there were material, because "knowledge of the possibility,

which surely was more than marginal, of the existence of a mine of the vast magnitude indicated by the remarkably rich drill core located ... might well have affected the price of TGS stock and would certainly have been an important fact to a reasonable, if speculative, investor in deciding whether he should buy, sell, or hold." 401 F.2d at 849–50, (Dk. 597, pp. 86–87, n. 45). The full quotation of the Second Circuit's reasoning concludes with: "After all, this first drill core was 'unusually good and ... excited the interest and speculation of those who knew about it.' " *Texas Gulf Sulphur*, 401 F.2d at 850. Even if the court were to apply this test of materiality here, there is no evidence giving rise to a genuine issue of materiality. Everyone knew the Cold Lake acreage was rich in oil sands, so the size of the reserve estimates would not have surprised anyone. It was simply a matter of the reserves becoming commercially exploitable. Richardson's estimates did not excite anyone at KEC. obviously, the reserves remained "fantastic" but incapable of profitable commercial extraction.

ed to plaintiffs that ... its [Koch Industries'] oil reserves at Giltedge were 4,160,-000 barrels.... Said report was based entirely upon information supplied by defendants to Ryder Scott. In fact, the information supplied to Ryder Scott was inaccurate and misleading. Defendants at the time knew the reserves at ... Giltedge 7,250,000 barrels ..., but did not disclose these facts to plaintiffs.

49. On March 5, 1983, William Koch requested current information regarding Koch Industries' oil reserves. In response, Koch Industries, acting through defendant Carey and with the knowledge and active cooperation of the other individual defendants, delivered to each of plaintiffs' representatives on the Board of Directors a copy of a 1983 letter from Ryder Scott that contained a summary stating that Koch Industries' collective oil reserves, including those at ... Giltedge ..., were 24.7 million barrels of developed reserves and 27 million barrels of undeveloped reserves. The 1983 Ryder Scott summary was prepared based entirely on operating figures and other information supplied by defendants to Ryder Scott. In fact, defendants were aware that the information so supplied to Ryder Scott was inaccurate and misleading and that the letter materially understated Koch Industries' oil reserves as of March 5, 1983. Defendants caused this letter to be delivered to plaintiffs intending and knowing that plaintiffs would rely on the letter in their analysis of the value of their Koch Industries stock.

(Dk. 522, pp. 34–36). In sum, the plaintiffs alleged that the defendants provided Ryder Scott with "inaccurate and misleading information" from which Ryder Scott prepared reports that understated oil reserves for the years of 1982 and 1983.

The plaintiffs' proposed pretrial order alleges the following with respect to Giltedge:

> *Giltedge.* The Giltedge field contained KII's largest body of "proved" reserves in Canada. In March 1982, KII gave the selling shareholders Ryder Scott's estimate that Koch owned 5,121,000 barrels of net remaining "proved" reserves at Gil-

tedge, plus 810,000 barrels of "indicated additional reserves" estimated inhouse by KII. A year later, KII gave the selling shareholders Ryder Scott's 1983 reserve study reporting only 4,506,000 barrels of "proved" reserves at Giltedge.

> KII knew, but did not inform the selling shareholders, that the actual proved reserves at Giltedge were roughly double the reported reserves. KII knew that Ryder Scott had mistakenly used a method of reserve estimation which assumed declining oil production from one year to the next. Actual production data, known to KII, showed that the opposite was true—that KII's Giltedge oil production was increasing from one year to the next. KII never disclosed to the selling shareholders that the "proved" reserves were understated, nor that Ryder Scott's evaluations assumed a production trend opposite to reality.

(DX–E & P 40). In their brief, the plaintiffs allege:

> **GILTEDGE:** Koch's largest body of "proved" Canadian reserves was its Giltedge holding. Koch gave plaintiffs a reserve estimate in early 1983. The reserve estimate was calculated on the assumption that oil production from the Giltedge field was declining from one year to the next. However, Koch knew the opposite was true. The production data in Koch's hands showed that oil production from Giltedge was *increasing* from one year to the next. The difference between the false assumption and the truth was to cut the reported value of the Giltedge reserves almost in half. Plaintiffs only got the lower number, of course, and were never told that the actual production was rising.

(Dk. 597, p. 16). The plaintiffs' allegations from the proposed pretrial order, as explained and argued by their brief, are that KII knew Ryder Scott had used a "decline curve analysis" for its reserve estimates despite increasing production at Giltedge and that KII never disclosed the same to the selling shareholders.

The defendants ask the court to dismiss all of the plaintiffs' current allegations with regard to Giltedge as an "unauthorized switch."

Rather than address each of the defendants' "switching" claim objections, the plaintiffs discuss generally the notice pleading requirements and the purpose for discovery. That their complaint and their proposed pretrial order may differ is to be expected, the plaintiffs argue, for the latter defines the factual and legal issues in more detail based on the facts as revealed by discovery. The plaintiffs accuse the defendants of taking an overly restrictive view of notice pleading.

■■■■ Notice pleading, as articulated in Fed.R.Civ.P. 8(a), requires "a short and plain statement of the claim showing that the pleader is entitled to relief." [47] The statement need not be factually detailed but it "must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). These liberalized pleading standards, however, do not mean that a contention in a brief may substitute for a missing allegation in a complaint. *Williams v. New Castle County,* 970 F.2d 1260, 1266 (3rd Cir.1992). Moreover, the liberalized pleading rules do not "permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case." *Evans v. McDonald's Corp.,* 936 F.2d 1087, 1091 (10th Cir.1991). Permitting a late change in theories or material allegations wastes the resources spent on unnecessary discovery, unfairly surprises the other side, and wastes time and additional resources for more discovery or continuances. *Id.* Consequently, when it comes to dismissal, the court is not to assume that a plaintiff "can prove facts that it has not alleged or that the defendants have violated the.. laws in ways that have not been alleged." *Associated General Contractors v. California State Council of Carpenters,* 459

U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983) (footnote omitted).

■■■ The plaintiffs' allegations concerning *Giltedge* in their third amended complaint do not provide fair notice of the allegations and theories now found in their proposed pretrial order and brief. No longer is there any alleged theory that the defendants provided false information on which Ryder Scott relied in preparing its reports. Instead, the plaintiffs allege a new theory that the Ryder Scott made its own error and that the defendants knew about the mistake and did not tell them of it. The alleged fraudulent act is transformed from an affirmative act to one of omission. More importantly, the plaintiffs' brief reveals that their Giltedge claim no longer focuses on the 1983 reserve estimates of volume but the present discounted value of those estimates. Even under the most liberal reading of the third amended complaint, one finds no suggestion that the plaintiffs are alleging that Ryder Scott's reports understate the present discounted value of the reserves. The defendants show prejudice from the "switch" in that KII witnesses were never asked if they knew or questioned Ryder Scott's methodology of "decline curve analysis" in estimating the reserves. The defendants say the plaintiffs also avoided any direct questions to Ryder Scott witnesses on this issue. The court finds that the plaintiffs have not properly alleged the claims now advanced and have abandoned the claims alleged in their third amended complaint.[48] With discovery now complete and a trial setting imminent, the court refuses to include the plaintiffs' new Giltedge allegations within the pretrial order.

■■■ To the extent, the plaintiffs still claim that KII failed to disclose that the 1983 estimate of 4,506,000 barrels understated the

---

**47.** All of the relevant allegations made by the plaintiffs are also subject to the requirement in Fed.R.Civ.P. 9(b) that "the circumstances constituting fraud or mistake shall be stated with particularity."

**48.** The court includes in its ruling the plaintiffs' allegation that the defendants did not disclose the fireflood plans for the disclosed fields at Giltedge. The plaintiffs' third amended complaint does not provide fair notice of any claim based on such an allegation. Even if the plain-

tiffs had properly pleaded this claim, the defendants disclosed the possible fireflooding of Giltedge in its description of potential reserves given to the plaintiffs' representatives. The plaintiffs' expert, Mr. Coles, assigned only potential reserves to the fireflooding project at Giltedge because of its experimental nature. The defendants would be entitled to summary judgment assuming the plaintiffs had pleaded this claim.

"proved" reserves, the defendants are entitled to summary judgment on this claim. Ryder Scott's estimate of proved reserves for Giltedge West in 1983 is within ten percent of the 1983 estimate of proved reserves given by the plaintiffs' expert, Mr. Coles. It is uncontroverted that a ten percent disparity in estimates of proved reserves is not a material difference. The variance in present value calculations is an allegation that has never been properly pleaded in this case. As for Giltedge East, the plaintiffs do not appear to base any claim on this field. Even if they did, Mr. Coles places a value of $700,000 on the disparity between his reserve estimate and Ryder Scott's estimate. This amount falls short of the $1,000,000 threshold of materiality argued by the plaintiffs. The defendants are entitled to summary judgment on this claim.

### D. Claim: Capa Madison Property

In their proposed pretrial order, as explained later in their memorandum opposing summary judgment, the plaintiffs allege under this heading that KII failed to disclose in regards to its acquisition of the Capa Madison Unit: (1) that KII planned a fireflood project for the Capa–Madison Unit; and (2) that its expected value greatly exceeded KII's costs. The defendants seek summary judgment on both alleged matters.

#### 1) *Fireflood project*

##### a. Factual overview

For several years before the SPA, KII had been using the fireflood technology at the Buffalo field in South Dakota. This project was discussed and described in some detail at Board meetings attended by the plaintiffs. At the March 1982 Board meeting, as reflected in William Koch's handwritten notes from that meeting, there was a proposed capital expenditure of $20 million to acquire additional tertiary properties on which to utilize the new fireflood technology developed in the Buffalo field. Additional information about the Buffalo project was given to the plaintiffs' financial advisers in 1982.

At the Board meeting in March of 1983, the capital expenditures plan included an al-

location of $100 million for special projects. The Board discussed that the special projects included the acquisition of properties on which to use the Buffalo field fireflood technology. At the shareholders' meeting held just before the Board's meeting, it was disclosed that KEP had purchased additional reserves.

##### b. Arguments

The defendants seek summary judgment arguing the plaintiffs have no factual basis for alleging that the defendants withheld its fireflood technology and plans. Pointing principally to the facts summarized above, the defendants conclude the plaintiffs knew KII's plans to acquire other tertiary properties and to apply the Buffalo field fireflood technology in the recovery of secondary reserves.

The plaintiffs explain in their brief that KII's non-disclosure of the fireflood project at Capa Madison is the pleaded claim for damages and that KII's pattern of efforts to keep this technology a secret evidences the intent behind the non-disclosure. As far as the development of this fireflood project, the plaintiffs cite testimony that KII considered itself to have a competitive edge because of this technology. The plaintiffs also refer to KII's general comments that its enhanced oil recovery projects were one of its strength and that these projects were a considerable part of KII's future. The plaintiffs allege that on the eve of the SPA the defendants took two large steps towards the large-scale application of its fireflood technology: (1) KII purchased the Capa Madison Unit to experiment with its fireflood technology; and (2) KII increased its estimate of "most likely" reserves for the Giltedge Field by 20,654,000 barrels based on the fireflood potential reserves. The plaintiffs accuse KII of positioning itself to exploit this technology and keeping this a secret from the plaintiffs.

In reply, the defendants argue it is revealing that the plaintiffs now want to make the Capa Madison claim part of a broader allegation that the defendants were secreting the fireflood technology. The defendants say it shows the plaintiffs realize that their own expert placed no value on the Giltedge poten-

tial reserves and that they are unable to predicate a fraud or warranty claim simply on their expert's higher valuation of the Capa Madison unit. The problem with the plaintiffs' new direction, according to the defendants, is that they have no evidence showing the defendants hid KII's fireflood technology from them.

### c. Analysis

 The uncontroverted evidence of record establishes the plaintiffs knew as of the SPA that the defendants had several years of experience using the fireflood technology at the Buffalo field, that the defendants were willing to spend $20 million or more in acquiring additional tertiary properties on which to experiment and exploit this fireflood technology, and that Koch Exploration had recently purchased additional reserves. This leaves the obvious question of what more should the defendants have disclosed that would have been material to the plaintiffs' valuation of their shares.[49] The plaintiffs allege two non-disclosures: the acquisition of the Capa–Madison Unit and the increased estimate of "most likely" reserves at Giltedge. Neither disclosure has been shown to have any materiality under the circumstances of this case.

The plaintiffs do not explain how knowing that KII had actually acquired the Capa Madison Unit for a fireflood project would have provided them additional facts material to the valuation of their shares. These facts would have simply revealed that KII had spent less than one-fourth of the already planned capital expenditure for such tertiary properties. The confidence and importance that KII placed in its EOR projects, particularly the fireflood technology, is revealed most plainly in its willingness to spend sub-

stantial sums in the acquisition of additional reserves for these projects. The plaintiffs offer no evidence that KII considered its technology to be materially more valuable than what is necessarily reflected in the amount and timing of KII's planned capital expenditures. For that matter, the opinions of KII's employees that KII enjoyed a competitive edge because of its experience in using the fireflood technology at the Buffalo field are self-evident in KII's capital plans and add nothing material to the mix of information already known by the plaintiffs.

The court wholly rejects the plaintiffs' argument that the mistaken form from KEC's Calgary files on Giltedge establish that KII's fireflood technology meant an increase in its "most likely" reserves. For the reasons discussed earlier under the Cold Lake claims and in the above statement of facts, the court interprets the form as showing only an increase in "potential" reserves. This increase in potential reserves is not a material fact. Furthermore, the defendants revealed the fireflood project at Giltedge in its narrative description given to Goldman Sachs.

For all of the above reasons, the court grants the defendants' motion for summary judgment on the plaintiffs' claim of non-disclosure of the fireflood project at the Capa Madison Unit.

### 2) *Expected Value of the Capa Madison Unit*

### a. Factual Overview

Beginning in the fall of 1982, Koch Exploration personnel began evaluating the Capa Madison unit as a possible fireflood project. Koch Exploration completed an enhanced recovery feasibility study which analyzed the Unit as a fireflood prospect, considering po-

---

49. The plaintiffs draw attention to William Koch's notes from the board meeting in March of 1982 in which he describes asking Charles Koch three times about the EOR project at Buffalo before learning that it was a fireflood project. William's notes also show that he then asked Howard Marshall "whether he knew of any tertiary recovery projects that were successful. Howard said that none, in his experience, worked well at all." (DX E & P 1, A001818). William's notes do not create any issue of material fact. Whatever reasons one wants to ascribe

to Charles' reluctance to answer William's questions, it remains uncontroverted that the defendants eventually disclosed the fireflood technology used at the Buffalo field in more detail than given in Charles' reticent answers at the Board meeting. There is no evidence that Howard Marshall was involved in the management or daily operation of KII's exploration activities. Consequently, the defendants are not responsible for Marshall's negative comments in general about tertiary recovery projects.

tential recoverable additional reserves, the costs of a fireflood project, and the risks of failure. The different factors were combined into a discounted cash flow analysis to arrive at a discounted present worth for the enhanced oil recovery area of Capa Madison. Because of the different risks with this project, including the probable presence of fractures in the reserves, Koch Exploration applied a fifty percent risk factor to its economic evaluation of Capa Madison. According to Koch Exploration's analysis, using a fifteen percent discount rate, Mr. Sutton's 92.7% interest in the Unit had a net present value of $4.4 million.

In late November of 1982, Koch Exploration began negotiations with Mr. Sutton for the purchase of Capa Madison. Mr. Sutton knew Koch Exploration wanted the property for an EOR project. After several offers and a counteroffer, Mr. Sutton accepted Koch Exploration's offer to purchase Mr. Sutton's 92.7% interest in Capa Madison for $4,300,-000 by letter received at Koch Exploration on March 4, 1982. The purchase was closed on May 2, 1983. The air injection process at Capa Madison, however, did not begin until 1984, because of the lead time needed to deliver and set up the equipment.

### b. Arguments

As stated before, the plaintiffs claim that Koch Exploration knew the "expected value" of Capa Madison greatly exceeded its purchase price or acquisition cost. The defendants first question the plaintiffs' use of the oblique term, "expected value," over the traditional accounting term, "discounted present value," which is the referenced calculations of value used by the plaintiffs' expert, Robert Vickrey. The defendants say it is unclear whether the plaintiffs are abandoning Vickrey's calculations of value.

The defendants' attack this claim along two lines. If the plaintiffs' claim is that as of June of 1983 Koch Exploration considered Capa Madison to have an actual value materially higher than its purchase price, then the plaintiffs have no evidence to sustain this claim. The defendants maintain that Koch Exploration personnel in the evaluation and purchase of Capa Madison used its normal

evaluation process for acquiring tertiary properties. The defendants point out that the plaintiffs' expert, Mr. Vickrey, acknowledged that the fractures were a risk and that the fifty percent risk factor used here was not unreasonable. The plaintiffs' expert also conceded that a fifteen percent discount factor was commonly used in 1983 for evaluating oil and gas acquisitions for secondary or tertiary recovery. Considering the risk of failure, the delay before EOR production and the required capital expenditures for the EOR project, the defendants had no reason to believe that the value of Capa Madison as a KII asset or as property on the open market materially exceeded its purchase price. If the plaintiffs' claim is that the defendants failed to disclose the future "potential" of Capa Madison, then the claim fails as a matter of law. The plaintiffs do not specify what additional information should have been disclosed. Whatever this information may be, as of June of 1983, the information known to the defendants consisted only of projections, estimates and speculations about this fireflood project at Capa Madison. All of which are immaterial as a matter of law under the plaintiffs' different theories.

The plaintiffs rely extensively on their expert's opinion that the net present value of Capa Madison on June of 1983 was in the range of $17,000,000 to $22,000,000. They accuse the defendants of misreading Koch Exploration's economic analysis of the project. They argue the analysis shows the defendants should have used a 10% discount rate and that the acquisition price should have been added to the net present value calculations. The plaintiffs highlight one statement from Koch Exploration's documents where the engineer acknowledges his analysis is "conservative" and a purchase price of $5,000,000 would still be "justified." The plaintiffs say their expert's valuation of Capa Madison is based on Koch's own estimates of reserves in place, additional recovery expected, oil prices, production data, and operating cost data. The plaintiffs' expert disagrees with the manner in which Koch Exploration used the fifty percent risk factor, as he believes that Koch had already factored

in risk through its estimates of reserves and prices.

### c. Analysis

The court agrees with the defendants that there is not sufficient evidence from which a reasonable jury could conclude that at the time of the SPA, KII considered Capa Madison, either as an asset or as marketable property, to have an actual value materially higher than its purchase price. There is no evidence that Koch Exploration departed from its typical methods used in evaluating tertiary properties. The plaintiffs' expert conceded not only that a fifty percent risk factor for the project was reasonable but that a fifteen percent discount factor was commonly used in 1983 for evaluating the purchase of tertiary properties. Koch Exploration's analysis certainly recognized the possibility of a higher value if the project proved successful. Even so, there is nothing to suggest that Koch Exploration did not properly account for the risks involved with this project. The plaintiffs' expert's testimony with respect to accounting for this risk [50] is not enough evidence on which to submit this claim to the jury.

The plaintiffs point to a memorandum and graph prepared by Koch Exploration which evaluated the discounted present worth of the project assuming no acquisition cost, no risk factor, and higher recovery rates from more of the field than the designated probable EOR area. As the accompanying memorandum explains, the graph depicts the maxi-

---

50. The plaintiffs say that Vickrey "used KII's own estimate of reserves in place, additional recovery expected, oil prices and other assumptions, concluding that Koch had already built the risk discount in their numbers." (Plaintiffs' Statement of Controverted Facts, ¶ [84], p. 57). The court's review of Vickrey's calculations shows he used several different factors and assumptions, none of which have been shown to be a reasonable basis for inferring that the defendants knew the Capa Madison Unit was worth substantially more than the purchase price. For example, Koch Exploration engineers analyzed present value based on an estimate of recoverable reserves of 3,160,000 barrels, while Vickrey's analysis used an estimate of recoverable reserves of 6,598,000 barrels. Koch engineers considered only part of the field suitable for EOR and designated this the "probable EOR area." The difference in reserve estimates apparently is due to Vickrey's evaluation of the entire field rather than just the probable EOR area. The plaintiffs do not explain Vickrey's reason for evaluating the whole field as an EOR project and do not come forth with anything to suggest that Koch engineers acted unreasonably in designating the probable EOR area and using it for purposes of valuation.

Vickrey refused to use the 50% deduction for risk saying that Koch had already accounted for risk in its other factors, like the price of oil and the expected rate of recovery. Vickrey gave this opinion even though admitting that he didn't know what analysis Koch had made of the project. (DX–E & P 73, p. 174). Vickrey based his opinion in part on what he read in a newspaper article in which Koch reportedly said it expected a recovery rate of twenty to thirty percent. (DX–E & P 73, p. 194). When pushed to explain his opinion about the subsumed risk factor, Vickrey's explanation is far from satisfying:

 Q. Now, how does the 20 to 30 percent recovery number, how does that figure—how

 does that have figured into it the 50 percent risk factor?

 A. I don't know how you did it. You came up with the numbers, said this is what we got.

 Q. The truth of the matter is you don't know whether that 20 to 30 percent projection is before or after the 50 percent risk factor, do you?

 A. I don't know, but the way you reported it [in the newspaper] and the way it came out is that this is what we're going to get, this is what we really have confidence in recovering.

(DX–E & P 73, p. 198). Absent from the record are any reasonable and admissible opinions that the risk factor was more than adequately accounted for in the other factors and that Koch's method for estimating risk here departed from accepted industry practices. Considering Vickrey's earlier concession that he would have used a fifty percent risk factor in evaluating this project, this opinion is not a reasonable basis on which to infer that Koch Exploration knew that it had substantially overestimated the risk in the project and, therefore, had materially understated the value of the tertiary property.

Finally, the other major difference in Vickrey's analysis is his use of a ten percent rather than a fifteen percent discount factor. The court believes Koch's use of the higher discount factor has not been shown to be unreasonable here. Vickrey used a fifteen percent rate in his first study and agreed this rate was commonly used in 1983 and 1984 in evaluating the purchase of tertiary properties. (DX–E & P 73, p. 135).

In sum, the plaintiffs have not shown that the differences between Vickery's present net value calculations and those used by Koch Exploration in the fall of 1982 are of the kind or nature from which a jury could find that KII knew Capa Madison was worth far more than its purchase price.

mum potential value for the field without considering acquisition cost or risk. The mere existence of this graph and memorandum does not suggest that Koch Exploration believed Capa Madison was worth far more than $4,400,000. At most, the documents indicate that Koch Exploration knew the property would have a much higher value in the event of a successful project and a higher than anticipated rate of recovery.

The plaintiffs see some significance in the following statement taken from a Koch engineer's memorandum evaluating this EOR project:

RECOMMENDATIONS:

1. It is recommended that we attempt to purchase Mr. Sutton's interest in the Capa field. An offer of $5 mill plus in cash and or participation is justified based on the after risk analysis which I feel is conservative. However, at this time I would recommend an initial offer of $2.5 to $3 million.

(DX–E & P 61, 10000762). Based on this statement, the plaintiffs misread Koch's documents as saying that the value of the property is the listed after tax values plus a $3,000,000 purchase price. The manner for calculating the figures found in the above memorandum are revealed on figure 2 (DX–E & P 61, 10000765), which shows that the $4,400,000 net after tax present worth figure includes the $3,000,000 purchase price. The court declines to find a genuine issue of material fact simply because an engineer expressed a "feeling" that "the after risk analysis" is "conservative." This "feeling" hardly equates with knowledge that the Capa Madison Unit was worth materially more than $4,300,000.

The plaintiffs do not respond to the defendants' second attack that the future "potential" of Capa Madison is not material information as a matter of law. The court concurs with the defendants' analysis of this point that none of the plaintiffs' legal theories would expect the defendants "to interrupt the closing of a $1.1 billion transaction to announce that they had acquired ... a geologically challenging field for $4.3 million in an arm's length transaction" for an experimental project with a fifty percent chance for success, when the selling shareholders already knew that KII had set aside in excess of $20 million to acquire tertiary properties for just such projects. (Dk. 602, p. 47). The defendants are entitled to summary judgment on the plaintiffs' Capa Madison claims.

## VII. ABKO

### A. Statement of Facts

For purposes of the pending motions only, the court considers the following facts to be uncontroverted.

1. In September 1979, ABKO Realty ("ABKO"), a company owned equally by KII and George Ablah, purchased from Chrysler Corporation all of the stock of Chrysler Realty for a net cash price of about $70 million after credits. ABKO paid approximately $3.7 million less than Chrysler Realty's net worth. Chrysler Realty was a wholly owned subsidiary of Chrysler Corporation and owned the underlying real estate to approximately 556 Chrysler dealerships and leased 245 other Chrysler dealerships. These properties were leased to Chrysler franchisees for automobile sales and service outlets. Chrysler Motors was under severe financial pressures at the time and needed to raise the cash generated by this sale of Chrysler Realty's stock.

2. ABKO financed its purchase of this stock by capital contributions of $7 million each from KII and George Ablah, who borrowed his $7 million from KII, and by borrowing $29 million each from KII and the First National Bank of Chicago. Ablah personally guaranteed the $29 million loan from First National Bank.

3. In November 1981, ABKO sold to KII a special class of voting preferred stock having an aggregate par value of $7.4 million. Ablah did not purchase any shares of such preferred stock.

4. Immediately after purchasing the Chrysler Realty stock, ABKO Realty changed its corporate name to ABKO Properties, Inc. The court shall refer to both ABKO Realty and ABKO Properties, Inc. as ABKO.

5. George Ablah was the chief executive officer of ABKO, Edwin Homer became President, C.J. Nelson was executive vice president, and Stuart Cammett Jr. was senior vice president. Nelson was a former KII employee, and Homer and Cammett had been employees of Chrysler Realty. When Homer resigned, Nelson became ABKO's president. Cammett resigned in the fall of 1982, and Chrysler rehired him after the sale of several hundred properties back to Chrysler in the fall of 1982.

6. At the time of the stock purchase in 1979, Chrysler was in a precarious financial position that resulted in a $1 billion loan from the United States government. After acquiring Chrysler Realty's stock, ABKO's business strategy was to sell dealerships, reduce debt, and diversify the real estate holdings. ABKO started with a comprehensive survey of all of the dealership properties. The properties were evaluated and graded on a scale from A to D, with A being the most desirable. ABKO also established asking prices and minimum prices for each property, with the latter being less than the former. From these established prices, the selling prices were to be negotiated.

7. As a part of its diversification effort, ABKO acquired in March 1980 approximately 1,238 acres of undeveloped land in northeast Wichita, known as Comotara, for a total purchase price of $3.6 million. Sometime near the middle of 1980, ABKO traded 26 of its Chrysler dealerships to Union Bank of California for an office building known as "Blue Hill" located in Rockland County, New York. The fair market value of the dealerships exchanged was considered to be approximately $25 million, and that value was used to record the cost of Blue Hill on ABKO's books. Blue Hill had approximately 1.2 million square feet of rentable space, but it also had problems. Leases had not been consummated prior to completion of Blue Hill's construction. When ABKO acquired Blue Hill, its tenant occupancy level was only nineteen percent.

8. By the end of 1981, ABKO had sold or otherwise disposed of approximately 250 of its dealership properties. ABKO had realized net after tax income of over $34 million,

paid dividends of $28 million, and reduced its term loans to First of Chicago and KII to approximately $30 million. In the summer of 1981, negotiations began with Chrysler concerning a repurchase of some or all of the dealership properties still owned by ABKO. Chrysler was concerned that as the leases expired, the properties would be sold to third parties who would not continue to lease them to a Chrysler dealer. Chrysler wanted to recapture control of as much of its dealer system properties as it could afford.

9. By 1982, Chrysler was returning to profitability, and negotiations with Chrysler intensified. By October 1982, the negotiations resulted in a transaction in which Chrysler purchased 336 of ABKO's then remaining 521 dealership facilities (which total excludes eight dealerships under contract to be sold to others). Chrysler also was obligated to purchase eight additional properties over the next eight months and was given the option to purchase an additional 26 properties. The purchase price for the 336 dealership properties was a formula price of $135 million less a negotiated discount of $16 million for a final purchase price of $119 million. The formula price was calculated by adding $88,141,000, which represented the net book value as of 6/30/82, to $47,000,000, which represented one-half the potential profit of $94,008,000 (minimum price of $182,149,000 minus the net book value of $88,141,000). Chrysler employed the real estate appraisal firm of Cushman and Wakefield to appraise the properties it was purchasing from ABKO. Cushman and Wakefield appraised the properties at a net market value of $126.7 million.

10. In addition, Chrysler signed new 15 year leases on 110 of ABKO's remaining 185 properties. The rent under this master lease was based on the "minimum" prices previously established by ABKO for each dealership property. During the first five years, the annual rent was to be ten percent of the "minimum price"; during the second five years, 12 percent of the "minimum price"; and in the last five years 14 percent of the "minimum price." The annual rental income from these 110 facilities had been $11.5 million. Under the new leases, Chrysler was to pay an additional $4.4 million per year in the

first five years and even more rent in subsequent years per the above schedule.

11. In addition to the Chrysler negotiations, efforts were underway in the spring and summer of 1982 to sell Blue Hill to Sterling Drug Company. ABKO had heard that Sterling Drug was seeking to move its offices out of New York City, and ABKO contacted Sterling Drug to test its interest in either leasing or buying Blue Hill. Sterling expressed an interest in buying but stated as early as April 1982 that it felt that Blue Hill was worth only about $25 million. ABKO had expressed a price of $63 million but quickly reduced the price to $53 million and then $44.6 million. By the middle of July, Ablah thought he had a deal with Sterling. While Ablah could not remember the details of this proposed agreement, an ABKO financial review package dated July 14, 1982 describes a "deal" with Sterling Drug as involving a total sales price of $38 million. Neither that deal or any other transaction with Sterling was consummated.

12. As a part of Goldman Sachs' investigation of KII in April 1982, they interviewed Ablah as well as others. In their interview, the Goldman Sachs personnel asked Ablah whether he would stay if their clients or someone else took KII's position in ABKO, and Ablah advised that he would not be needed if they were just going to liquidate the company. On April 26, 1982, Ablah wrote a seven-page memo to Charles Koch discussing the present and future situation of ABKO and suggesting several circumstances that indicated the time may be coming when they should split up. One of the circumstances that Ablah mentioned in the memorandum was the controversy between KII and the dissident stockholders. Ablah felt insecure because he did not think the dissidents liked him, and it was difficult for him to plan for the future because of the controversy.

13. During the spring and summer of 1982, various accountants associated with ABKO, Ablah or KII, were running different split-up scenarios that generally assumed liquidation, including the sale of dealership properties to Chrysler. These scenarios generally involved analysis that started with the assignment of values to the different assets owned by ABKO and then made accounting adjustments based on different assumptions, such as time of sale, expenses of sale, and tax consequences of sale. Each of these scenarios and calculations assumed that the Chrysler dealerships were worth less than the "minimum prices" carried on each dealership. There is nothing on the face of these worksheets indicating an assumption that the dealerships could be sold at or above the "minimum prices." The worksheets from the various scenarios, however, did not represent themselves to be based on their own valuations of the dealerships or to be different because of the particular valuations used. Rather, the worksheets simply showed the net worth results after changing certain accounting assumptions. None of these scenarios were provided to Goldman Sachs.

14. By August of 1982, the transaction with Chrysler had been negotiated to a conclusion but could not be closed until it was approved by the federal loan guarantee board supervising Chrysler's government loan.

15. In the latter part of August, Ablah indicated to Nelson that either he would buy ABKO, or KII would buy ABKO, or the assets would be split. Ablah asked Nelson to go through the dealership properties that would remain after the recent sale to Chrysler and independently evaluate the properties. Charles Koch and Tom Carey also asked Nelson to make a study of values in the latter part of August 1982.

16. Nelson asked Cammett and Gegen to assist him with the valuations. Cammett was to be primarily responsible for setting "new minimum prices" and giving six month and twelve month liquidation values. They displayed the results of their work on September 9, 1982. The document, in tabular form, shows old "minimum prices" totalling $251 million, the "new minimum prices" totalling $231 million, the total liquidation values ranging between $193 million to $207 million, and a column labelled "revised evaluation" totalling $188 million. (DX–ABKO 23, K303332). The "revised evaluation" column represented Nelson's opinion on the current

market value of the properties as of September of 1982. A final decision on who between KII and Ablah would end up with what properties had not been made while these property valuations were being done.

17. Nelson met with Charles Koch and Tom Carey to review the valuation results on or shortly after September 9, 1982. Charles suggested that the values be verified by taking a random sample of the properties and submitting them to an independent real estate appraiser. A computer was utilized to obtain the random sample of 36 properties from the total 185 properties.[51] Carey believes that a representative from Peat Marwick was involved in the selection process of the properties.

18. On September 21, 1982, the list of properties randomly selected was given to J.P. Weigand & Sons, a Wichita real estate firm, which was asked to appraise those properties and report the results back within seven to ten days. Weigand contacted knowledgeable realtors in each city where the 36 properties were located and asked them to provide quick individual opinions of market value or "drive-by appraisals." The total of those 36 opinions of value for the properties was $46 million. Comparing this number to the total valuations and prices on the same 36 properties, it was a little over $4

million greater than Nelson's revised values of $42 million, $10 million lower than the "old minimum prices," and approximately $7.5 million lower than Cammett's "new minimum prices." (DX–ABKO 10, A000378–381).

19. On September 20, 1982, George Ablah and Charles Koch met to discuss the liquidation of ABKO. As reflected in contemporaneous memoranda from both Ablah and Charles, they generally agreed that a "fair, after tax liquidation value for the company might be in the realm of $90,000,000" and that Blue Hill was worth in the range of $25.5 million. (DX–ABKO 27, K300922). At that time, it was Charles' view that KII had not completed its evaluation of ABKO and that it was too early to come to a final agreement. Charles suggested to Ablah that he should consider staying, or not selling, until most of the remaining properties had been sold. Ablah thought that KII should keep the dealerships and he should take Blue Hill if a split-up occurred. On September 22, 1982, Nelson made modifications to his valuation including adjusting "Blue Hill up to $25.5 million."[52] (DX–ABKO 28, K309495).

20. By October 12, 1982, KII had completed its evaluation of ABKO and finalized the terms of a proposed transaction with Ablah, which was then presented to KII's

---

**51.** None of the deposition excerpts cited by the plaintiffs controvert the statements found in this paragraph.

**52.** Citing various documents where different net worth valuations were indicated, the plaintiffs seek to controvert the inference that Ablah and Charles Koch believed that $90 million was a fair value for ABKO in a buy out. While these documents show that both Charles Koch and Ablah had considered figures greater than $90 million, most of these other estimates of value were calculated using different assumptions or are not materially different. Charles Koch's handwritten notes in September referring to ABKO's net worth in the range of $138–$143 million are pretax calculations based on dealership values in excess of the revised values used in the Executive Committee report. The plaintiffs also refer to a memorandum from Ablah dated September 3, 1982, noting that a study of 178 properties sold over a three year period showed the average selling price was 86.2% of the old minimum price. (PX 315). The "revised values" used in the buy out were 75% of the old minimum prices. The defendants note that sale prices as a percent of minimum prices had declined and that ABKO in the most recent Chrysler transaction had re-

ceived only 65% of minimum price. The plaintiffs also submit Ablah's balance sheet for December 31, 1982, showing that the equity value of his share of ABKO was $60,300,000. The same document also reflects a market value for Blue Hill of $39,000,000 and Ablah's opinion that this "is a ridiculously low salvage number for the fabulous office complex that is there today." (PX 316, H06998). A real estate consultant firm appraised Blue Hill's market value as of July 1, 1983, at $80,000,000. Ablah considered this firm to be one of the best real estate appraisal firms in the nation, and he agreed with their appraised value. Finally, Ablah in his deposition admitted that his valuation of ABKO may have been influenced by the circumstances: "I think if you go out to a third party, ..., and try to sell something, you look for a profit, you look for a lot of things, and if you and a partner are splitting something up, I think you look for a fair price." (PX 304, p. 146). None of this evidence controverts the above statement that in September of 1982 both Ablah and Charles Koch believed a net equity value of $90 million would be fair for purposes of splitting up ABKO.

Executive Committee (consisting of Charles Koch, David Koch, Sterling Varner and Howard Marshall II) on October 19. The presentation was in the form of a thirty-page document (the "Executive Committee Report"), which outlined not only the Ablah transaction, but also described the history of ABKO, summarized its financial performance since acquisition, described the accounting effect of the proposed Ablah transaction on KII, reviewed the transaction with Chrysler, set forth the ABKO pro forma balance sheet, and included a current value balance sheet. (DX–ABKO 10). The Executive Committee Report valued the assets using the "revised values" determined by ABKO personnel. These "revised values" were less than the old "minimum prices" on the properties. The Executive Committee Report also contained a schedule showing the results of the third-party appraisals of the 36 randomly selected properties. This schedule disclosed that the appraisals came in at a total of $46 million and compared this total to the "revised price" of $42 million and the "old minimum price" of $56 million. For purposes of the accounting determinations, the Executive Committee Report assumed that the values could be reached by selling the properties evenly over a two-year period, deducting selling and commission expenses of 4.5% [53] and taxes of $24 million, resulting in an adjusted common stock equity of $104.9 million. Discounting this to present value at rates of 10%, 12%, or 14%, the Executive Committee Report reflected a present value net worth for the common stock of ABKO of $89.6 million, $86.8 million, and $84.1 million, respectively.[54] (DX–ABKO 10, A000374).

21. The Executive Committee Report began with a summary of the proposal for vote before the Executive Committee which was, as stated, the management's recommendation that "(Koch) purchase the interest of ... (Ablah) in ABKO Realty, Inc. for $45.0 million." The Report described the consideration to be paid to Ablah as follows:

| ($IN MILLIONS) (As of 10/31/82) | | |
|---|---|---|
| Blue Hill Office Plaza | $25.5 | |
| Plus: Other Balance Sht. Items | 1.1 | |
| Less: Existing Debt | (14.5) | $12.1 |
| Two Aircraft (Lear and Citation) | 2.2 | |
| Less: Existing debt | (2.0) | .2 |
| Cash Payment at Closing | | 32.7 |
| Total Cost | | $45.0 |

(DX–ABKO 10, A000359).

22. The Executive Committee of KII approved the above proposed transaction with Ablah except for two agreed changes. First, Ablah took the Comotara undeveloped property with a value of $3.6 million in lieu of cash and, second, the airplanes were distributed debt free. The result of these two changes reduced the cash paid to Ablah from $32.7 to $26.8 million. Nelson determined the $3.6 million value given to Comotara after consultations with various real estate agents in Wichita, including Weigand, who gave him their indications of value.[55] Until the change prior to closing, Comotara was an asset to be retained by KII. The transaction with Ablah was closed on November 1, 1982.

23. In early October of 1982, there were no pending negotiations between the defendants and the plaintiffs. William Koch and others filed the "Koch I" lawsuit on October

---

53. The plaintiffs point out that ABKO's average selling commission was less than 2% between January of 1981 through May of 1983. At the Board meeting in August of 1983, the selling expenses were valued at 1%. The plaintiffs' other argument that the report actually deducted selling expenses greater than 4.5% is not supported by the documents cited.

54. Citing their expert witness's affidavit, the plaintiffs say the Report understates the after-tax operating income by $11 million, the accounts receivable by $3.6 million, and the after-tax value of the dealerships by $43.5 million. (PX 310).

55. The plaintiffs cite other evidence indicating a higher value for Comotara. For example, Ablah wrote a letter to his staff dated October 28, 1992,

stating that the market sale price on Comotara would be $9,000,000 but that he would be "hard pressed" to decline an offer of $6 million. (PX 324, H004331). On Ablah's financial statement of December 31, 1982, he lists Comotara with a market vale of $6.4 million and explains this value was confirmed in a trade for the Boulevard Office Park and its subsequent sale. On pro forma statements from September of 1982, ABKO had calculated Comotara's present value using an eight and ten-year liquidation periods and a range of discount rates. At a discount rate of 12%, the present value was $18,362,000 for ten years and $22,461,000 for eight years.

12, 1982. One of the allegations challenged the propriety of the sale of properties to Chrysler because it had not been approved by the full Board of Directors. On October 21, 1982, the representatives of the plaintiffs on the Board called a special meeting of the Board to review the transactions which had been approved and/or conducted by the Executive Committee. A Board meeting was also called by Charles Koch, and the two meetings were consolidated and held on November 6, 1982.

24. The ABKO transaction approved by the Executive Committee was discussed at the KII Board meeting on November 6, 1982. The Board members received a copy of the Executive Committee Report described above, and the transaction was discussed and reviewed in conjunction with the Report. In addition, Tom Carey made a presentation about the transaction from prepared notes. After that presentation, questions were asked and answered. William Koch has testified that Tom Carey "described the report to us and described the outcome of the calculations that were made that weren't obvious from the report itself." (DX–ABKO 33, William Koch Dep. p. 2751). From that presentation, the Board discussion, and the Executive Committee Report, the plaintiffs were informed:

(a) That the Chrysler transaction in October of 1982 involved 336 dealerships which were sold at a net price of $119 million, whereas the remaining 185 dealerships had a "revised value" of $188 million.

(b) That the common equity [56] of approximately $90 million was arrived at by first making certain pro forma adjustments reflecting the Chrysler and related transactions, assuming the properties would be sold over two years at prices equal to the revised value of $188 million; that such price would be reduced by assumed selling expenses of $9.7 million and income taxes of approximately $25.7 million; that the net price would be further reduced by discounting the net after tax realization to present value at discount rates of ten percent, twelve percent and fourteen percent; and that the net worth would be enhanced by the after tax operating income over the assumed two year liquidation period of approximately $1.8 million.

(c) That the approximate net worth of $90 million was computed after deducting the preferred stock owned by KII in ABKO.

(d) That the revised values for all of the properties were lower than the new minimum [57] asking prices, with the new minimum asking prices being $280 million [58] as compared to the revised values of $204 million.

(e) That the appraisal of 36 randomly selected properties reflected appraised values that were approximately $4 million (or about ten percent) higher than the revised values for such properties.

(f) That Blue Hill was being written down by $6.7 million.

(g) That as a result of the new Chrysler lease on 110 of the properties, the rent was scheduled to increase from $11,467,000 per year to $15,879,500 per year for the first five years. Such rent represented ten percent of the "minimum prices" and was scheduled to go to twelve percent in the years six through ten and to fourteen percent in the years eleven through fifteen.

25. Mr. Carey's prepared notes for his presentation at the Board meeting on November 6, 1982, reflect that he intended to tell the Board that the values for the remaining Chrysler dealerships used in the report were established in the following manner:

---

56. The Executive Committee Report unambiguously refers to "common" equity, and the record demonstrates that the plaintiffs' financial adviser, Goldman Sachs, understood the same. (DX–ABKO 60, A001024).

57. The plaintiffs correctly note that these prices were actually the "old minimum" prices, but the Executive Committee Report did refer to these prices as the "new minimum" prices.

58. The defendants explain in reply that the $280 million figure comes from $230 million for the "new minimum" price for the dealerships and the $50 million for the minimum price of Blue Hill. The plaintiffs are correct that the $280 million figure cannot be linked to numbers found in the exhibits to the Executive Committee Report.

The mark-up to market to 204 million was based upon market value established by the ABKO Real Estate team *adjusted downward* by Corky Nelson. The ABKO minimum asking price for these properties was 280 million. Exhibit E reflects the result of the random appraisals of 36 properties with a minimum asking price of 56 million—Corky's [Mr. Nelson's] estimate of 42 million and third party appraisal of 46 million.

(DX–ABKO 32, K300389) (underlining added). From Carey's presentation at the meeting, the secretary for the Board took the following notes: "204 MM appraisal of to ABKO, asking price of 280 MM for the properties." (DX–ABKO 34, K708943). William Koch's notes found on his copy of the Report state: "ABKO valued, Corky knocked down and did statistical valuation on 36." (DX–ABKO 10, A000374).

26. William's notes from the same Board meeting also reflect that he asked about the future plans for ABKO. Charles reported that while they had no final plans they would probably sell the bad properties and keep the good ones for an income stream, and look at it as time goes on.[59]

27. Before it was known whether KII or Ablah would keep the properties, Ablah had enlisted the aid of one of his partners in other real estate ventures, Frank Macari, to line up purchasers for 76 dealerships, so that Ablah could have a ready source of cash if he ended up with the dealerships. When it was decided that ABKO would retain the dealerships, Macari's sales efforts were called off, "because they were at prices below what we thought these were valued at." (DX–ABKO 3, Nelson Dep. at 150). At the request of Ablah, Nelson sent Macari a letter on November 15 saying that ABKO had decided to hold these properties for long term investment.

28. On November 24, 1982, the plaintiffs in the 1982 litigation filed an Amended Complaint, which added a challenge to the propriety of the KII/Ablah transaction that had been approved by the KII Executive Committee and discussed at the November 6 Board meeting. Specifically, the amended complaint alleged the individual defendants acting through the Executive Committee had taken actions, including the approval of the ABKO stock purchase and the sale of ABKO assets, in furtherance of a "policy of freezing the minority directors and stockholders out of participation in Company affairs." (DX–ABKO 37, pp. 25–26).

29. Between the November 1982 Board meeting and June 1983, ABKO sold an additional 30 dealership properties. Ten of these properties sold at a price less than the "revised values" used in the Executive Committee Report and reviewed at the November Board meeting, one sold at exactly the same price, and the remaining properties sold at prices higher than the revised values. In the aggregate, these 30 dealership properties sold for approximately $30.2 million, as compared to the $27.8 million of "revised prices," or a difference of $2.4 million—less than a ten percent variance and within the same range of differences between "revised values" and "appraised values" reflected in the Executive Committee Report reviewed at the November Board meeting.

30. In the early part of 1983, KII determined that the target selling price for the remaining Chrysler dealership properties should be at an amount equal to KII's alternative investment rate, that being the rate which KII could yield after tax if it reinvested the sales proceeds.[60] In January of 1983 this was determined to be eight percent. Accordingly, the new prices (the "eight percent DCF prices") for the dealerships were computed by discounting the after tax cash flow from a dealership (including its residual

---

59. Don Cordes' answer to a similar question from David Koch at the October Executive Committee meeting does not controvert or contradict Charles Koch's answer here. Cordes' answer may have more detail, but both answers contemplate selling some properties, keeping other properties for their income, and considering other options later.

60. The plaintiffs' cited excerpts of testimony do not controvert that KII developed the eight percent DCF prices for the remaining dealerships in the early part of 1983.

sale upon the expiration of the 15 year Chrysler lease) to a present value at the rate of eight percent. The new price of the dealership became the price it would take to yield cash (after tax and after paying off any debt on the property) equal to that eight percent present value. The "eight percent DCF prices" were target prices. It was understood that there could be circumstances where ABKO would sell an individual property for less than its listed eight percent DCF price. When the study was completed, it included prices at six percent, eight percent and nine percent DCF rates. The highest price was the six percent DCF and that was the goal of the sales people.

31. In June 1983, Nelson described the ABKO goal as being to dispose of vacant facilities at the "established minimum prices" and to pursue selling the occupied facilities at the higher of the "established minimum price" or the "eight percent price." (DX–ABKO 41, K309162). Between November 1982 and June 1983, only two properties with an eight percent DCF asking price had actually been sold, and the goal of achieving that price had not been realized. Both of those properties sold for less than the eight percent DCF price. In 1983, two properties were sold before the SPA at approximately 68% and 74% of the eight percent DCF prices. Of the remaining sales in 1983, three were above the DCF prices, one was equal to the DCF price, and the remaining ten sales were below the DCF prices. In 1984, excluding the nine properties sold to Chrysler in one transaction, eight of the ten sales were below the DCF prices. In 1985, excluding the fifty-six properties sold to Chrysler in one transaction, four of the ten sales were below the DCF prices. The Chrysler package sales in 1984 and 1985 exceeded the DCF prices.

32. Between 1982 and 1985, the economy in the United States improved. During this period, interest rates on U.S. ten year bonds dropped from 12.54% to 10.3%, inflation went from 6.16 percent to 3.56 percent, the Dow Jones Industrial Average went from 1250 to 1550, and real estate prices increased.

33. During this same period, Chrysler's financial health was also improving. After sustaining losses of $1.1 billion in 1979, $1.7 billion in 1980 and around $400 million in 1981, Chrysler recorded earnings of $170 million in 1982, $700 million in 1983, $2.3 billion in 1984, and $1.6 billion in 1985. In November of 1982, Chrysler's common stock was trading at $11 per share, and by the summer of 1985 it was trading at over $37 per share. As its financial health improved, Chrysler's appetite for the remaining dealerships still owned by KII increased. In addition to the 34 properties on which it had options or was required to purchase, Chrysler purchased an additional nine properties in early 1984. Coupled with sales made to others, this left KII with approximately 88 dealerships as of the beginning of 1985. Chrysler became more and more concerned about KII's intention with respect to the dealerships and was fearful that KII would sell the dealerships to third parties. In addition, the commercial real estate market was improving, and KII had shown a pattern of increasing its asking prices for the dealerships in the years 1983, 1984, and 1985.

34. In the spring of 1985, Chrysler initiated discussions with KII about the purchase of 56 of the remaining dealerships. As a preliminary step, Chrysler had Cushman and Wakefield conduct an appraisal of those properties, and in June 1985, Cushman and Wakefield reported that the value on a "highest and best use" basis was $105 million. According to Chrysler documentation, KII's asking price was $135 million. The report to the Board of KII reflected that management thought the properties had a fair market value of $98 million. By late July 1985, KII and Chrysler reached an agreement, which transaction then closed in October 1985. Chrysler agreed to pay $110 million, in the form of a long-term note bearing interest at the rate of 12 percent, which note was guaranteed by a bank. The eight percent DCF selling price for these 56 properties was $104.7 million. However, considering the tax benefit from the tax deferral and the high interest rate, KII considered this to be equivalent on after tax basis to a six percent DCF price, and the transaction was concluded on that basis.

35. After his acquisition of Blue Hill in November 1982, Ablah continued the effort to lease and/or sell the property. In February 1983, he attempted, without success, to sell Blue Hill to Equitable Life Insurance for a net of $40 million, and in the same month he proposed a sale to Sears. Ablah did not complete the sale with either possible purchaser. As a part of the above efforts, Ablah continued to seek permanent financing. In June 1983, Ablah obtained an appraisal of Blue Hill from Weitzman Group, a real estate consultant firm, who was aware that the purpose of the appraisal was for refinancing. Weitzman Group appraised the market value of Blue Hill as of July 1, 1983, at $80,000,000 and upon achievement of a stabilized occupancy level as of January 1, 1986, a value of $132,000,000. The Weitzman Group's income approach for the 1983 appraised value assumed the property would be fully leased by 1986. At the time of the appraisal, only 305,777 square feet out of a total of 1.2 million square feet of Blue Hill was occupied or committed, and the occupancy had never been higher during the eleven years of the building's existence. Ablah testified in his deposition that he does not believe the June 1983 appraisal accurately reflected current fair market value based on the conditions existing at that date. This opinion is contrary to statements Ablah made in his financial statement of December of 1983. There is no evidence that anyone at KII was aware of the Weitzman Group appraisal.

36. By June 1985, the loan at First of Chicago had increased from the $14 million Ablah had assumed at the time he acquired Blue Hill in November 1982 to $55 million. In addition, Ablah borrowed an additional $8.5 million from the Chemical Bank in New York in exchange for a second mortgage on Blue Hill. These borrowed funds were the result of continual capital improvements being made to the property. Ablah sold Blue Hill in June of 1985 for $100 million, his net cash realization from the sale was approximately $30 million, and he reported a net gain on the transaction of $29 million. It is not clear from the documents whether those numbers reflect time and travel expenses or interest expense accrued on the temporary loans from the banks.

37. In addition to the financial statements and other information which Goldman Sachs received and/or reviewed in the spring of 1982, as summarized above in the statement of general facts, Goldman Sachs received a computer run of income for each dealership; a 54–page analysis, "Summary of Property by Rating" dated "4–30–82," and a 61–page study, dated "3/5/82," "Property Evaluation Report," which collectively gave Goldman Sachs as to each dealership its description, its ranking by ABKO, the minimum price, the rental income, the expenses, the square feet, the mortgage balance and payments, the termination date of any leases, its status (i.e., leased to a dealership, leased to others, no lease, vacant, etc.) and other information.[61]

38. Goldman Sachs conducted at least two interview meetings with Ablah and other KII personnel regarding ABKO, at which they were told, among other things, that all of the dealerships had been ranked from "A" to "D" with "A" being the best, and that ABKO "tried to concentrate in '79–'81 on selling Cs and Ds." (DX–ABKO 56, G00451). At one of the meetings, Ablah estimated for Goldman Sachs the future value of ABKO in the range of $120 to $200 million. In his personal financial statement for December 31, 1981, Ablah wrote that *"ABKO properties could be liquidated for at least $200,000,000 above the company's book value and present net worth."* (PX 338, K303394).

39. At the meeting on April 29, 1982, Goldman Sachs was given a memorandum from Gegen to Carey, dated April 23, 1982, estimating the current value of ABKO. The memorandum explained that the minimum asking prices are "deliberately inflated" because ABKO's field staff "was constantly of-

---

**61.** The plaintiffs complain that after the sale of 336 properties to Chrysler later in 1982, they did not know which properties had been retained. The plaintiffs do not allege, however, that they ever asked for this information and were denied it. Moreover, the plaintiffs knew 36 of the re- maining 185 properties by reason of the random appraisals summary attached to the Executive Committee Report. In addition, the plaintiffs knew the remaining properties had greater value than those recently sold to Chrysler.

fering ... properties to outsiders without our knowledge." (DX–ABKO 57, K307480). Gegen noted in the memorandum that in 1981 "the average gross selling price" was "approximately 82% of the minimum asking price" and that an "even lower percentage" would be anticipated in the 1982 market. (DX–ABKO 57, K307480). His memorandum assigned high, low and probable percentages of minimum price to the various classes of dealerships and properties, to arrive at a range of high, low and probable values. His worksheet reflected that Blue Hill had a minimum asking price of $50 million, but that he was placing a high, low and probable range of $42.5 million, $37.5 million and $40 million on Blue Hill. Gegen's memorandum also addressed these values in the accounting context in arriving at ABKO's current value. The memorandum also made certain assumptions as to how long it would take to sell the assets at those values, the expenses involved, the income realized from the process, and the tax consequences. Gegen's memorandum assumed that the costs of liquidation, sales, etc., would be from $45 to $52 million, and the taxes on the sales by ABKO would be from $26 to $42 million. The memorandum added the net proceeds to the existing book net worth and arrived at a range of net worth (net of preferred stock) of from $76 million to $111 million. The memorandum recites that "the most probable current value would probably be in the realm of $80 million with a plus or minus swing of up to 25 percent due to market conditions."

40. Using the information obtained, and separately consulting with their own in-house expert, Claude Ballard, Goldman Sachs estimated the value of KII's 50 percent interest in ABKO as being between $60 million and $100 million, as of June 25, 1982. In reaching that conclusion, Goldman Sachs used both a (1) discounted cash flow analysis in which it assumed, among other things, that "all properties assumed sold on 12/31/90 for 150 percent of 'minimum price' of 2/28/82," and (2) an asset value analysis in which it valued the dealerships at a range of percentages of "minimum price" from 50 percent to 86 percent. This was similar to the valuation step in the Gegen Report. Blue Hill, however, was valued by Goldman Sachs at a con-

stant $15 million, because it was viewed as a "white elephant." The spreadsheet reflecting these values subtracted the KII preferred stock to arrive at the 50 percent of common equity figure.

41. Bain & Co. expressed no opinion as to the value of ABKO.

42. Goldman Sachs and Bain & Co. had access to those details of the Chrysler and Ablah transactions reflected in the Executive Committee Report given to the plaintiffs or their representatives on the Board of Directors, and they had access to the monthly financial statements of ABKO through April 1983.

43. From the April financial statements of ABKO (then known as Koch Properties) the plaintiffs and their advisors knew that through the first four months of 1983, ABKO had the following earnings, gain on sale of properties, and depreciation. With these numbers, the plaintiffs with the assistance of their financial advisers could have calculated the following:

| | (millions) |
|---|---|
| Earnings before depreciation, valuation and income taxes | $6,666 |
| Less gain on sale of properties | (3,209) |
| Net operating cash flow before depreciation and taxes | 3,457 |
| Less depreciation | (829) |
| Taxable income from operations | 2,628 |
| Less taxes at 50% | (1,314) |
| Net operating after tax cash flow for four mos. | 2,143 |
| Annualized cash flow (x 3) | 6,429 |

44. Prior to the sale of the plaintiffs' stock, none of the financial schedules prepared by the plaintiffs' various financial advisors changed the value of ABKO previously determined by Goldman Sachs as being in a range of $60 to $100 million for KII's common stock interest.

### B. Claims

A combined reading of the plaintiffs' proposed pretrial order and memorandum opposing summary judgment yields the following two claims: (1) KII told the selling shareholders at the Board meeting in November of 1982 that KII's retained half of ABKO was worth $45 million when the defendants knew the "real value of KII's retained half of ABKO was more than twice

**1552**

the $45 million figure they told the selling shareholders"; and (2) After the Board meeting, KII performed evaluations of ABKO reflecting substantially higher values than the $90 million, and KII never disclosed these evaluations or higher values to the selling shareholders prior to the SPA. (DX–ABKO 63). The allegations underlying the first claim are: (a) that the $45 million value was based on a study done by Nelson who attributed a value to each of the 185 Chrysler dealerships "that was substantially less than KII's existing targeted price for each, referred to as the 'minimum price'"; (b) that KII knew that Ablah's half of ABKO was also worth more than twice the stated value of $45 million; and (c) that KII performed evaluations prior to the Board meeting reflecting substantially higher values than the $90 million value. (DX–ABKO 63). The allegations underlying the second claim are based on the non-disclosure of the following: (a) that "[c]oncurrent with or shortly after the Ablah buy-out, KII established new values for the leased dealership properties based upon a discounted cash flow analysis referred to as the '8% DCF' prices"; (b) that the 8% DCF prices were "far greater" than the values told the shareholders at the Board meeting; and (c) that KII advised prospective purchasers it would not sell the dealership properties at the values used in the buy-out but would only sell at the minimum price or the 8% DCF price, whichever was higher. (DX–ABKO 63).

### C. Arguments

As for the plaintiffs' claim based on the representation of value made at the Board meeting, the defendants argue that the Executive Committee Report contained only estimates and opinions, not statements of facts, and that no reasonable person would understand the Executive Committee Report as meaning that ABKO could not be worth more than $90 million at the time of the Report or at any time in the future. The Report was prepared not for the plaintiffs to value their shares but to assist the Committee in deciding whether $45 million was a "good and fair price" for purchasing Ablah's half of ABKO. The Report reveals that ABKO could well be worth more than $90 million. The presenta-

tion to the Board in November emphasized that the revised values were less than the minimum prices and the appraised values. The presentation likewise referred to a $280 million asking price for the properties. The defendants emphasize Goldman Sach's estimate that KII's half of ABKO was worth between $60 to $100 million.

In addition, the defendants argue the plaintiffs are not able to prove an untrue statement of fact in the Executive Committee Report concerning the revised values. The revised values were within ten percent of the third-party appraised values. Between November of 1982 and June of 1983, ABKO sold an additional thirty dealership properties—ten below revised value, one at revised value, and nineteen above revised value—for a total sales price of approximately $30.2 million or just $2.4 million or 8% more than the total revised value. The defendants deny that the plaintiffs have any competent evidence that the current fair market values of the property in November of 1982 "were in fact materially higher than those reflected in the Executive Committee Report." (Dk. 581, pp. 76–77).

As far as the plaintiffs' claim that the defendants failed to disclose higher valuations of ABKO and its holdings after the November Board meeting, the defendants maintain the plaintiffs actually knew the material facts. The plaintiffs knew ABKO had retained the more valuable dealerships in the 1982 Chrysler transaction. The remaining 185 dealerships had a revised value of $188 million for an average value in excess of $1 million per dealership. The 336 properties sold to Chrysler before the ABKO buy-out had an average value of $354,000 ($119,600,000 + 336) and adjusting for leased, but not owned properties, the average value is still only $592,000 (119,600,000 + 201). The defendants deny that they ever considered the eight percent DCF price to be fair market value. The purpose of this calculated price was to assist management in setting a target asking price for the various properties. The defendants point out that none of the properties sold before June of 1983 reached the eight percent DCF price, that only four of the sixteen properties sold in 1983 reached

the eight percent DCF price, and that excluding the Chrysler deal in 1984 only two of ten properties sold in 1984 reached the eight percent DCF price. Furthermore, the defendants argue the plaintiffs still had the Goldman Sach's valuation and the knowledge that ABKO had kept the more valuable properties, had negotiated leases promising a forty-percent annual increase in rental income with further increases in subsequent years, and had transferred Blue Hill for $10 million more than Goldman Sach's earlier valuation.

The plaintiffs allege Charles Koch set out to lower the plaintiffs' expectations for ABKO from the value given by Goldman Sachs in June of 1982. The plaintiffs cite some negative comments about ABKO's market made at the June 1982 Board meeting. Next, ABKO sold the majority of its car dealerships back to Chrysler in October of 1982, and then KII bought out Ablah with ABKO keeping the remaining dealerships and Ablah taking ABKO's other assets, including Blue Hill and Comotara, and $26 million in cash. According to the plaintiffs, from June to November, the defendants had ABKO dismembered and it's real estate portfolio modified to the point that the defendants could now tell a new story about ABKO's value in November of 1982.

The plaintiffs maintain the defendants represented the fair market value of ABKO to be $90 million in the Executive Committee Report and the accompanying presentation at the November Board meeting. The plaintiffs allege the defendants did not disclose that ABKO had kept the best dealership properties after the bulk sale to Chrysler in October of 1982. The plaintiffs even allege that Charles Koch implied the opposite by saying at the November meeting that Koch's strategy, in part, would be the selling of the "bad" properties. The plaintiffs further allege that the defendants failed to disclose ABKO's internal valuation of the properties in September of 1982 made by Stuart Cammett and that the defendants only disclosed Nelson's "cooked" values that were much lower. Following the Ablah buy-out, the defendants turned down offers to buy properties at prices equal to the revised values used in Nelson's report. The defendants instead established new eight percent DCF prices for the remaining dealerships. The total of these new prices was $60 million more than the total revised values. Finally, the plaintiffs say the defendants failed to disclose the new eight percent DCF prices prior to the SPA.

### D. Analysis

■ The defendants' disclosure of information about ABKO properties to Goldman Sachs in the Spring of 1982 and then Goldman Sachs' higher valuation of ABKO in June of 1982 are serious hurdles for the plaintiffs in proving the reasonableness of their reliance on later representations of value. The plaintiffs' effort begins with accusing the defendants of taking steps that essentially undermined the reliability of Goldman Sachs' valuation and lowered the plaintiffs' expectations of ABKO's value.

The plaintiffs' accusations, however, crumble under the weight of several uncontroverted facts. First, the defendants did not learn of Goldman Sachs' valuation opinions until March of 1983. In other words, it was months after the Board meeting in June of 1982, the Chrysler transaction in October of 1982 and the ABKO buy out in November of 1982 before the defendants learned that Goldman Sachs had valued KII's half interest in ABKO as worth something in the range of $60 to $100 million. Second, during 1982, ABKO was being considered as a possible spin-off for the plaintiffs. Not knowing how much Goldman Sachs had estimated the value of ABKO to be or even if ABKO would remain with KII, the defendants were not in a position where one would reasonably expect there to be a motive to depress ABKO's value. Moreover, neither the timing nor the circumstances of the Chrysler transaction or the Ablah buy out suggest any motive to dismember ABKO to the point that prior valuations would be useless.[62]

---

62. All of the evidence of record suggests that the idea of Ablah and KII ending their joint ownership of ABKO began with Ablah. As for the Chrysler transaction, the documentary evidence shows Ablah had been negotiating for some time with Chrysler regarding this transaction and others.

The plaintiffs' alternative scenario is that the defendants simply took advantage of the changes to tell a "new" story about ABKO's value. Even under this theory, the plaintiffs' claims falter in several critical respects. First, the plaintiffs have not shown that the $45 million valuation in the Executive Committee Report was a final representation of established worth on which they should have relied in valuing their KII shares as of June of 1983. Second, the plaintiffs do not offer evidence showing that the fair market value of the retained dealership properties in November of 1982 and June of 1983 materially exceeded the opinions of value found in the Executive Committee Report. Third, the plaintiffs have not shown that the defendants knew the fair market value of the assets was, in fact, materially greater than the opinions of value found in the Executive Committee Report. Finally, the plaintiffs have not shown justifiable reliance on the valuation in the Executive Committee Report rather than the valuation of their own financial adviser, Goldman Sachs.

Before addressing each of these points, the court wants to discuss generally the "materiality" of the valuations and the manner in which such valuations are often expressed. Such information is treated as "soft information" in the securities industry. *Garcia v. Cordova*, 930 F.2d at 830. They "inherently involve some subjective analysis," not unlike other "projections, estimates, [and] opinions." *Id.* The materiality of valuations as predictive information depends on a number of factors. *Id.* The court considers the following to be the more relevant factors: the preparer of the valuation, the purpose of the valuation, the currency of the valuation, the importance of the valuation, and the reliability of the valuation. Valuations are typically expressed in ranges, as the parties' investment bankers did here. Valuations, as any reasonable businessman or investor knows, are foremost a matter of subjective judgment.

### 1) *Reliance on $45 million valuation*

The Executive Committee Report plainly informed the plaintiffs the purpose for which that valuation was made. The Report disclosed the details of a proposal recommended by management in which KII would purchase Ablah's half of ABKO for $45 million. The Report explained that the recommended price was based on a "current value equity . . . estimated at approximately $90 million." Attached to the report was the "PRO FORMA CURRENT VALUE BALANCE SHEET" used to calculate this $90 million value. Thus, the plaintiffs are correct that the Report repeatedly refers to "value."

The Report was written by KII management for the Executive Committee's use in October of 1982. It was later shared with the Board and the selling shareholders on November 6, 1982, only after the plaintiffs' representatives called a special meeting of the Board to review this transaction and others that had been approved by the Executive Committee. The Report disclosed that the $45 million was based on revised property values recently determined by ABKO personnel and that these revised values were less than the minimum prices and the third-party appraised values. As written, the Report plainly reflected management's valuation of ABKO strictly for the Executive Committee's purpose of setting a fair price for Ablah's half in the buy out. Consequently, the plaintiffs knew the valuation in the Report had not been written or intended for them to use in valuing their KII shares. Moreover, the plaintiffs have not shown that the defendants subsequently told them to rely on this valuation as a final representation of ABKO's established worth for purposes of valuing their shares of KII stock.[63]

It is plain from the face of the Report that KII's interest in ABKO could be worth more than $45 million. The Report disclosed the revised values for the 36 dealership properties randomly selected from the remaining

**63.** The plaintiffs point to notes from Goldman Sach's meeting with Lehman Brothers' representatives on November 14, 1982, approximately eight days after the Board meeting. The plaintiffs do not cite any testimony with respect to these notes. Construed as a whole, the notes reflect basic discussions recounting the recent transactions at ABKO, including the Ablah buy out. Most importantly, Goldman Sachs, had access to the Executive Committee Report and its explanation of these transactions and figures.

185 properties. The Report showed that the individual revised values were in most instances less than the minimum prices and the third-party appraisals and that the aggregate revised value for the 36 properties was less than the aggregate minimum price and third-party appraised value.[64] In addition, the Report disclosed that current annual net rental income under the new 15–year leases with Chrysler would increase from $11,467,000 to $15,879,500, for an initial annual difference of $4,430,500. The Report further detailed that rental rates would increase by 2% after each 5–year interval. The Report plainly informed the plaintiffs that KII's interest could be worth more than $45 million.

Carey's comments at the November Board meeting, as evidenced by the notes taken by Hanson and William Koch, further disclosed that ABKO personnel had placed a market value on the properties ($208 million) and that Nelson[65] had "knocked down" this value in arriving at the revised values. (DX–ABKO 34, K708943; DX–ABKO 10, A000374). Carey also told the Board that the total minimum asking price was $280 million for the properties. (DX–ABKO 34, K708943). From Carey's explanation of asking price, market value and revised value, the plaintiffs were effectively told that KII hoped to realize more from the properties than the revised values used in the Ablah buy out.

From all the facts and circumstances disclosed within and along with the Executive Committee Report, the court believes no reasonable jury could find that a reasonable businessman would understand this internal valuation plainly made for purposes of set-

ting a fair price in an amicable buy out of an equal partner would be a representation of all that could be realized or recovered[66] from ownership of that one-half interest.

### 2) *Fair Market Value of Dealership Properties*

Actual sales of dealership properties from October of 1982 through June of 1983 confirmed the reliability of the revised values found in the Executive Committee Report. The total revised value of the properties was approximately 75% of the old minimum prices and 80% of the new minimum prices. In the Chrysler transaction negotiated in August of 1982 and closed in October of 1982, over 336 dealership properties were involved, and the net price was $119 million. ABKO's minimum price for the 336 properties was $182 million, so the sale price was 65% of the minimum price. Between November of 1982 and June of 1983, ABKO sold an additional thirty-six properties: ten were sold for less than revised value, one was sold for equal to revised value, and the rest were sold for more than revised value. Of the thirty-six properties, thirty were dealership properties, and they sold for a total of $30.2 million, as compared to their revised value of $27.8 million for a difference of $2.4 million or less than ten percent.[67] The plaintiffs' evidence of higher sales prices is principally limited to the transactions with Chrysler which occurred in 1984 and 1985.

During the same October through June period in 1982, third parties gave appraisal opinions that also confirmed the reliability of

---

**64.** Moreover, there does not appear any reason in the record why the 36 properties could not have been treated as a statistically adequate random sample for extrapolating the totals for "minimum prices" and third-party appraised values.

**65.** For the 36 properties found on the random appraisals summary, Nelson gave a revised value for each of the properties. The revised values for the different properties are not a fixed percentage of their corresponding minimum prices. This creates the impression that Nelson must have individually valued each of the 185 properties in arriving at the revised values.

**66.** The court intentionally uses this language in lieu of fair market value. As explained later, the plaintiffs do not offer any opinion evidence concerning the fair market value of the dealership

properties as of the Ablah buy out or the subsequent SPA. Rather, the plaintiffs rely on prices and values expressed in other documents found in the defendants' possession. The plaintiffs assume these other prices and values are representations or opinions of fair market value. The record, however, does not sustain the plaintiffs' assumption. For the most part, these other prices and values were prepared to assist in determining and evaluating what could be realized or recovered from the properties.

**67.** The plaintiffs do not deny that the gains from these sales were reflected in the monthly financial statements given to them or their representatives.

the revised values found in the Executive Committee Report. Cushman & Wakefield appraised the 336 properties for Chrysler in August of 1982 at a value of $126.7 million or 69% of the minimum price. In addition, the total appraised value on the thirty-six randomly selected properties in September of 1982 was within 10% of their total revised value.

The plaintiffs do not come forth with any opinion evidence concerning the fair market value of the 185 dealership properties retained by ABKO as of November of 1982 and June of 1983. The plaintiffs' designated expert on this claim, Creighton Hoffman, is an accountant. The plaintiffs tacitly admit that Hoffman is not being offered as an expert witness on the appraised fair market value of the dealership properties. Rather, they say Hoffman, as an accountant, is qualified to testify as an expert on the presentation of financial information, discount rates, "and arm's-length indicators of value." (Dk. 597, p. 113). The fatal shortcoming with the plaintiffs' approach is that they want the court to assume that the different KII documents found by their expert are the relevant and more reliable indicators of market value than the actual comparable sales and appraisals performed during the same time period. The plaintiffs do not appear to have a witness qualified to testify that those different documents are the more reliable indicators of market value or that they contain values which are consistent with the actual fair market value of the properties.

For example, the plaintiffs argue the defendants' eight percent DCF prices were KII's best estimate of the properties' actual value. In the plaintiffs' opinion, the eight percent DCF price "was the value Koch would forego by selling a property for cash rather than holding the property for its guaranteed income stream." (Dk. 111). The uncontroverted evidence is that ABKO used the eight percent DCF calculations only to arrive at a new target asking price for the dealership properties.

Hoffman converts for the plaintiffs this eight percent DCF price [68] into Koch's "expected selling prices" for purposes of valuing ABKO. The evidence of record contradicts rather than supports Hoffman's conversion. None of the dealership properties sold in 1983 and before the SPA obtained its eight percent DCF price.[69] Excluding the package sales to Chrysler in 1984 and 1985, most of the dealership properties sold for less than their 8% DCF prices, and it was not until 1985 that selling prices regularly began exceeding the eight percent DCF prices. Hoffman's opinion on the likelihood of ABKO obtaining the 8% DCF price is outside the sphere of his expertise, but most importantly, it erroneously attempts to transform speculation over property prices into material information known at the time of the SPA.[70] In short, the court believes the uncontroverted evidence shows the 8% DCF prices were little more than ABKO's asking prices based on assumptions and hopes about Chrysler's continued health. From the evidence of record, the court does not believe a reasonable jury could find that this eight percent DCF pricing scheme was a more reliable indicator of market value at the time of the SPA than the contemporary actual sales and appraised values.

Through their expert, the plaintiffs also argue that KII's rejection of the two Macari offers is an indication of value. The uncontroverted evidence is that Macari's first offer was below the revised values. Though the second offer was at revised value, it also gave the buyer the right to select five out of the seventy-eight properties, required ABKO to finance fifty percent of the purchase, and contained other unacceptable terms. The rejection of these offers can hardly be termed more reliable indicators of market value.

The court finds that no reasonable jury could conclude from the evidence and argu-

---

68. The plaintiffs offer no proof that the eight percent DCF calculation is even an accepted or recognized method for appraising the value of commercial properties.

69. One sold for 68% of its eight percent DCF price, and the other sold for 74% of that price.

70. The biggest unknown at that time was whether Chrysler would remain solvent and financially healthy for fifteen years.

ments submitted by the plaintiffs that the fair market value of ABKO's assets was materially greater than the revised value disclosed in the Executive Committee Report.

### 3) Defendants' Knowledge of Fair Market Value

The plaintiffs' evidence and arguments are not persuasive enough for a reasonable person to conclude that the defendants knew the "real value of KII's retained half·was 'worth more than twice the $45 million." What the plaintiffs call internal valuations of the dealership properties are nothing more than different split-up scenarios or worksheets prepared by accountants who simply assumed value as being in the range of sixty to eighty-three percent of minimum asking price. These worksheets do not represent themselves to be separate valuations of the dealerships. None of the worksheets assume the dealerships could be sold at or above the minimum asking prices. Consequently, these worksheets are not a reasonable basis for inferring that the defendants knew the properties were worth more than the revised values. If anything, the valuations used in the different worksheets are not materially different from revised value which was seventy-five percent of minimum price.

The only other valuation argued by the plaintiffs is Cammett's asking prices reported in September of 1982. Cammett set new minimum asking prices and gave liquidation values for six months ($193 million) and twelve months ($207 million). The revised value of $188 million was Nelson's opinion as to market value assuming a 24–month liquidation period. The revised value was within 3% of Cammett's six-month liquidation value and within 10.1% of Cammett's twelve-month liquidation value. This evidence simply cannot sustain an inference that the defendants had reason to believe the dealership properties were worth twice Nelson's revised value.

The court will not repeat its analysis of the eight percent DCF prices or the Macari offers, other than to say this evidence, by itself and in combination with the other discussed above, is not enough for one to reasonably conclude that KII believed the dealership properties were worth materially more than the revised values. Overshadowing all the different valuations, pricing schemes, and offers to purchase was the risk caused by Chrysler's questionable, financial health. If Chrysler did not improve, the lease terms would lose all real potential and the value of the limited purpose dealership properties would· bottom out. In November of 1982, Chrysler's stock was trading for only $11 per share as contrasted to the $37 share in the summer of 1985. With the risk still present, the defendants justifiably kept their valuations conservative, but they obviously were aware that if Chrysler emerged prosperous, as it eventually did, then greater returns and values would be enjoyed.

### 4) Plaintiffs' reliance on Report's Valuation

·, The plaintiffs' own investment bankers, Goldman Sachs, had valued KII's half interest in ABKO at between $60 to $100 million. The plaintiffs do not show that Goldman Sach's valuation approach, using the information known to the plaintiffs at the time of the SPA, would yield a value that was materially less than Goldman Sach's prior valuation. If anything, the changed circumstances, as revealed to the plaintiffs, would suggest that KII's interest would remain valued in the same range or more. Goldman Sachs had assumed that Blue Hill was worth only $15 million. In the Ablah buy out, Blue Hill was valued at $25 million, so KII realized $10 million more than Goldman 'had ·estimated. The less valuable dealership properties were sold to Chrysler with ABKO retaining the more valuable ones.[71] The Pro Forma Current Value Balance Sheet reflects that ABKO's situation improved significantly af-

---

71. The plaintiffs and their investment bankers were presented with all the facts necessary to conclude that ABKO had kept the more valuable dealership properties. Using the revised values, the average value of the dealership properties was approximately $1 million. The average price of dealership properties, adjusting for leas-

ter the Chrysler transaction [72] Subsequent to Goldman Sach's valuation, ABKO had negotiated new leases with Chrysler resulting in a 40% increase in annual rental income for the next five years and additional increases for subsequent years. On these facts, the plaintiffs are not able to show that they justifiably relied on the Executive Committee Report rather than their own investment bankers' valuation.

Much of what the court has discussed above in its analysis is also relevant here. The plaintiffs not only had their own investment bankers' valuation, but they were aware of other circumstances plainly indicating the limited purpose of the Executive Committee Report's valuation. The Report informed the plaintiffs that ABKO had set minimum asking prices which were significantly higher than the revised values. The Report also disclosed that the revised values were less than the third-party random appraisals. At the Board meeting, the plaintiffs learned that Nelson had revised or lowered the valuations given by ABKO team. In sum, the court believes the plaintiffs are unable to show any justifiable reliance on the Report's valuation of ABKO at the time of the SPA.

For all the foregoing reasons, the court finds that the defendants are entitled to summary judgment on the plaintiffs' ABKO claims in their entirety.

## VIII. ACCOUNTING

For purposes of the pending motions only, the court considers the following facts to be uncontroverted.

1. KII's financial statements for all relevant years were prepared by Koch employees and then audited by the accounting firm of Peat, Marwick, Mitchell & Co. ("Peat Marwick"). For each relevant year and in the regular course of its business, Peat Marwick attached a letter [73] to KII's financial statements stating its opinion that the "financial statements present fairly the financial position" of KII for the years in question "in conformity with generally accepted accounting principles applied on a consistent basis." (DX–Acct 1, A002112).

2. The financial statements of KII for the years 1982 and 1981 reflect the following data:

| | (In Millions) | |
| --- | --- | --- |
| | 1982 | 1981 |
| Sales | $16,977.5 | $15,665.2 |
| Pre tax earnings | 564.7 | 467.1 |
| Net earnings | 309.2 | 273.5 |
| Stockholder's equity | 1,540.6 | 1,259.0 |

3. "Inherent in rendering an audit opinion is the recognition that financial statements cannot 'precisely' or 'exactly' present financial position, results of operations and cash flows. Such precision is unattainable. . . ." (PX 408, *Montgomery's Auditing*, p. 174). Consequently, an accountant's opinion that "the financial statements fairly present the financial condition of the Company in accordance with generally accepted accounting principles" is not the same as stating that everything in the financial statement is perfect; rather, it means the financial statements are materially accurate and provide sufficient disclosure to users of the financial statements. (PX 408, *Montgomery's Auditing*, p. 174). "Materiality is 'the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or

ing arrangements, in the 1982 Chrysler deal was in the range of $354,000 to $740,000.

**72.** Before and after the Chrysler sale, ABKO's assets decreased from $261 million to $203 million while ABKO's liabilities decreased proportionally more, from $226 million to $90 million.

**73.** The plaintiffs argue the opinion letter is unreliable hearsay, because Peat Marwick destroyed its work papers on which its audit opinions for 1981 and 1982 were based. The defendants demonstrate that work papers for the 1981 and 1982 audits were destroyed by Peat Marwick pursuant to its regular six-year retention policy. Peat Marwick has retained the 1983 work papers as they were subpoenaed in 1989, prior to their destruction, in a claims court proceeding involving William Koch. As for the 1981 and 1982 work papers, the plaintiffs did not file their motion to add these accounting claims until almost two years after the 1982 audit work papers were destroyed. The destruction of the work papers under these circumstances is not a reasonable ground for excluding the opinion letters. The plaintiffs' other objection to the currency of Peat Marwick's audit opinions goes to the weight of the opinions, not their admissibility.

influenced by the omission or misstatement.' " *Id.* (quoting Financial Accounting Standards Board ("FASB") Statement of Financial Concepts No. 2, *Qualitative Characteristics Accounting Information*) . "A concept of materiality is a practical necessity in both auditing and accounting. Allowing immaterial items to complicate and clutter up the auditing process or financial statements is uneconomical and diverts users' attention from significant matters in the financial statements." (PX 408, *Montgomery's Auditing*, pp. 173–74).

4. The plaintiffs' expert on damages, Kenneth W. McGraw of Patricof & Co., has computed damages by combining and weighting the enhancements from two different damage calculations: asset values and operating results or earnings. In calculating damages using operating results, Mr. McGraw considered only the effect the accounting allegations had on KII's income for the year 1982, with 1981 playing no role in his computations. Mr. McGraw relied on the opinions of the plaintiffs' accounting experts, K. Gary Gibbs and Alan May, and on his understanding of certain characterizations made by KII's accounting staff, specifically Milton Hall and Lynn Markel.

*Unusual or Infrequently Occurring Losses*

5. Under GAAP, "extraordinary," "unusual nature" and "infrequency of occurrence" are terms of art in accounting literature. If an item meets the definition of "extraordinary," GAAP requires that the item be set out separately from income from operations. An "extraordinary" item is one which is both "infrequent" and "unusual," with the latter two terms being defined as follows in Accounting Principles Board ("APB") Opinion No. 30 at ¶ 20:

> *Unusual nature*—the underlying event or transaction should possess a high degree of abnormality and be of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the entity, taking into account the environment in which the entity operates.
>
> *Infrequency of occurrence*—the underlying event or transaction should be of a type that would not reasonably be expected to recur in the foreseeable future, taking into account the environment in which the entity operates.

(DX–Acct 5, p. 325). If the item is "infrequent" or "unusual," but not both, then the following disclosure is required by APB Opinion No. 30, ¶ 26:

> A material event or transaction that is unusual in nature or occurs infrequently but not both and, therefore does not meet both criteria for classification as an extraordinary item, should be *reported as a separate component of income* from continuing operations. *The nature and financial effects of each event or transaction should be disclosed* on the face of the income statement, or, alternatively, in notes to the financial statement. Gains or losses of a similar nature that are not individually material should be aggregated. Such items should not be reported on the face of the income statement net of income taxes or in any manner inconsistent with the provisions of paragraphs 8 and 11 of this Opinion or in any other manner that may imply that they are extraordinary items. Similarly, the earnings per share effects of those items should not be disclosed on the face of the income statement.

(DX–Acct 5, p. 326) (underlining added).

6. At ¶ 23, APB Opinion No. 30 gives several examples of some gains and losses that "should not be reported as extraordinary items because they are usual in nature or may be expected to recur as a consequence of customary and continuing business activities:" [74]

> a. Write-down or write-off of receivables, inventories, equipment leased to oth-

---

[74] The plaintiffs construe ¶ 23 to mean that the listed items are not extraordinary *but are* either unusual or infrequent. This is a strained reading, for the paragraph only states that the listed items are not extraordinary "because" they are either usual or expected to recur. This is the limited theme of this paragraph. It does not purport to identify whether any of the items may be unusual or infrequent. Indeed, the paragraph says nothing about the listed items necessarily satisfying one of the two elements of an extraordinary item. The plaintiffs' construction of this paragraph is not a fair reading.

ers, deferred research and development costs, or other intangible assets.

 b. Gains or losses from exchange or translation of foreign currencies, including those relating to major devaluations and revaluations.

 c. Gains or losses on disposal of a segment of a business.

 d. Other gains or losses from sale or abandonment of property, plant or equipment used in the business.

 e. Effects of a strike, including those against competitors and major suppliers.

 f. Adjustment of accruals on long-term contracts.

(DX–Acct 5, p. 325).

7. The accountant preparing a financial statement decides first whether any "extraordinary," "unusual" or "infrequently occurring" event has taken place during the year, and it is left to the auditor's judgment to agree or disagree.[75]

8. In its 1982 financial statements at note 1(f), KII disclosed one of its accounting policies as follows:

> Nonproducing properties are periodically evaluated and, if conditions warrant, an impairment allowance is provided. When persuasive evidence exists that there has been an impairment of productive facilities, additional depreciation is provided to reduce asset carrying values to recoverable cost.

(DX–Acct 1, A002117). In its application of this accounting policy, KII disclosed the following in note 6 to its 1982 financial statements:

> Depreciation, depletion and amortization includes $43.4 and $24.2 million for 1982 and 1981, respectively, to reduce the carrying value of productive facilities to recoverable cost.

(DX–Acct 1, A002120).[76]

9. Milton Hall personally prepared and maintained for his personal use a list of items in 1982 which he labeled "Extraordinary Items." Hall said the list was to assist him in remembering features of a particular financial statement so that later he could answer questions and explain portions of the statements to others. Hall testified that such heading, "Extraordinary Items," was not intended to be his classification of the listed items as "extraordinary" in the technical GAAP sense. Hall conceded it was a "poor choice of words" and explained it was just a schedule of things that he "wanted to remind himself" of later. (PX 401, p. 40). Hall said he maintained lists as a part of his file for each year. While saying the items were not "extraordinary" in terms of GAAP, Hall did testify that he regarded the items to be "non-recurring or infrequently occurring" and "unusual." (PX 401, p. 40). For the year of 1982, Hall's list included expenses and writedowns totalling $65.8 million and income items totalling $31.6 million.

10. The footnotes to the financial statements disclose only writedowns of "property plant and equipment," whereas Hall's list of

---

**75.** The defendants do not submit evidence supporting the statement that "[n]either KII nor Peat Marwick were of the opinion that KII had any 'extraordinary,' 'unusual' or 'infrequently occurring' items during the years in controversy." The plaintiffs cite the deposition testimony of Milton Hall, the defendant's chief accountant and senior CPA, that he considered the items listed on his personal schedule of "Extraordinary Items" to be both "non-recurring or infrequently occurring" and "unusual." (PX 401, p. 40).

**76.** The plaintiffs contend the notes discuss depreciation without mentioning "write-downs" or "write-offs." They insist the title of "depreciation" misleads the reader into believing the expense is recurring in nature. The plaintiffs offer the testimony of their expert, an excerpt from a treatise, Williams, Stanza & Holder, *Intermediate Accounting* at 495 (4th ed. rev.) on "Permanent Impairment in Value," and the testimony of the defendants' expert. The conflicting evidence creates uncertainty in the court's mind about the meaning of these notes. On their face, the notes discuss reducing the carrying value of producing assets to recoverable cost. The notes, however, treat this reduction as "additional depreciation." The accounting treatise cited by the plaintiffs offers that a permanent impairment in value is handled as a loss after crediting back the accumulated depreciation. The defendants' own expert appears to have testified that the $43.4 million loss disclosed in the footnote was not depreciation, depletion or amortization. (PX 403, p. 307). Confused itself over the meaning of these notes, the court believes the plaintiffs have controverted any simple characterization of these notes as KII's stated policy on "write-downs" or "write-offs."

"Extraordinary Items" includes losses and gains on other assets such as inventory, marketable securities, futures contracts, dry holes, and losses from non-consolidated subsidiaries (ABKO–Blue Hill loss).

11. The items on Hall's list that are not included in the footnote are as follows:

| | (000's omitted) |
|---|---|
| Loss on Sale of Kerr McGee Shares | $ 2,463 |
| Write–down–Northwest Portland Cement Shares | 685 |
| Janesville, Wis. Emulsion plant | 448 |
| Columbia dry hole | 2,564 |
| Austin Chalk writedown | 1,000 |
| Drilling Pipe Inventory | 1,442 |
| Isabelle Ref. Job loss accrual | 863 |
| ABKO | |
| Blue Hill writedown | 3,682 |
| Comotara writedown | 312 |
| Gain on sale of jets | (284) |
| Futures trading—mark to market | 9,855 |
| Total | $23,030 |

(DX–Acct 13, K. Gary Gibb's 1992 Rept. p. 29). Mr. Hall's list also included four items of "extraordinary income," as follows:

| | (000's omitted) |
|---|---|
| Gain on sale of Marathon shares | $ 6,652 |
| Gain on sale of Trans-Ok Plant | 1,460 |
| Gain on sale of Gas Liquids P/L | 1,356 |
| Gain on sale of ABKO to Chrysler | 22,114 |
| Total | $31,582 |

(DX–Acct 7, L001075).

12. The plaintiffs' expert, K. Gary Gibbs, did not net the income items on Hall's list against the expense items, because he concluded that plaintiffs knew about the gain on the sale to Chrysler and the securities gains were included in the financial statements in the line item "Gain on Sale of Securities and Fixed Assets."

13. Gibbs testified that the $3.1 million of losses on Kerr McGee and Northwest Portland Cement shares included in Hall's list were "not necessarily" unusual or infrequently occurring. (DX–Acct 14, p. 425). He included them as unusual or infrequent, because they were on Hall's list and because their disclosure would be required by 5(d) of the SPA. Hall's list included $2.6 million for a dry hole in Columbia. Gibbs testified that he generally did not consider dry holes to be "unusual" or "infrequently recurring" and

that dry holes did not necessarily meet those definitions. He opined that ¶ 5(d) of the SPA required disclosure and that disclosure would "make the financial statements informative and useful." (DX–Acct 14, pp. 435–36). Gibbs also avers he included the dry hole expenses as non-recurring because they were on Hall's list and Hall testified all of the listed expenses were non-recurring. (PX 430, ¶ 11).[77]

14. Hall's list included an item of $9.8 million for a "mark to market" adjustment relating to Koch Fuels' futures contracts. Under the accounting rules, futures contracts in non-hedging transactions are required to be adjusted up or down to market prices at the end of each accounting period. (PX 414, FAS No. 80, § F80.103). KII makes these adjustments monthly. Gibbs opined this adjustment was infrequent based upon its presence on Hall's list and Hall's testimony that this adjustment could include hedged transactions.

15. Gibbs considered the rest of the items on Hall's list as being "infrequently occurring." Gibbs went on a property by property basis, and, if an item was written down, he considered it to be infrequently occurring because it was on Hall's list and because it either could not be written down again (e.g. abandoned property fixed assets) or was of a certain magnitude (large amount of inventory write-downs). For example, Hall's list included an item of $863,000 for the loss on a job being performed by Koch Process Systems, identified on the list as the Isabelle refrigeration job. Koch Process Systems made refrigeration equipment, and on one of its contract jobs it had accumulated more costs than the fixed selling price, so a loss on the contract was accrued. Gibbs considered this to be "infrequent." Paragraph twenty-three of APB No. 30 lists "adjustments of accruals on long term contracts" as an example of an item that should not be regarded as

---

77. It is not clear from Hall's affidavit whether he avers that ABKO's losses were not included because they occurred prior to ABKO's consolidation with KII. Specifically, Hall's affidavit lists the ABKO transaction as one of several examples of losses on assets other than "property, plant and equipment." The phrase, "losses in conjunction with the ABKO/Ablah transaction of $7.7 million prior to its consolidation with Koch," purports to describe the transaction rather than attributing the cause for its exclusion from the footnote.

extraordinary because they are usual in nature or may be expected to recur.

16. Gibbs's report dated January 30, 1992, was submitted in support of the plaintiffs' motion to amend their complaint. In that report, the following sentence appears: "Further, the actual nature of the matters was clearly revealed in the discovery documents furnished to the bankers but was not fully disclosed in the financial statements, or elsewhere, as required by paragraph 5(d) of the Purchase Agreement." (DX–Acct 10, p. 25). In Gibbs's final report, submitted in November 1992 after the court's order of June 30, 1992, allowing the amendment, Gibbs opined that the footnote disclosure of $43.4 million was inadequate under GAAP. The plaintiffs' draft Pretrial Order essentially alleges this opinion by Gibbs as one of the claimed bases that KII's accounting practices violated GAAP and breached the materiality warranty. In that November report, Gibbs also utilized a list prepared by Lynn Markel, the controller for KII, which came to a total of $95.3 million. Gibbs used the highest number from each list and moved such number into a new column, totaling $108.2 million, and opined that such number should have been disclosed.

17. The major differences between Markel's list and Hall's list is that Markel's list includes $13 million more for dry hole expenses and $17 million in inventory adjustments. Markel prepared his list of items to assist Charles Koch in discussing the year's results with the Board at the March 5, 1983 meeting. Gibbs and May assumed that these inventory adjustments impacted income, because they were found on Hall's and Markel's lists.

18. The plaintiffs' other expert, Alan May testified that his opinion is based on the definitions of "unusual" or "infrequently occurring" as employed by Hall who as the preparer of the financial statement decided what items needed additional explanation. May also explained his opinion was reached without independently deciding if the items on Hall's list were "unusual" and without knowing how often KII would write down assets, would write off oil and gas properties, or would make other adjustments. May

agreed it was not unusual, for accounting purposes, for a company engaged in exploration and production to have dry holes.

19. The defendants' accounting expert, William Holder, emphatically agreed "that the people who know best whether an item is unusual in nature or infrequent in its occurrence are the people in the company who face those items." (PX 403, pp. 90–91).

20. The plaintiffs' damage expert, Kenneth McGraw, adjusted KII's 1982 income for non-recurring losses. He started with Hall's list of $65.8 million, deducted $9.5 million of "non-recurring income" on Hall's list, and added inventory writedowns of $18.1 million set forth on Markel's list, to come to a total of $74.5 million of "non-recurring expenses." Holding the opinion that the footnote did not adequately disclose the nature of the items and their non-recurring character, McGraw did not subtract the $43.4 million disclosed in the footnote to the financial statements. McGraw also did not subtract the "non-recurring income" of $22.1 million on the sale of ABKO to Chrysler because the plaintiffs knew about that. He included in his list of non-recurring expenses, however, the $3.7 million writedown of Blue Hill, even though that was disclosed to the plaintiffs in the same document. Although McGraw considered dry holes to be recurring expenses, he included this expense only because it was on Hall's list.

21. Some of the items found on Hall's and Markel's lists were discussed at the Board meeting on March 5, 1983. Charles Koch makes notes in advance of the Board meeting as reminders of the items to review with the Board. Charles testified that he tried to faithfully follow his notes. Charles' notes reflect a note to the depreciation expense item as follows:

Includes writedowns (pre-tax):

| Rigs | 15.2 | |
|---|---|---|
| Asphalt | 2.5 | Cinnci and Elberta |
| Carbon | .8 | Rocklick Mine shutdown |
| E & P | 15.7 | Mon. Valley, Lysite, Twin Forks, Austin Chalk, Amigo (Alberta) |
| Fiberglass | 2.6 | Manchester |
| Fuels | 5.7 | Savannah # 3 & Tows |
| MDC | 5.8 | |
| Matador | .6 | tow |
| | 48.9 | |

(DX–Acct 19, XAG 9159). Board secretary Hansen's notes from that meeting reflect that William asked about a loss of $10 million in Koch Fuels in December of 1982 and was told that it was due to "riding (sic) Commodities down to market." (DX–Acct 21, K708967). Hansen's notes also show a "write down of Savannah terminal of $5 MM pre tax." *Id.* William's notes from the March 1983 Board meeting mention a write off of pipe inventory of $2.6 million, a write off because of a "bad job" in KPS, and a Koch Rubber write off of $5.3 million. William Koch's notes of the Board meeting on November 6, 1982, also reflect that a number of the 1982 writedowns were discussed with the Board. His notes refer to writedowns of drilling rigs and petroleum coke, the shutdown of the Rock Lick mine, and writedowns on Austin Chalk and Lysite, and writedown of the Manchester, Tennessee fiberglass plant.

### Capitalization Versus Expensing of Certain Refinery Expenditures

22. Based on the report of Gibbs, the plaintiffs claim that the defendants improperly treated as repair expenses instead of capital improvements various expenditures at the Pine Bend refinery in the following totals for the years 1981 and 1982:

(In Millions)

| | 1982 | 1981 |
|---|---|---|
| Alleged capital expenditures | $2.190 | $1.405 |
| Additional depreciation | (.250) | (.070) |
| Alleged understatement of pre-tax income | $1.940 | $1.334 |

23. The Financial Accounting Standards Board Statement of Financial Accounting Concepts No. 7 at appendix B, concerning "Development Stage Companies," states:

Established operating enterprises incur costs under various circumstances and with varying degrees of uncertainty about future benefits, especially in expanding their existing businesses. Authoritative

accounting literature does not contain general criteria or guidelines for determining when costs should be charged to expenses as incurred and when costs should be capitalized or deferred, and this Statement does not attempt to specify such circumstances.

(DX–Acct 23, p. 14).[78] The accounting literature generally states that expenditures which constitute renewals and betterments should be capitalized. Koch's financial statements for 1981 and 1982 say "[r]enewals and betterments are capitalized." (DX–Acct 41, K304833; DX–Acct 1, A002117). One definition for "betterment" is:

An expenditure having the effect of extending the useful life of an existing fixed asset, increasing its normal rate of output, lowering its operating cost, increasing rather than merely maintaining efficiency or otherwise adding to the worth of benefits it can yield ... A betterment is distinguished from an item of repair or *maintenance* in that the latter have the effect merely of keeping the asset in its customary state of operating efficiency without the expectation of added future benefits.

(PX 417, *Kohler's Dictionary for Accountants* 63 (6th ed.1983)). One definition for "renewal" is:

The replacement of a part, having more than a nominal value or having a life generally of more than a year; of a machine; or of any unit of plant and equipment; an addition to fixed assets accompanied by the removal therefrom of the item replaced.

(PX 417, *Kohler's Dictionary for Accountants* 428 (6th ed.1983)). Judgment is exercised in applying these definitions, and accountants looking at the same facts can disagree over whether an item meets either definition.

24. The KII engineers who authorize and/or supervise the particular plant expen-

---

**78.** The plaintiffs object that this standard and its appendix is irrelevant as it applies to "Development Stage Companies," and KII is not such a company. The court finds relevance in that the FASB's Statement plainly indicates that even established operating businesses incur costs under varying circumstances and with uncertainty about the future and that this is the reason for authoritative accounting literature not containing

guidelines or criteria for deciding when a cost should be either charged as an expense or capitalized. In short, the FASB recognized that its reason for not including such guidelines for development stage enterprises applies with as much force for companies who are no longer in the development stage. The court overrules the plaintiffs' objection.

ditures initially determine and indicate on an Authorization for Expenditure ("AFE") whether the expenditure should be treated as a capital item or expense. Typically, the engineer is more informed than an accountant about the technical aspects of a plant project. The AFE is next reviewed by the plant manager, and he determines whether he agrees with the engineer's analysis. The AFE is then reviewed by an accountant who makes the final determination. Sometimes, the accountant becomes involved earlier if there is question.

25. In conducting its audit, Peat Marwick's staff accountant had access to all of the AFEs. The staff accountant's conclusions were discussed and reviewed by a Peat Marwick senior accountant and, ultimately, the partner in charge of the audit. Peat Marwick's work papers from 1981 and 1982 are no longer available, but its work papers for 1983 reflect that they reviewed expense AFEs, raised questions about at least one of the expenditures, and received an explanation from KRC's accounts payable supervisor.

26. Gibbs rendered his first report to plaintiffs in January 1992 and concluded that expenditures which should be capitalized amounted to a total of $1 million in 1981 and $790,000 in 1982.

27. In determining whether an expenditure should be capitalized or treated as an expense, Gibbs looked to the AFE itself and the AFE status report. Coopers and Lybrand, the accounting firm employing the plaintiffs' other expert in the accounting area, recommended that KII engineers be deposed on the AFEs. Gibbs has not talked to any KII engineer, has not reviewed the depositions of any KII engineer, and has never drafted or otherwise suggested questions which plaintiffs' counsel should pose to KII's engineers in discovery. No KII engineers were asked questions about the AFEs listed in Gibbs's report. At the time of his January report, Gibbs had not consulted with any engineer.

28. In his second report, Gibbs concluded that for the period between January 1, 1981, and April 30, 1983, the defendants had treated $4,612,000 of betterments and renewals as

expenses. Gibbs made no analysis as to why his conclusions changed from his first report in January 1992 to his second report in November 1992. Gibbs testified that between the time of his January report and his November report, he met with Tommy Woods, a petroleum engineer from Muse Stancil, but Gibbs did not have a record of which AFEs were discussed with Woods. Gibbs has averred that he attended or reviewed the depositions of KII's internal accountants.

29. Gibbs's conclusion as to whether an expenditure was a capital expenditure as opposed to a repair item was based on his interpretation of the AFE and his consideration of any attachments, the AFE status reports, and feedback from Woods. Examples of Gibbs's interpretations are:

(a) On AFE 778, the KII engineer gave the following reasons for the project:

The existing #1 Crude Unit Preflash Heater is in need of extensive revamp and repair. The basic structure and refractory system is in very poor condition and in need of rebuild. Firing conditions in the heater have deteriorated to the extent that we cannot achieve design firing efficiencies.

(DX–Acct 31, KQ122754). Another of the plaintiffs' experts in this area, Mr. May, agreed that if this language meant that the expenditure was necessary to return the equipment to its original design efficiency, then it would probably be treated as a repair. Gibbs chose to interpret the language as meaning there was improvement over original design.

(b) On AFE 805, the following was recited as the reasons for project:

The present 31E–5A/B units were formerly feed effluent exchangers in the old No. 1 Fuel Oil Desulfurizer. At the present time, they serve as coolers ahead of the No. 2 Separator in the No. 2 Fuel Oil Desulfurizer. Recent inspections have revealed repeated tube leaks in the top bundle, both channels and tubesheets are cracked and beyond repair and the top

## 1565

shell will require nozzle replacements. It is proposed to replace these two units with a single new unit, rated to handle a water wash system proposed by Tech. Service.

(DX–Acct 32, KQ122717). Gibbs testified that this language "sounded like an up-grade."

(c) Alerted by the contemporary timing of certain expense AFEs and capital AFEs, Gibbs reviewed some expense AFEs and concluded that they involved work that was done in connection with and as a part of the work done on the capital project. For example, AFE 796 involved a $77,000 expenditure for "tank cleaning, removal of scaffold brackets and other structural repair, painting, and piping modifications," and Gibbs concluded that this should be capitalized because these items would be done at the same time a new roof would be installed, which new roof KII treated as a capital expenditure. Gibbs assumed that they were a single project because they were done at the same time. Gibbs used the same analysis on AFE 826.

(d) Other than looking at the AFEs and the AFE status report, Gibbs did not verify the actual accounting treatment. He capitalized an expenditure for a catalyst because the expense box on the AFE had been checked. The AFE, however, also was coded with a number indicating that it was capitalized for amortization. In his January report, Gibbs capitalized an expenditure for a catalyst which had a useful life for less than one year and when this error was pointed out in the affidavits filed in connection with plaintiffs' motion for leave to amend, Gibbs omitted this item from his November report.

30. May testified that he made no independent determination as to whether Gibbs was correct in capitalizing certain AFEs. May's involvement was limited to reviewing whether Gibbs's work was done in an appropriate manner.

31. For the years of 1981 and 1982 and for the first four months of 1983, KII had total repair and capital expenditures at Pine Bend Refinery, as follows:

(Millions $)

| | Repairs (excluding turnaround) | Capital Exp. * | Total |
|---|---|---|---|
| 1981 | $18.22 | $ 69.9 | $ 88.12 |
| 1982 | 19.08 | 26.2 | 45.28 |
| 1983 | 5.14 | 8.4 | 13.54 |
| Total | $42.44 | $104.5 | $146.94 |

* Based on AFEs

### Treating Interest on Construction Projects As Either Capital or Expense

32. FASB Standard No. 34 requires interest costs to be capitalized for certain "qualified" capital assets. To be "qualified," the assets must be under construction or otherwise produced for some period of time. The capitalization of interest attributable to the purchase of assets (e.g., a truck), however, is not required. The accounting theory behind this standard is that the construction of an asset ties up money. The associated interest cost incurs for that time period before an asset is put to use, whether or not the borrowing is specific to that construction. The capitalization of interest is not required if the net effect is immaterial.

33. For the years of 1980, 1981 and 1982, KII determined that its interest costs were not material for purposes of capitalizing them and, thus, treated those costs as expenses with one exception. The exception was the Wood River pipeline construction project on which the interest was capitalized in 1980 and 1981 pursuant to the requirements of the Federal Energy Regulatory Commission ("FERC"). Pursuant to its audit of KII's financial statements in 1981 and 1982, Peat Marwick agreed with KII's determinations on capitalizing interest. The amounts of interest capitalized in those years were reflected in the footnotes to the financial statements, as set forth in the paragraphs below.

34. In the footnotes to its 1981–1980 financial statements, the following statement appeared:

Capitalized interest associated with a specific borrowing was $5.8 and $2.1 million in 1981 and 1980, respectively. Interest costs for these years totaled $19.6 and $11.7 million, respectively.

(DX–Acct 41, K304833).

35. In the footnotes to its 1982–1981 financial statements, the following statement appeared:

No interest associated with a specific borrowing was capitalized in 1982. Interest of $5.8 was capitalized in 1981. Interest costs for these years totaled $16.8 and $19.6 million, respectively.

(DX–Acct 1, A002117).

36. KII also separately sets forth its interest expenses in the Consolidated Statements of Earnings and Retained Earnings section of the financial statement. Those entries reflected for each of the years in question that the total interest treated as an expense was consistent with the footnotes. One of the plaintiffs' accounting witnesses agreed that anyone reading the financial statements would know the total amount of interest expense deducted.

37. Peat Marwick's work papers for 1984 demonstrate its method for determining whether the interest expense was material and should be capitalized under FASB Standard No. 34. Peat Marwick averaged the balance in the construction in progress account as of the beginning and end of the year, and applied an interest rate to that balance. The actual balance in the construction in progress account as of the end of 1980, 1981 and 1982 was:

| 1980 | $116.5 million |
|------|----------------|
| 1981 | 56.5 million |
| 1982 | 57.1 million |

The average of the beginning 1982 balance ($56.5 million) and the ending 1982 balance ($57.1 million) was therefore $56.8 million.

38. Gibbs opined that a net of $13.6 million (1982) and $12.1 million (1981) of interest cost which was treated as an expense should have been capitalized. Gibbs made this determination based on the following assumptions:

(a) the investment in qualified assets was an amount equal to (i) the average of the amounts in the "construction in progress account" at the beginning and the end of the year, plus (ii) one half of the expenditures made during the year for the construction of qualified assets, and

(b) the "qualified assets" for KII bore the same ratio to total KII capital expenditures as the "qualified assets" for the Pine Bend refinery (as determined by Gibbs) bore to Pine Bend's total capital expenditures. Gibbs determined this ration to be .90 based on the years 1981 and 1982.)

39. Employing the above assumptions, Gibbs concluded that the average balance in the construction in progress account was $267.8 million during 1981 and $181.5 million during 1982. He then computed a blended interest rate of 12.1 percent for 1981 and 10.1 percent for 1982. Applying those interest rates against the calculated balance in the construction progress account, Gibbs came to the conclusion that the entire interest expense in 1982 should be capitalized and $13.8 million should be capitalized in 1981.

40. Gibbs opined that he had followed the same methodology employed by Peat Marwick in determining the amount of interest that would be subject to capitalization under FASB No. 34. Gibbs found a work paper which had averaged the monthly balances in the construction in progress account. There is no evidence, however, that Peat Marwick actually relied on this alternative methodology in making its determination whether interest costs needed to be capitalized. As noted above in ¶ 37, Peat Marwick's methodology actually involved averaging the balance in the construction in progress account, as of the beginning and end of the year, and applying an interest rate to that average balance. Instead of following this particular methodology, Gibbs added to the average balance in the construction in progress account, 90% of the average AFE capital expenditures incurred during the year.

41. Using Pine Bend construction-in-progress information from AFEs as comparable information, Gibbs determined that "qualifying assets" were 90% of the total capital expenditures. Gibbs also reviewed the KII capital expenditures as presented to the Board of Directors and concluded in 1982 that 74% of the total capital expenditures instead of 90% were investments in qualifying assets. Included in the $207 million of qualifying assets as determined by Gibbs, were $121 million of costs in acquiring exploration properties and drilling wells involving more than 25 projects. With regard to oil and gas exploration properties and projec-

> For oil and gas producing operations accounted for by the full cost method, assets whose costs are being currently depreciated, depleted, or amortized are assets in use in the earning activities of the enterprise and are not assets qualifying for capitalization of interest cost. Unusually significant investments in unproved properties and major development projects that are not being currently depreciated, depleted, or amortized and on which exploration or development activities are in progress are assets qualifying for capitalization of interest cost. Similarly, in a cost center with no production, significant properties and projects on which exploration or development are in progress are assets qualifying for capitalization of interest cost.

(DX–Acct 37, XAG 8758–59). Gibbs made no finding as to whether any of the more than 25 projects were "major" or whether any of the property acquisitions were "unusually significant."

42. The plaintiffs knew as early as October 1980 that earnings of KII could be increased by the new rule on capitalizing interest.

### Accounting for the Loss on Blue Hill

43. As a part of the transaction with George Ablah at the end of October 1982, ABKO recorded a loss on the Blue Hill office building on the basis of the $25.5 million value assigned to it in the transaction. Since the writedown was on ABKO's books, and since KII owned only one-half of ABKO at the time of the writedown, KII's 1982 earnings were adversely impacted to the extent of $5.3 million pre-tax and $3.7 million post-tax.

44. The writedown of Blue Hill was based on the following calculations. The net equity value of Blue Hill was $12.3 million (sales price of $25.5 million, plus other balance sheet items of $1.3 million, less mortgage balance of $14.5 million). Because the net book value of Blue Hill was $22.9 million, ABKO recorded the loss as $10.6 million ($22.9 million less $12.3 million). KII did not have a tax incentive to value Blue Hill at a low price.[79]

45. The "Executive Committee Report" given to all of the KII Board members and reviewed at the Board of Directors' meeting of November 6, 1982, contained pro forma financial statements, and the Report states at page 4 that:

> The pro forma statements ... reflect Koch's August 31, 1982 position adjusted for all Realty transactions in September and October including ... *a $6.7 million writedown of the Blue Hill Office project.*

(DX–Acct 48), A000362) (emphasis added).

46. The plaintiffs' accounting witness, Gibbs, opined in his report of November 1992 that this was a " 'nonmonetary transaction' and the loss must, therefore, be based on the 'fair value' of the non-cash assets exchanged by the parties, and its nonmonetary nature must be disclosed, according to GAAP." (PX 430, Ex. A, p. 15). Gibbs now avers in his most recent affidavit:

---

[79]. In his report of November 1992, Gibbs opines that "[a]n understated amount reduced Ablah's tax gain on the sale of his ABKO stock, and resulted in a tax deductible loss to KII." (PX 430, Ex. A, p. 16). The defendants filed an affidavit from Lynn Markel, the Executive Vice President–Chief Financial Officer of KII, stating that KII "did not claim, and was not entitled to claim, a loss for federal or state income tax purposes by reason of the transaction with Ablah in 1982." (DX–Acct 18, ¶ 4). In response to Markel's affidavit, Gibbs offers another angle on this possible tax incentive: "If Koch had valued Blue Hill at its book or market value, however, Koch would have had a substantial, taxable gain. Thus, Koch had a tax incentive of gain avoidance or deferral." (PX 430, ¶ 22). The defendants submit a supplemental affidavit from Markel explaining that Gibbs most recent opinion on a tax incentive also is "not true." "The transaction with Ablah qualified as a partial liquidation under Section 311(d)(2) of the Internal Revenue Code, prior to the amendment to that section by the 1986 Tax Reform Act. As a partial liquidation, no gain or loss was recognized by ABKO in the transaction with George Ablah." (DX–Acct S–3, ¶ 5). In what was in effect their surreply, the plaintiffs do not respond to Markel's last explanation of the tax treatment of this transaction. Given the conclusory nature of Gibbs's opinion on tax incentives and his failure to even cite the applicable tax code provisions on which he relies in characterizing this 1982 transaction, the court does not consider a genuine issue of fact to exist by reason of Gibbs's most recent affidavit.

Defendant's (sic) dispute my characterization of Koch's buy out of George Ablah's interest in ABKO as a "non-monetary" transaction. For accounting reporting purposes under GAAP, however, it does not matter whether the transaction was monetary or non-monetary, because either way the assets should be valued at fair market value, or book value if fair market value cannot be determined. (See APB Opinion No. 29, ¶ 18, a true and correct copy of which is attached as Exhibit I.)

(PX 430, ¶ 20). The APB Opinion No. 29 cited by Gibbs expressly deals with nonmonetary transactions, and ¶ 18 of that Opinion says nothing about using book value in monetary transactions when fair value is not determinable within reasonable limits. Gibbs also opined in his written report that the disclosure of the transaction in footnote 2 of the 1982 financial statements was inadequate under GAAP for non-monetary transactions.

47. At his deposition, Gibbs admitted that he had never seen the Executive Committee Report on KII's purchase of Ablah's interest in ABKO which was given to the Board of Directors. Gibbs also admitted he did not understand that the parties to the ABKO buy-out had agreed on a $90 million value for ABKO.

48. APB Opinion No. 29, "Nonmonetary Transactions" provides:

> Both exchanges and nonreciprocal transfers that involve *little or no* monetary assets are referred to in this opinion as nonmonetary transactions. (emphasis added)

(DX–Acct 49, XAG 8778). The plaintiffs say this opinion and the defendants' argument about the "non-monetary" nature of the transaction are irrelevant.[80]

49. In determining the loss or writedown of an asset such as that recorded on Blue Hill, the accountant preparing the financial statements in the first instance, and the auditor reviewing those statements in the second instance, are called upon to exercise their judgment, based upon the facts and circumstances known to them at the time of their respective work. There is no evidence that the KII or ABKO accountants, or the Peat Marwick auditors, did anything other than rely on the facts and circumstances then existing in determining the amount, and the propriety of, the writedown on Blue Hill.

50. The information available to the KII, ABKO and Peat Marwick accountants consisted of the following:

(a) Two years prior to the disposition of Blue Hill to Ablah, ABKO had acquired the property in a transaction which was valued at approximately $25 million.

(b) Sterling Drug Company, during negotiations with ABKO over Blue Hill, had informed ABKO that Sterling Drug believed Blue Hill to be worth no more than $25 million.

(c) The accountants knew that Ablah and KII had negotiated the value of Blue Hill to be $25.5 million in their transaction.

### Accounting for Refinery Turnaround Expenses

51. Refineries generally operate 24 hours a day, every day of the year. Periodically, usually about once every three years, the major units have to be shut down for an extended period for repair and renovation. These are referred to as "turnarounds." In between these major turnarounds, refinery turnarounds for its minor units occur.

52. There are three accepted, basic ways to account for the expenses incurred during a refinery turnaround:

(a) The expenses may all be charged off in the year in which the turnaround actually occurs. This method tends to distort the income of the company in that particular year.

(b) The costs actually incurred during a turnaround may be amortized after the turnaround is complete, over a period of time until the next turnaround.

(c) Estimates may be made of the costs to be incurred in an upcoming turnaround,

---

**80.** The court understands the plaintiffs to have conceded by this position that the Ablah buy-out was a monetary transaction.

and provision for these anticipated costs is made through charges to current expense.[81]

For years, KII has consistently followed the latter accounting practice of making a provision for turnarounds in advance by accruing or charging enough to expense each month on a ratable basis so that the accrual at the time of turnaround is sufficient to cover all of the turnaround costs. In footnotes to its financial statements, KII described this practice in the following terms:

> Provisions are made for refinery turnarounds and drydocking vessels by current charges to expense. Other maintenance and repair costs are charged to expense as incurred. Renewals and betterments are capitalized.

(DX–Acct 53, K304833 (1981); DX–Acct 54, C00345 (1982)). The plaintiffs' financial advisors' notes from meetings with KII personnel indicate they were told that refinery turnarounds were accrued.[82]

53. The historic practice of KII has been that as soon as one turnaround was completed, refinery engineers would begin the job of estimating the anticipated costs for the next turnaround. Refinery accountants would begin to charge those anticipated costs against current expense through the addition of amounts to the turnaround accrual account. As time passed and the upcoming turnaround approached, revisions were sometimes made to the estimates.

54. On a staff time sheet found in the files of Jim Carlson, one of the partners for Peat Marwick, there was a notation that read "accrued liabilities—turnaround—change in accounting policy" with "12" hours recorded next to it. (DX–Acct 60, K432782). Carlson testified that he did not recall the note or to what it referred. Carlson guessed that it could refer to any internal change in KII's accounting or processing procedure for which the auditors would check whether it affected the governing accounting principles and whether it needed to be disclosed as a change in accounting policy. Carlson also testified that there were no changes in KII's methods for accounting for refinery turnarounds during the periods from 1981 through 1983. Other witnesses familiar with KII accounting policies during the relevant period also testified that they were not aware of any changes in KII's accounting policies concerning refinery turnarounds.[83]

55. The plaintiffs reference two memos authored by Mark Halepeska, the Koch Refining engineer at Pine Bend responsible for estimating the future turnaround expenses, as support for the opinion that there was a change in KII's accounting policy for turnarounds. Mr. Halepeska has testified that there was no change whatsoever in the way in which he estimated future turnaround expenses for inclusion in the accrual account, or in the types of items to be included in the accrual versus directly expensed as an operating expense. The plaintiffs specifically questioned Halepeska about the two memoranda.

56. Concerning the first memorandum dated October 4, 1982, Halepeska testified that it simply reflected two types of revisions to his previous estimates for future turnarounds. One type of revision referenced known projects that had been previously included by Halepeska in his turnaround estimate, but as to which he was now revising his earlier estimated dollar amount. The other type of revision was based upon the general belief that additional amounts need-

---

81. The plaintiffs' cited testimony does not controvert the statement that this is one of the accepted ways to account for the expenses incurred during a refinery turnaround.

82. William Koch's affidavit does not effectively controvert the above statement. The notes taken by Goldman Sachs representatives reveal that they knew refinery turnarounds were a "non-current" item on the balance sheet and were handled as an "accrual on liab[ility] side." (DX–Acct 56, G04122). These notes plainly indicate the plaintiffs' representatives knew that turn-

arounds were not expensed as incurred but accrued in advance and not capitalized as an asset but handled as a liability.

83. The plaintiffs are not able to controvert Carlson's testimony simply by emphasizing Carlson's notation on an internal billing record kept at Peat Marwick. The memoranda written by Mark Halepeska, an engineer at Pine Bend Refinery, evidence a change in turnaround totals but not changes in KII's accounting policy for turnarounds.

ed to be included in the accrual based upon anticipated deterioration caused by the aggressive crude slate that the refinery was currently running. During his deposition, Gibbs agreed the October 1982 memo could be simply an update to the amounts Halepeska believed needed to be included in the turnaround accrual.

57. The second Halepeska memo is dated June 8, 1983. This memo identifies certain work, most of which was already covered by expense AFEs, and asks that the AFEs for this work be changed and included in the turnaround accrual account. When questioned about this memo, Halepeska testified that it was intended to correct a mistake in the previous accounting for expenses that were anticipated at the next turnaround. Halepeska testified that these expenses were for work which would be done at the turnaround, that he had been accruing for these expenses, but that they had mistakenly been recorded on current expense AFEs, which would be charged against normal refining operating expense. His June 1983 memorandum was simply intended to correct that mistake. The changes requested by Halepeska's June memorandum were added to the accrual account as of the end of May 1983. Gibbs admitted that those changes would not have appeared in the financial statement for the month ending April 30, 1983, which was the last financial statement that the plaintiffs saw before the stock sale.

58. As of December 31, 1982, KII had accrued $20.3 million for the turnaround scheduled in the fall of 1983. Over the next four months, KII accrued a little over $1 million each month making for a total turnaround accrual of $24.7 million on April 30, 1983. In May 1983, the turnaround accrual increased by nearly $5 million to $29.547 million.

59. The fall 1983 turnaround did not cost as much as had been forecasted. KII treated its turnaround account as over accrued by about $6.6 million. Of this amount over accrued, about $1.2 million was attributable to turnaround projects which were deferred until later years; $1.6 million was attributable to accounting error, in that certain expenditures were directly expensed during the

turnaround instead of being charged against the turnaround accrual; and the balance was due to overestimation of costs.

60. Gibbs did not analyze what a reasonable accrual should have been based on the facts known as of the date of accrual from the records that were available to him. He also did not analyze or criticize the process used by KII to estimate turnaround costs. Nor did he make a unit by unit analysis of the reason for the overaccrual of the account. Gibbs admitted that his conclusion on the fact and amount of overaccrual is based on the actual amounts spent in the fall of 1983.

61. The amounts in the turnaround account are based, in part, on estimates. Accounting literature distinguishes between errors and changes in accounting estimates. APB Opinion No. 20, at paragraph 13 states:

> Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared. In contrast a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment. Thus, an error is distinguishable from a change in estimate.

62. The plaintiffs allege that the defendants knew as of December 31, 1982, or April 30, 1983, or prior to the stock sale that the turnaround accrual had been overestimated. The plaintiffs base this allegation on the facts that KII's turnaround accrual estimates had been accurate in the past and that the 1983 Pine Bend turnaround overaccrual was "inordinately high" in the opinion of Peat Marwick auditors.

### A. Failure To Disclose Non–Recurring Expenses

The nub of this claim relates to the accounting concept that recurring earnings (recurring revenue reduced by recurring expenses) indicate a company's future income stream, which is an important component in estimating a company's value. Thus, to determine future income and value, the reported earnings for any given year must be

adjusted for losses or gains that are non-recurring in nature. As far as disclosure under GAAP, APB Opinion No. 30 at ¶ 26 provides in relevant part:

A material event or transaction that is unusual in nature or occurs infrequently but not both, and therefore does not meet both criteria for classification as an extraordinary item, should be reported as a separate component of income from continuing operations. The nature and financial effects of each event or transaction should be disclosed on the face of the income statement or, alternatively, in notes to the financial statement. Gains or losses of a similar nature that are not individually material should be aggregated.

(DX–Acct 5, p. 326). This accounting rule was meant, at least in part, to assist users of this information in predicting a company's future.

### 1) *Scope of Alleged Claim*

■ The plaintiffs' draft of the pretrial order alleges the following as its first accounting claim:

(a) KII failed to disclose its unusual and/or infrequently occurring losses. KII categorized these losses as recurring expenses or depreciation, thereby artificially reducing what appeared to be KII's ordinarily recurring income.

The defendants argue that this allegation, when read in conjunction with the plaintiffs'

experts' final reports, exceeds the scope permitted by the court's ruling in June of 1982 (Dk.505).[84] The defendants insist the court should not allow the plaintiffs to assert a claim that the footnote disclosure was inadequate or a claim based on Markel's list.

The plaintiffs respond in several ways. First, they note that their motion to amend was accompanied by Gibbs's preliminary report dated January of 1992, in which he opined: "Further the actual nature of the matters was clearly revealed in the discovery documents furnished to the bankers but was not fully disclosed in the financial statements, or elsewhere, as required by paragraph 5(d) of the Purchase Agreement." (DX–Acct 10, p. 25). Second, during the discovery permitted on "the nature" of the $43.4 million figure, the plaintiffs say they learned that Hall considered the items on his "Extraordinary Item" list to be "non-recurring" and that KII considered the $43.4 million figure to be a subset of Hall's list of non-recurring items. Consequently, the plaintiffs' experts considered this new evidence in their updated reports.

At ¶ 38J(7) of their amended complaint, the plaintiffs allege in relevant part:

(a) As part of its deliberate policy of understating net assets and earnings, Koch Industries utilized a practice of not disclosing fully its infrequently occurring losses, the disclosure of which "might [have] materially affect[ed] the valuation of the stock

84. In that order, the court observed the following before allowing the amendment:

The plaintiffs here allege that KII had a policy of not disclosing fully its infrequently occurring losses. This allegation is grounded on a comparison of figures. The first set of sums comes from a footnote to the 1982 financial statement regarding the impairment of non-producing properties and the depreciation, depletion and amortization of productive facilities. The other set of totals are contained on KII documents given to its investment bankers under the category of "Extraordinary Items." The plaintiffs allege the discrepancy between the two sets of figures indicates that KII failed to disclose its infrequently occurring losses to the selling shareholders in violation of GAAP.

The defendants argue this proposed amendment is unsupported by any evidence. The defendants submit the affidavit of Milton Hall, a vice president of KII, to show that the second

set of figures includes additional sums unrelated to property, plant and equipment. He also concludes that these additional sums are not "unusual" or "infrequently occurring" as those terms are used in GAAP.

Though this claim seems to be based mostly on semantics, "extraordinary" in the context of a disclosure to an investment banker and "infrequently occurring" in the context of GAAP, the court will grant the plaintiffs leave to add this claim on the condition again that discovery is limited to determining the nature and extent of the two sets of figures referenced in their allegations.

(Dk. 505, pp. 23–24). The quoted portion of this prior order reflects the court understood the plaintiffs' proposed claim was concerned principally with the difference between the $43.4 million disclosure in the footnote to the financial statement and the $66 million figure found on Hall's list of "Extraordinary Items" found in Lehman Brothers' possession.

of [Koch Industries] by a prudent and knowledgeable investor." *Thus, in a disclosure to its banker, Lehman Brothers, under the heading "Extraordinary Items," Koch Industries revealed specifically listed expenses which were not similarly disclosed in the Financial Statements or to the plaintiffs.*

(Dk. 522, p. 26) (italics added). The italicized language can be reasonably construed to allege that the footnote did not disclose specific expenses as had been done on Hall's list of "Extraordinary Items." Such a reading is plainly consistent with Gibbs's January 1992 report. The court is satisfied that the plaintiffs' third amended complaint provides fair notice of an allegation that the footnote in the financial statements fails to disclose the actual nature of the expenses included in the $43.4 million figure. Moreover, the court believes the allegations at 138J(7) adequately encompass a claim that the defendants failed to disclose all non-recurring expenses, including those expenses found only on Markel's list.

### 2) Arguments

The defendants observe that Hall's list of "Extraordinary" items only included $23 million more "expense items" than were included in the $43.4 million footnote calculation found on the 1982 financial statement. Because this $23 million figure is $8 million less than the $31 million of "income items" found on Hall's list, the defendants argue the disclosure of the additional "extraordinary" expense items offset by the additional "extraordinary" income items would have the net result of actually depressing the calculated value of KII's stock. The defendants deny any impropriety or violation of GAAP because the footnote did not contain the additional items from Hall's list. The footnote addressed only "property, plant and equipment," while Hall's list covered losses and gains on other assets.

As for whether any of the items included in the footnote or found on Hall's list required separate disclosure in the 1982 financial statements, the defendants maintain that none of these items are "unusual" or "infrequently occurring" as those terms are defined by GAAP. The defendants argue that

Hall's deposition testimony about the listed expenses being "non-recurring" can only be construed in the colloquial sense of "unusual" and "infrequently occurring" and not in the accounting sense of those terms. The defendants observe that the plaintiffs' experts do not opine that any of the expenses are "unusual" and even admit that several expenses would not be considered "infrequently occurring" but for Hall's supposed characterization of them. The defendants expose Gibbs's reasoning as untenable that a write-down expense is "infrequent" because, if abandoned, the property cannot be abandoned again. The defendants likewise attack Gibbs's reasoning that inventory revaluations to market are infrequent even though APB No. 30 lists this as an example of a non-extraordinary item. The defendants point out that the plaintiffs' other expert, May, not unlike Gibbs, admitted he was not relying on GAAP definitions but principally on the fact that the items appeared on Hall's list.

The defendants argue that from the Board meetings the plaintiffs learned what items comprised the footnote and even discussed some of the additional items found on Hall's list. As for the items found on Markel's list but not Hall's list, the defendants note that the additional items were more dry hole expenses which are recurring and also inventory adjustments which are recurring and have no impact on KII's earnings. Finally, the defendants attack the plaintiffs' claim that footnote six does not disclose the non-recurring nature of those expense but instead misleads a reader into believing the expense is simply recurring depreciation. Because the same footnote shows that 1982 write-downs were nearly twice as much as the 1981 writedowns, the defendants say the plaintiffs cannot argue they believed the 1982 level of writedowns occurred every year. Based on the plaintiffs' pleadings, the defendants also dispute any allegation that plaintiffs did not understand that the footnote disclosed an impairment allowance which was over and above any recurring depreciation expense.

The plaintiffs maintain summary judgment is precluded by Hall's and Markel's "secret" lists of non-recurring items and by Hall's later admissions during his supplemental de-

position. As KII's most senior and chief internal accountant, Hall was most familiar with the details of these financial statements. The plaintiffs emphasize that Hall admitted not only that the items on his list of "Extraordinary Items" were non-recurring, but he also admitted that the items comprising footnote six of the 1982 financial statements were also non-recurring.

The plaintiffs argue the footnote fails GAAP disclosure standards and misrepresents the non-recurring nature of these items by burying them under the category of "depreciation, depletion and amortization." The plaintiffs say the GAAP warranty cannot be circumvented by oral disclosures during the Board meetings. As for what was disclosed at the meetings, the plaintiffs argue the facts are controverted over which items were disclosed and whether the proper amounts were ever disclosed. Moreover, the plaintiffs deny that Charles Koch ever described these expenses as non-recurring in nature.

3) *Analysis*

 The defendants' arguments and evidence simply are not of such weight and quality that the court can rule out the likelihood of a reasonable jury finding that all or most of the items totalled in the footnote, found on Hall's list and found on Markel's list were non-recurring in nature and required separate disclosure under GAAP. Despite the defendants' attempts, the court simply cannot dismiss Hall's testimony as colloquial verbiage rather than an accountant's use of his own profession's vernacular.

Milton Hall was the defendants' chief accountant and senior CPA in 1982. He submitted an affidavit in support of the defendants' opposition to the plaintiffs' motion to add these accounting claims. In that affidavit, Hall specifically referenced the GAAP terminology and definitions for "unusual" and "infrequency of occurrence." (DX–Acct 12, 1 5). After the court allowed the plaintiffs to add these claims, Hall's supplemental deposition was taken. The fair inference is that Hall must have known that his deposition would concern his list of "Extraordinary Items" and his classification of those items as an accountant for KII.

During his deposition, Hall testified as follows:

Q. We've discussed the items under your label, extraordinary expense. Why did you call those extraordinary expenses for 1982?

A. Well, that was probably a poor choice of words but it's just a name that I put on them. There are no rules involved in this statement. This is simply a personal schedule that I made out for my personal use and extraordinary expense is the label that I chose to put on them.

Q. I take it you are saying that strictly speaking they are not extraordinary items under GAAP?

A. That's correct.

Q. That much having been said, why did you choose to call them extraordinary expenses for this purpose?

A. I have no idea. They are something I wanted to remind myself of in the future.

Q. Did you regard them as non-recurring or infrequently occurring items?

A. Yes.

Q. Did you regard them as unusual items?

A. Yes.

(PX 401, p. 40). The defendants argue Hall was referring to the common sense or colloquial meanings of "infrequently occurring" and "unusual" rather than their meanings under GAAP. They say this construction is sustained by its consistency with Hall's earlier affidavit and his other deposition testimony. To accept this construction, the court must ignore Hall's profession, his knowledge that these terms have special meaning under GAAP, his willingness to answer the questions without clarification, and his apparent understanding of the need for a supplemental deposition. During Hall's deposition, the defendants did not object to the above questions, did not ask for the questions to be clarified, and did not cross-examine Hall about these matters so as to limit or correct his testimony. Considering all of these circumstances, the court believes a jury reason-

ably could construe the above testimony as Hall's use of GAAP terminology.

Hall's testimony, by itself, creates a genuine issue of material fact as to the non-recurring nature of items totalled in the footnote,[85] the items included in his list of "Extraordinary Items," and the items included on Markel's list.[86] Despite the defendants' attacks on Gibbs's opinion about the non-recurring nature of the items found on Hall's list, Gibbs' reliance on Hall's apparent characterization of those items cannot be dismissed as unreasonable or improper. The defendants' own accounting expert readily agreed "that the people who know best whether an item is unusual in nature or infrequent in its occurrence are the people in the company who face those items." (PX 403, pp. 90–91). As the senior accountant for KII, Hall's opinion ostensibly would be the last word among company officials on the accounting treatment of the different transactions. Whatever can be argued about Gibbs's other reasons for treating the items as non-recurring does not matter, Gibbs's reliance on Hall's list and Hall's testimony is enough to sustain his opinion on this matter.

The only other issue requiring further discussion is whether the disclosure in footnote six satisfies GAAP. If the event or transaction occurs infrequently, then GAAP requires reporting it "as a separate component of income from continuing operations" along with a disclosure of its "nature and financial effect." (ABP Opinion No. 30, ¶ 26; DX–Acct 5, p. 326). The evidence is far from clear that the defendants' accounting treatment, description, and characterization of the impairments as additional depreciation qualifies as the reporting of a separate component of income from continuing operations. Gibbs opines for the plaintiffs that the footnote fails to disclose its inclusion of the infrequent write-down of fixed assets as "productive facilities." The court is satisfied that genuine issues of material fact remain as to the footnote's compliance with GAAP. The court denies the defendants' motion for summary judgment on this accounting claim.

## B. Capitalization Versus Expensing of Certain Refinery Expenditures

### 1) *Claim*

For this claim, the plaintiffs propose that the pretrial order read: "KII improperly expensed items of a capital nature at the Pine Bend Refinery. This practice overstated KII's expenses, and understated its income and assets." (DX–Acct 15).

### 2) *Arguments*

The defendants premise their motion on several general propositions. First, while accounting literature does not set guidelines for determining whether costs should be expensed or capitalized, the literature does recognize that renewals and betterments should be capitalized. This characterization of a cost item is a judgment call over which accountants may differ. Second, the defendants argue their characterization is the result of a series of professional judgments by both engineers and accountants which are then reviewed by auditors. At KII, the engineers initially determine whether a cost should be capitalized or expensed, and their determination is reviewed by the plant manager and eventually a KII accountant. During the audit process, accountants with Peat Marwick review the larger expense items and the supporting AFEs. Third, the defendants argue that the plaintiffs' characterization is little more than the interpretation of AFEs by an accountant without a working knowledge of the technical refinery process. The defendants insist the narrative description of the projects found on the various AFEs are written in such technical terms that they cannot be properly evaluated without understanding those terms. Fourth, the defendants argue that Gibbs assumed things or read in terms so as to interpret the differ-

---

**85.** Hall testified in his deposition that for an item to be included in the footnote it must have been "non-recurring." (PX 401, p. 18).

**86.** Because Hall's list included dry hole expenses, Hall's testimony concerning the items on his list would support the non-recurring nature of dry hole expenses found on Markel's list. Similarly, because Hall's list included drilling pipe, an item characterized by Gibbs as inventory, Hall's testimony concerning the items on his list would support the non-recurring nature of inventory adjustments found on Markel's list.

ent AFEs consistent with his opinion on capitalization. Finally, the defendants argue that Gibbs's proposed adjustment of $1.9 million for capitalized expenditures is about 1/3 of 1% of KII's 1982 pre-tax income and that is "a clearly immaterial amount." (Tr. 581, p. 120).

The plaintiffs point to KII's 1982 financial statements which explicitly represent that "[r]enewals and betterments are capitalized." (DX–Acct 1, A002117). Citing APB Opinion No. 20, ¶ 17,[87] the plaintiffs argue the defendants were required to follow this policy until a new one was disclosed. The plaintiffs deny that an accountant needs engineering expertise to evaluate the AFEs. Finally, the plaintiffs refer to the IRS's review of the 1981 and 1982 AFEs and its holding that KRC had expensed items which were capital expenditures.

### 3) *Analysis*

The court finds that the plaintiffs have not presented the evidence from which a jury reasonably could find a violation of GAAP. The plaintiffs limit their allegations of a GAAP violation to an untenable reading of APB Opinion No. 20, ¶ 17. The plaintiffs do not present any authority for their position that a company's occasional non-compliance with its own stated accounting principles constitutes a "change" in their accounting principles. Moreover, the cited portion of APB Opinion No. 20 does not appear to say anything about a company's compliance with its current accounting principles. As far as interpreting and applying APB Opinion No. 20, the plaintiffs offer no opinion from their expert witness that the defendants violated GAAP by treating certain expenditures as expenses just because another accountant, like himself, believes the same expenditures are capital items.

Whether an expenditure is a renewal or betterment requiring capitalization is an exercise in judgment over which accountants considering the same facts can disagree.[88] KII spends millions of dollars annually to maintain and improve Pine Bend refinery. In 1982 alone, excluding turnaround, KII spent $45.28 million and categorized the expenditures as $19.08 million for repairs and $26.2 million for capital improvements. Gibbs opines for the plaintiffs that KRC should have capitalized $2.2 million more of these expenditures. Failure to capitalize less than the five percent of the total expenditures for Pine Bend, less turnaround, hardly constitutes a change in accounting principles.[89]

At page eleven of his report, Gibbs lists those KRC expense AFEs over $50,000 for Pine Bend Refinery that he believes should have been capitalized. (PX 430, Ex. A). Beside each AFE, Gibbs gives a brief reason for his listing of it. Both sides attach examples from the listed AFEs. The defendants cite

---

87. This paragraph of APB No. 20 provides:
 "17. The nature of and justification for a change in accounting principle and its effect on income should be disclosed in the financial statements of the period in which the change is made. The justification for the change should explain clearly why the newly adopted accounting principle is preferable."
 Though cited by the plaintiffs for this proposition, this quoted paragraph does not speak to compliance with an existing accounting principle. It only mandates what must be done when an accounting principle is changed. The plaintiffs apparently presume that KII changed its accounting principle because, in the plaintiffs' opinion, the defendants did not comply with it as evidenced by the expenditures they challenge from the AFEs. As far as the court can tell, this is the only GAAP violation—an undisclosed change in accounting principle—that the plaintiffs are presently alleging under this specific claim. The plaintiffs do not cite any other standard or offer other evidence of GAAP requirements.

88. The courts have recognized that GAAP itself has discretionary play:

 "Accountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. 'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."
 *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 315 (5th Cir.1988) (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544, 99 S.Ct. 773, 787, 58 L.Ed.2d 785 (1979)).

89. Indeed, it seems a fair statement that the relative size of the alleged non-capitalized items seems much more consistent with a likely difference of opinion between accountants over the characterization of expenditures than it seems any deliberate attempt to understate income by overstating expenses.

excerpts from Gibbs's deposition where he reveals some of his thinking behind the conclusions found in his report. After reviewing these matters, the court draws several conclusions which it believes a reasonable jury would be compelled to draw from the evidence. Gibbs's opinion about the capitalization of these expenditures is based principally on his review and interpretation [90] of the AFEs and the AFEs status report. In many instances, the narratives on the AFEs describe the work in technical terms. The record does not demonstrate that Gibbs has the background or knowledge to interpret and understand the full extent and particular nature of the work done simply from interpreting the technical narratives on the Pine Bend Refinery AFEs.[91] For example, the court does not consider Gibbs qualified to opine that work separately expensed is actually part of the work done in installing a capital asset. Under such circumstances, the court deems it unreasonable to allow such a claim to go forward based on nothing more than substituting one accountant's interpretations, some of which are questionable, of written AFEs for a series of judgment calls made by refinery engineers and plant managers, who were responsible for the actual expenditures, and by company accountants and outside auditors.[92]

Finally, the court agrees with the defendants that the claimed amount of non-capitalized expenditures is immaterial. Accepting Gibbs's 1982 figures for purposes of this issue only, his adjustment under this claim amounts to only 1/3 of 1% of KII's 1982 pre-tax income.[93] Accountants differ over whether an expenditure is a capital item or an expense, for these are judgment calls.[94] Neither the amount of the plaintiffs' claim nor its nature reach the materiality threshold.[95]

90. *See* Accounting Statement of Facts ¶¶ 27 and 28.

91. For that matter, the record is also silent as to the experience and qualifications of Tommy Woods whom Gibbs apparently consulted on these AFEs. The court only knows that Woods works for Muse Stancil and that he is a petroleum engineer and not a chemical engineer. There is nothing of record to show that he would be considered an expert in the field of refinery operations. In addition, Gibbs could not recall much detail from his conference with Woods and did not keep any notes from it. In sum, the court is unable to find that Gibbs consulted a person who is knowledgeable of refinery operations.

92. The court is not saying that an accountant with Gibbs's qualifications, as evidenced by the record, may not give an opinion concerning some of the AFEs simply from reading their narratives. Rather, the court is saying that Gibbs's opinion is not enough here under all the circumstances, including Gibbs's apparent lack of technical knowledge of the refineries, Gibbs's emphasis on isolated terms in AFE narratives, Gibbs's failure to verify the accounting treatment of the AFEs, Gibbs's improper assumptions on several of the AFEs, the relatively small percentage of expenditures that Gibbs's challenges, and the series of judgments by engineers and accountants underlying the defendants' categorization of the cost.

93. Even May, the plaintiffs' expert witness, agreed this amount alone would be clearly immaterial to an auditor.

94. The court is mindful that an accountant's judgment calls are influenced by the conservatism inherent in financial accounting. "[F]inancial accounting has as its foundation the principle of conservatism, with its corollary that 'possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets.'" *Thor Power Tool*, 439 U.S. at 542, 99 S.Ct. at 786.

95. The plaintiffs argue for materiality thresholds (1) that aggregate all accounting errors, (2) that start at $1 million, (3) that permit them to assume the same errors occurred throughout KII's other subsidiaries, and (4) that treats all errors as material upon evidence that the defendants deliberately attempted to understate KII's income and assets. While these proposed materiality thresholds do have some basis in fact and argument, they are not definitive standards with general application. Rather, each remains a possible approach whose applicability ultimately will depend on the relevant circumstances of the respective claims. For example, on this claim of improperly expensing capital items at Pine Bend, the applicability of proposed thresholds (1), (3), or (4) would depend on some proof that the errors were not just the mistaken judgments of the lower-level engineers and accountants initially responsible for the contested characterizations of expenditures. The plaintiffs do not offer any such proof. Indeed, these sweeping thresholds appear to have no applicability considering that less than five percent of the total expenditures for Pine Bend, less turnaround, were allegedly not capitalized. As for the proposed $1 million threshold, its applicability is undermined by the fact that Gibbs's 1982 figures are the result of at

The court sustains the defendants' motion for summary judgment on this claim.

## C. capitalization Versus Expensing of Interest on Construction Projects

### 1) Claim

In their proposed pretrial order, the plaintiffs allege the following with respect to this claim: "KII failed to capitalize interest costs on construction projects. This practice, too, overstated KII's expenses, and understated its income and assets." (DX–Acct 15, p. 12).

### 2) Arguments

The defendants couch their first argument on materiality. The Statement of Financial Accounting Standards ("SFAS") No. 34 issued by the FASB and later amended in SFAS No. 42 contains an overriding materiality standard that is relevant here:

> 8. In concept, interest cost is capitalizable for all assets that require a period of time to get them ready for their intended use (an "acquisition period"). However, in many cases, the benefit in terms of information about enterprise resources and earnings may not justify the additional accounting and administrative cost involved in providing the information. Accordingly, interest shall not be capitalized in the situations described in paragraph 10.

(DX–Acct 67). The materiality standard takes into consideration the "disproportionate amount of time" that can be required to track the construction projects to determine which ones are qualified, to determine the appropriate interest rates, and to apply the rates to the money spent before the asset is used. (Dk. 581, p. 121). The uncontroverted facts show that both KII and Peat Marwick had concluded the materiality standard did not require the capitalizing of interest for either 1981 or 1982. The defendants challenge Gibbs' methods of calculating higher interest totals as flawed. Finally, the defendants say the plaintiffs knew KII was not

capitalizing interest based on a footnote in the 1982 financial statements.

The plaintiffs contend that Gibbs's interest calculations, reduced by one-half for taxes, still clear the materiality thresholds earlier argued. The plaintiffs reject as irrelevant under GAAP the argument that capitalizing the interest would have required a disproportionate amount of time. The plaintiffs consider any disagreement over Gibbs's calculations to be a fact question. As for the footnote in the financial statements, the plaintiffs say it does not inform them that the defendants were ignoring GAAP. Moreover, the footnote does not disclose how much interest should have been capitalized and does not adjust KII's income to account for this practice. The plaintiffs emphasize that Charles Koch in 1981 made this very adjustment when comparing KII's income with Kerr McGee's.

### 3) Analysis

 In October of 1979, the FASB issued SFAS No. 34 entitled "Capitalization of Interest Cost." The theory behind the capitalization of interest cost is that the historical cost of acquiring an asset includes all costs incurred in bringing the asset to the condition and location of its intended use. To qualify for interest capitalization, an asset must be one that requires a period of time to prepare it for its intended use, as in an asset that is constructed or otherwise produced for an enterprise's own use.

As originally adopted, SFAS No. 34 had what some perceived to be its own materiality standard. In response to this, the FASB later issued SFAS No. 42 deleting the language that arguably created a separate materiality standard. (DX–Acct 67). The FASB attached several paragraphs to Appendix A of SFAS No. 42 to explain and serve as a basis for its conclusions. Appendix A states in relevant part:

> 8. The usual tests of materiality for accounting changes are set forth in APB

least seventeen different AFEs apparently originated and submitted by several different engineers over the entire year of 1982. Such a low threshold utterly ignores the number of individual decisions, the nature of those decisions, and

the total monetary impact of those decisions. For these reasons, the court believes the plaintiffs have failed to establish the applicability of their proposed materiality thresholds under the circumstances of this claim.

Opinion No. 20, *Accounting Changes.* Paragraph 38 of Opinion 20 requires disclosure of an accounting change that has a material effect on income before extraordinary items or net income of the current period. In addition, paragraph 38 requires disclosure of an accounting change that has a material effect on the enterprise's trend of earnings.

. . . .

10. . . . Minimum threshold levels are common in inventory and property, plant, and equipment accounting. Many enterprises do not include the costs of minor items in inventory, and many enterprises do not capitalize individual items of property, plant, and equipment, the costs of which are less than a specified threshold. Such thresholds are designed to minimize the burden of capitalizing large numbers of assets and accounting for those costs as the assets are used. Those thresholds are justified on the grounds that the assets whose costs are charged to expense as purchased are immaterial both individually and in the aggregate. This Statement affirms the usual tests of materiality and does not affect threshold levels established in conformity with usual materiality tests. (DX–Acct 67, pp. 449–50). Plainly, the FASB affirmed in SFAS No. 34 the importance of the materiality standard in this area and the validity of threshold levels, because the burden of capitalizing interest and accounting for it underpins the need and importance of the materiality standard.

It is uncontroverted that both KII and Peat Marwick considered the interest for capitalization in 1981 and 1982 to be immaterial. The plaintiffs do not offer any evidence or testimony specific to this issue. In his report, Gibbs avoids giving an opinion on the materiality of the interest he calculates should have been capitalized. Instead, Gibbs assumes materiality because Charles Koch adjusted KII's 1981 balance sheet for this interest when comparing it to the balance sheet of Kerr McGee which had capitalized its interest. Charles Koch's interest adjustment in the context of comparing the balance sheets of two corporations does not necessarily establish materiality in the different context of a disclosure required under GAAP or even in the context of a reasonable investor evaluating KII's value. The court shall not assume a shared materiality standard when the contexts suggest different purposes for considering the capitalization of interest. Gibbs also assumes in his report that "[i]f KII's capex [capital expenditures] in 1981 and 1982 were comparable to Kerr–McGee's, 100% of KII's interest costs should have been capitalized under FASB No. 34." (PX 430, Ex. A, p. 13). Gibbs's report does not provide the required factual predicates for such an assumption.

To prove a violation of GAAP here, the plaintiffs must show that KII did not choose or apply "a procedure from the universe of generally accepted accounting principles" for calculating the interest to be capitalized and for determining whether that interest was material. *See Godchaux v. Conveying Techniques, Inc.,* 846 F.2d 306, 315 (5th Cir.1988). The plaintiffs offer no evidence on which a reasonable jury could find for them on this element of their burden of proof. What the plaintiffs proposed up-front as their quantitative and qualitative thresholds for materiality does not create a genuine issue concerning the acceptability of KII's accounting methods for calculating and determining materiality in the particular context of interest capitalization. The plaintiffs only propose different materiality thresholds; they do not rule out the defendants' procedures as unacceptable choices of thresholds under GAAP.

Gibbs does aver for the plaintiffs that KII's method for calculating the amount of interest to be capitalized is "flawed." (PX 430, ¶ 15). From what is of record, Gibbs's affidavit and expected testimony is not enough to prove that KII's methodology violated GAAP. Gibbs only offers what he believes are more accurate methods of calculation. He does not opine that KII's methods are outside the universe of acceptable accounting procedures. Even assuming KII's method of calculation is unacceptable, Gibbs's calculated amounts are still less than three percent of KII's 1982 pre-tax income. The plaintiffs come forth with no proof that the decision to treat as immaterial capitalizable interest totalling less than three percent of

annual pre-tax income would be unacceptable under GAAP.

■ As to the warranty on material disclosures, the plaintiffs had actual knowledge that KII was not capitalizing interest in 1982. The 1982 financial statement disclosed that "[n]o interest associated with a specific borrowing was capitalized in 1982." The plaintiffs also knew that KII had made large capital expenditures in 1982. The plaintiffs knew that earnings would increase if the $16.8 million in interest for 1982 were capitalized rather than expensed.[96] An accounting consultant to William Koch told him as much in 1980. Having actual knowledge of the material facts, the plaintiffs are unable to prove a violation of this warranty. The defendants are entitled to summary judgment on this accounting claim.

## D. Accounting for the Loss on Blue Hill

### 1) Claim

In their proposed pretrial order, the plaintiffs allege the following with respect to this claim:

> (d) KII recorded an unsubstantiated loss on the sale of the Blue Hill property to George Ablah. Thus, by recording a fictitious "loss" on the portion of ABKO property taken by Mr. Ablah, KII added a second deception to its misstatement of the value of the portion of ABKO retained by KII. . . .

(DX–Acct 15). In his report of November 1992, Gibbs opined that this was a "non-monetary" transaction under GAAP which required KII to have used at least recorded book value for purposes of the transaction and that GAAP also required a disclosure of its "non-monetary" nature. Based on their brief, the plaintiffs now appear to have abandoned the theory that this was a non-monetary transaction. The plaintiffs, however, still claim that KII should have used Blue Hill's book value because it did not have good evidence of fair value as to justify departing from book value.

### 2) Arguments

The defendants argue there is no factual basis for alleging that the fair market value of Blue Hill could not be determined within reasonable limits. It is for the accountant and auditor to evaluate the writedown of an asset, like Blue Hill, as a matter of their professional judgment based on the circumstances known by them at the time. According to the defendants, the relevant circumstances were that ABKO had acquired Blue Hill just two years earlier for $25 million, that Sterling Drug had indicated to ABKO its opinion that Blue Hill was worth no more than $25 million, and that both Ablah and KII had agreed on a $25.5 million value for the buy out. The defendants point out that all of the plaintiffs' evidence of a higher value comes from events sometime after the Blue Hill loss was recorded. The defendants note that the plaintiffs knew of this loss through the Executive Committee report distributed in November of 1982. Finally, the defendants dispute the materiality of this alleged loss.

The plaintiffs say ABKO's original valuation of Blue Hill was only for accounting purposes. The plaintiffs say the defendants rejected Sterling Drug's offer of $25 million for Blue Hill and were asking between $60 and $65 million. The plaintiffs reject the valuation used in the Ablah buy-out as a "collusive" one. As for learning about the loss from the Executive Committee Report, the plaintiffs say this is no defense to a GAAP violation.

Specifically, the plaintiffs say that regardless of whether the transaction is characterized as monetary or non-monetary GAAP required KII to state Blue Hill at its book value and, thus, to record no loss. Citing APB Opinion No. 29, ¶ 18, Gibbs has averred: "For accounting reporting purposes under GAAP, however, it does not matter whether the transaction was monetary or non-monetary, because either way the assets should be valued at fair market value, or book value if

---

**96.** Even though the actual amount to be capitalized may be less than the $16.8 million, the plaintiffs here cannot state a viable claim on the basis that the actual adjusted earnings would be less than what they could have calculated.

fair market value cannot be determined." (PX 430, ¶ 20).

### 3) *Analysis*

■■■ The court rejects Gibbs's reading of APB Opinion No. 29, ¶ 18. The title of that Opinion is "Accounting for Nonmonetary Transactions." The opening sentence of ¶ 18 states: "The Board concludes that in general accounting for nonmonetary transactions should be based on the fair values of the assets (or services) involved which is the same basis as that used in monetary transactions." The sum of ¶ 18 discusses using fair value. Contrary to Gibbs' citation, ¶ 18 says nothing about using book value in monetary transactions when fair value is not determinable within reasonable limits. Indeed, ¶ 18 does not address any circumstances when fair value is not determinable. Consequently, the plaintiffs offer no proof of a GAAP standard requiring KII's accountants to use other than their best estimate of Blue Hill's fair market value.

The plaintiffs say the defendants' evidence is weak on the indicia of Blue Hill's fair market value from which the defendants calculated and recorded the loss on Blue Hill. The plaintiffs do not submit expert witness testimony to support this conclusory allegation. Nowhere in his attached expert report does Gibbs directly opine that the circumstances existing at the time the loss was recorded were insufficient for determining fair market value within reasonable limits.[97] Moreover, Gibbs does not opine that the circumstances on which the KII accountants based their estimate were unreasonable or

unacceptable under GAAP or that GAAP required an independent appraisal in this situation. Short of some proof that GAAP would require more in estimating fair market value, the plaintiffs' general attacks on the different indicia of value used by the defendants do not create a genuine issue of material fact.

■■■ Concerning the warranty on material disclosures, the defendants disclosed through the Executive Committee Report that they had valued Blue Hill at $25.5 million and that the transaction resulted in "a $6.7 million writedown of the Blue Hill office project." For purposes of this claim, the plaintiffs had actual knowledge of these material facts known to the defendants at the time of the SPA. Such knowledge defeats the plaintiffs' ¶ 5(d) warranty claim. The defendants are entitled to summary judgment on this accounting claim.

### E. Accounting for Refinery Turnaround Expenses

#### 1) *Claim*

In their proposed pretrial order, the plaintiffs allege the following with respect to this claim:

> (e) KII failed to disclose a change in accounting policy for the anticipated refinery turnaround expenses at Pine Bend. Thus, by shifting expenditures into the turnaround accrual account, KII was able to accelerate the time when it charged an expense and reduced the refinery's reported income. KII also accrued amounts that greatly exceeded the actual expenditures for the turnaround, which amounts were

---

**97.** On this point, Gibbs's report states:

"This valuation was not substantiated, for example, by independent appraisals of Blue Hill. Instead, it was an amount agreed-upon by the parties, both of whom had incentives to understate the amount. . . ."

"GAAP states 'If neither the fair value of a nonmonetary asset transferred nor the fair value of a nonmonetary asset received in exchange is determinable within reasonable limits, the recorded amount of the nonmonetary asset transferred from the enterprise may be the only available measure of the transaction.' (APB 29, para. 26). Accordingly, because of the apparent doubt as to the fair value of Blue Hill, no loss should have been recorded on this transaction in the KII financial statements."

(PX 430, Ex. A, p. 16). The operative language from the cited GAAP standard is whether the fair value of the asset is "determinable within reasonable limits." Noticeably absent from Gibbs's report is any statement that the fair value of Blue Hill was not determinable within reasonable limits. Gibbs observes that the value used was one that the parties agreed upon and that the value was not substantiated by independent appraisals. Neither observation equates with being not "determinable within reasonable limits." As for Gibbs's conclusion that there was "apparent doubt as to the fair value of Blue Hill," his report offers no factual basis for this conclusion.

reversed after the Stock Purchase and Sale Agreement in June 1983.

(DX–Acct 15). This claim ostensibly breaks down into two separate allegations: (1) failure to disclose a change in accounting policy; and (2) excessive accruals later reversed after the SPA. In their memorandum opposing summary judgment, the plaintiffs say they have two claims regarding Koch's turnaround accounting practices:

First, Koch did not clearly disclose its unusual turnaround policy.

. . . .

Second, Koch changed its turnaround accounting policy to reduce its 1982 reported income even further by (1) reclassifying certain future ordinary expenditures as turnaround expenditures, so they would be charged against earnings in advance rather than when they were actually incurred; and (2) increasing accruals for projects already classified as turnaround projects.

(Dk. 597, pp. 129–30). The court understands the plaintiffs to have abandoned their claim on excessive accruals in favor of a claim that these overaccruals are only circumstantial evidence of a change in accounting policy.

### 2) *Arguments*

The defendants say that footnote (1)(f) to KII's 1982 financial statements, when read in its entirety, means that "current charges to expense" are made in preparation of refinery turnarounds. The defendants insist this adequately discloses the turnaround accounting policy. Moreover, it is uncontroverted that the plaintiffs' financial investment bankers understood the turnaround accounting policy as revealed in their notes from meetings with KII officials. The defendants argue the plaintiffs are without any credible evidence to show an accounting policy change. The defendants say the plaintiffs have no evidence that anyone at KII knew it had overaccrued turnaround expenses as of the financial state-

ments of December 31, 1982, and of April 30, 1983, or at anytime prior to the actual turnaround.

The plaintiffs take issue with the footnote in the 1982 financial statements as not plainly disclosing KII's turnaround accounting policy. The plaintiffs insist they have enough circumstantial evidence from which a jury could find that KII changed its accounting policy as to require disclosure under GAAP.

### 3) *Analysis*

The plaintiffs do not mention any GAAP requirements with respect to their claim concerning disclosure of the turnaround accounting policy. Gibbs's report concludes that KII did not clearly disclose this accounting method and that this violates the ¶ 5(d) warranty on material disclosures. Neither Gibbs's report nor the plaintiffs' brief cites any GAAP requirement violated as a result of the alleged failure to disclose the turnaround accounting policy. Thus, the court understands the plaintiffs to have no GAAP warranty claim based on the initial disclosure of this accounting policy.

■■■ As mentioned before, the plaintiffs' knowledge of an alleged undisclosed matter defeats a ¶ 5(d) warranty claim. William Koch avers:

64. Defendants never disclosed, and I did not otherwise know, that the company was accounting for refinery turnaround expenses by charging anticipated future costs to current expense in the years and months in advance of the turnaround. Indeed, the relevant footnote to the financial statements led me to believe that the refinery turnarounds were accounted for by charges to expense in the period when the turnaround occurred.

(PX 8, p. 18). Not surprising, Gibbs reads footnote (1)(f) in the 1982 financial statement in the same way.[98] Whereas, the plaintiffs'

---

**98.** The contested language in footnote (1)(f) is not as oblique as argued by the plaintiffs. The financial statements explain that the "notes ... are an integral part of" the statements. Note (1) identifies "Significant Accounting Policies." Note (1)(f) summarizes the significant accounting policies concerning property, plant, and equipment. The specific paragraph contains three

sentences each obviously intended to address different expenditures and the different treatment of each. The first sentence concerns those costs for which provisions are made by current charges to expense. The second sentence concerns those costs that are charged to expense as incurred. The third sentence concerns those costs that are capitalized. Consequently, the paragraph, read

other expert, May, offers only that "there is a potential for someone not knowledgeable as an accountant to not understand that the company's method was to accrue." (PX 412, p. 172).

The plaintiffs were assisted by many experts, including accountants, in analyzing the 1982 financial statements. Indeed, the plaintiffs' financial advisors' notes from meetings with KII personnel indicate they were told and apparently understood that refinery turnarounds were accrued. One such note plainly reflects that turnarounds were "noncurrent" items on the balance sheet and were treated as an "accrual on the liab[ility] side." (DX–Acct 56, G04122). These notes plainly indicate the plaintiffs' representatives knew that turnarounds were not expensed as incurred but accrued in advance and not capitalized as an asset but handled as a liability. Based on the known role and involvement of the plaintiffs' financial advisors prior to the SPA, the plaintiffs necessarily must be charged with at least the same knowledge of the events, conditions, and state of facts concerning KII and its subsidiaries as that held by their financial advisors. The defendants are entitled to summary judgment on the plaintiffs' ¶ 5(d) warranty claim regarding the disclosure of its accounting policy on turnarounds.

 The plaintiffs' other turnaround accounting claim alleges KII changed its accounting policy by (1) reclassifying future ordinary expenditures as turnaround expenditures and (2) by increasing accruals for projects already classified as turnaround projects. The plaintiffs base this claim on a notation found on a staff time sheet from Peat Marwick, two memoranda written by an engineer at Pine Bend, and the following opinion from Gibbs:

> The turnaround (T/A) accrual account and related expenses were increased in the fall of 1982 and early 1983, and the increases were *not* changes to estimates of planned work for the T/A, but were "known projects not included in past estimates"

(KR507993 and KR507962)—such as those reflected on expense AFE's, previously "charged to the unit" and, therefore, expensed as incurred. Such a change in the composition of the elements of costs included in the turnaround accrual resulting in a change in the timing of when an expense is incurred, to the extent it constituted a **change in the method of applying** the previously established accounting principle for turnaround, should have been disclosed. (Re: FASB current text, A06.105, .108).

(PX 430, Ex. A, p. 19). The plaintiffs also cite APB Opinion No. 20, ¶ 17, which provides in relevant part that "[t]he nature of and justification for a change in accounting principle and its effect on income should be disclosed in the financial statements of the period in which the change is made." (PX 416, p. 514).

The plaintiffs are without evidence, direct or circumstantial, showing that KII materially changed its turnaround accounting policy so as to require under GAAP disclosure in its financial statements. The notation on Peat Marwick's staff time sheet refers to a "change" about which no one knows anything. Jim Carlson, who authored the notation, does not remember what "change" was being referenced in his staff billing sheet. He presumed it was an internal change in KII's processing procedure, for if it were an actual change in accounting policy he "would have insisted that there be disclosure in the financial statements and very probably in the auditor's report as to consistency." (DX–Acct 39, p. 112). Carlson and KII officials testified that they were not aware of any changes in the turnaround accounting policy for purposes of GAAP during this relevant period. Under these circumstances, the court draws no reasonable inference of an undisclosed accounting policy change from simply a vague reference found in an internal billing record of the auditor.

Nor do the two memoranda written by Halepeska evidence a change in accounting

in its entirety, discloses that the costs addressed in the first sentence are handled neither as expenses when incurred nor as expenditures capitalized and amortized. Consequently, the first

sentence fairly tells the reader that KII provides or prepares for refinery turnarounds by making current or ongoing charges to expense.

policy requiring disclosure under GAAP. Neither memorandum shows a change in KII's method of applying the turnaround accounting policy. As explained by Halepeska, his first memorandum requested changes to the turnaround accruals that were either revised estimates of projects already included in the turnaround estimate or increased repairs anticipated as a result of the aggressive crude currently being processed. The attachments to Halepeska's memorandum are consistent with his explanation. Gibbs's opinion that this memorandum shows a new policy of accruing as turnaround certain additional costs that had been expensed as incurred is nothing short of speculation. Gibbs offers no facts to support his assumption that Halepeska's changes actually modified "the composition of the elements of costs included in the turnaround accrual." (PX 430, Ex. A, p. 19). The same can be said about Gibbs's opinion with respect to Halepeska's second memorandum dated June 8, 1983.[99] The memorandum simply asked that certain work that had been recorded on current expense AFEs be corrected and added to the accrual account. Again, Gibbs simply speculates that the corrected amounts changes the "elements of costs included in the accrual account." (PX 430, Ex. A, p. 19). There is no evidence that changes requested by Halepeska and the resulting increases in the turnaround accruals constitute a change in accounting policy or a change in the method of applying that policy. Finally, Halepeska testified there was no change whatsoever in the way that he estimated future turnaround expenses or in the items to be included as turnaround expenses. The plaintiffs offer no evidence controverting this testimony.

The fact that KII's overaccrual for the 1983 turnaround was unusually large, by itself or in combination with the other circumstances, does not create a genuine issue of material fact concerning a change in accounting policy. That the overaccrual was due to an accounting change is not an explanation that is any more likely than that the overaccrual was the result of accounting errors, the

subsequent deferral of a 1983 turnaround project, and other overestimates of cost. The defendants are entitled to summary judgment on this last accounting claim.

## IX. STATUTE OF LIMITATIONS ON CLAIMS AGAINST THE DEFENDANTS CAREY, CORDES AND DAVID KOCH

The defendants argue the three different limitations periods governing the plaintiffs' respective claims all expired before Thomas Carey, Donald Cordes and David Koch were named as defendants in this case on July 28, 1989, when the plaintiffs filed their second amended complaint. The plaintiffs say they first brought claims arising from the SPA against these three individual defendants on August 26, 1987, when they filed *OxbowEnergy, Inc., et al. v. Koch Indus. et al.*, No. 87–2463–S, in Kansas City, Kansas. After Judge Saffels dismissed this action on other than the merits, the plaintiffs filed their motion to amend in the instant case within the six-month period afforded by the savings statute at K.S.A. 60–518. Therefore, according to the plaintiffs, the action against these individual defendants was brought on August 26, 1987. The defendants in their reply brief do not challenge the plaintiffs' position on this commencement date.[100]

The plaintiffs appear to have commenced their warranty claim against David Koch within the five-year limitations period of K.S.A. 60–511(1). The plaintiffs' other claims are governed by two-year statute of limitations: common-law fraud—K.S.A. 60–513(a)(3); breach of fiduciary duty—K.S.A. 60–513(a)(4), *see Resolution Trust Corp. v. Scaletty*, 257 Kan. 348, 353, 891 P.2d 1110 (1995), and *Boyle v. Harries*, 22 Kan.App.2d 686, 695, 923 P.2d 504 (1996); and federal securities fraud—K.S.A. 60–513(a)(3), *see Anixter v. Home–Stake Production Co.*, 977 F.2d 1549, 1551 (10th Cir.1992), *cert. denied*, 507 U.S. 1029, 113 S.Ct. 1841, 1842, 123 L.Ed.2d 467 (1993), and *Seiffer v. Topsy's International, Inc.*, 64 F.R.D. 714, 716

99. The date of the memorandum means that its requested changes did not appear in any financial statement on which the plaintiffs would have relied in valuing their stock.

100. For purposes of this motion, the court will assume this commencement date is correct for all of the plaintiffs' causes of action.

(D.Kan.1974), *appeal dismissed,* 520 F.2d 795 (10th Cir.1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976). With respect to these other actions, the defendants have not shown an absence of a genuine issue of material fact given the controlling law on accrual and tolling. Based on the affidavit of the plaintiffs' counsel, a jury could find that the plaintiffs did not reasonably ascertain their injury caused by and did not discover the fraud associated with the remaining Pine Bend Refinery claims and the one remaining accounting claim until after August 25, 1985. For this reason, the court denies summary judgment on this statute of limitations issue.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk. 580) is granted as to the plaintiffs' claim that as of June of 1983 the defendants planned to increase Pine Bends Refinery's capacity to 175,000 bpd within two years and is denied with respect to the remainder of the plaintiffs' "Pine Bend Refinery" claims as set forth in the plaintiffs' proposed pretrial order;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Dk. 580) is granted as to the plaintiffs' claims concerning "Canadian and U.S. Oil and Gas Properties" as set forth in the plaintiffs' proposed pretrial order;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Dk. 580) is granted as to the plaintiffs' claims concerning "ABKO" as set forth in the plaintiffs' proposed pretrial order;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Dk. 580) is granted as to the plaintiffs' claims concerning the "Accounting Issues" as set forth in the plaintiffs' proposed pretrial order, except for the plaintiffs' accounting claim on infrequently occurring expenses.